RICHARD ARJUN KAUL, MD

NEW YORK

440c SOMERSET DRIVE

PEARL RIVER, NY 10965

201 989 2299

RECEIVED
SDNY PRO SE OFFICE
2018 APR -9  PM 2: 21
S.D. OF N.Y.

# 18CV3131

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD ARJUN KAUL, MD, <br><br> Plaintiff, <br><br> v. <br><br><br> CHRISTOPHER J. CHRISTIE, ESQ (in his individual capacity) ESQ; JAY HOWARD SOLOMON, ESQ (in his individual and official capacity); THE NEW JERSEY BOARD OF MEDICAL EXAMINERS; ANDREW KAUFMAN, MD (in his individual capacity + official capacity), PETER STAATS, MD; GREGORY PRZYBYLSKI, MD (in his individual capacity + official capacity); ALLSTATE NEW JERSEY INSURANCE COMPANY; GEICO; GEICO INDEMNITY; GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY; ROBERT HEARY, MD; MARC COHEN, MD; NORTH JERSEY MEDIA GROUP, INC; LINDY WASHBURN; LEWIS STEIN, ESQ; HACKENSACK UNIVERSITY MEDICAL CENTER; ROBERT GARRETT; ATLANTIC HEALTH SYSTEM; JOHN ROE 1-50, JOHN DOE 1-50, ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50 <br><br> Defendants. | Civil Action <br><br><br> COMPLAINT AND DEMAND FOR JURY TRIAL |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD ARJUN KAUL, MD<br><br>Plaintiff,<br><br>CHRISTOPHER J. CHRISTIE, ESQ, et al.,<br><br>Defendants. | Civil Action<br><br>CERTIFICATION OF PLAINTIFF |

Richard Arjun Kaul, of full age, certifies and says:

I am the Propria Persona Plaintiff

I make this Certification in support of the Plaintiff's Complaint. This Complaint is filed partly on the basis of New Evidence that implicates the Defendants in the offenses of Obstruction of Justice and Evidence Tampering.

K1 refers to Kaul v Christie – Docket No. 16-CV-02364 – District of New Jersey.

K2 refers to Kaul v Christie – Docket No. Pending – Southern District of New York.

Attached as Exhibits 1 – 39 are true and accurate copies of the original documents:

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Dated: April 9, 2018

_____

Richard Arjun Kaul, MD

## TABLE OF CONTENTS

I.    PARTIES.....................................................................................................................v

II.   JURISDICTION AND VENUE.......................................................................................viii

III.  OVERVIEW OF PLAINTIFF'S LEGAL CLAIMS.................................................................1

IV.   PRELIMINARY STATEMENT........................................................................................1

V.    STATEMENT OF FACT................................................................................................4

    A. Defendant Allstate and GEICO have corrupted the New Jersey Superior Court, Union County into using the IFPA (N.J.S.A. 17:33AG  1 et seq.) to violate the Constitutional due process rights of members of the medical community.................................................................................4

    B. Defendants Solomon, Przybylski and Kaufman collectively committed **two hundred and seventy.  eight (278) separate instances of perjury, evidential omission, misrepresentation and gross mischaracterization** in the proceeding in the New Jersey Office of Administrative Law (April 9, 2013 – June 28, 2013)
    + The Defendants committed bribery in quid pro quo schemes with Defendant Christie, in order to have the Plaintiff's medical license revoked.......................................................................5

    C. The Plaintiff has consistently been denied substantive justice in administrative, state and federal courts in New Jersey...............................................................................................6

    D. The Plaintiff's medical license was revoked because of Political Corruption at the New Jersey Board of Medical Examiners, and because the Mechanism of Physician Regulation in New Jersey is illegally Configured.................................................................................................19

    E. The Plaintiff's pioneering work in the field of minimally invasive spine surgery caused professional jealousy amongst his business and professional competitors...................................21

F. The Defendants conspired to eliminate the Plaintiff from the practice of medicine by encouraging patients to file complaints with Defendant New Jersey Board of Medical Examiners.................25

G. The Defendants conspired to engage in media censorship and suppress the Plaintiff's First Amendment Right to Free Speech........................................................................................25

H. The Plaintiff's medical license was revoked because of Political Corruption at the New Jersey Board of Medical Examiners and because the Mechanism of Physician Regulation in New Jersey is illegally Configured............................................................................................26

I. Defendants Allstate + GEICO propagated knowing falsehoods that Kaul had committed insurance fraud.
Defendant TD negligently failed to perform any due diligence before acting on Defendants Allstate and GEICO's patent falsehoods.
Defendants Stolz + DiOrio conspired with Defendants Allstate + GEICO to commit fraud against Kaul + Creditors of the Bankruptcy Estate..........................................................................28

J. Kaul's Qualifications for, and successful outcomes in, Minimally Invasive Spine Surgery.....................31

VI.    CLAIMS FOR RELIEF................................................................................................33

COUNT ONE – VIOLATIONS OF 18 U.S.C. § 1962(C)G (D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against Defendants Christie + Kaufman + Przybylski + Heary + Lomazow + Staats + Hafner + Cohen + CNS..........................33 + ASIPP)

A. Description of the CHC RICO Enterprise.............................................................34

B. The CHC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues..................................................................................................37

C.  Predicate Acts: Mail and Wire Fraud..............................................................40

COUNT TWO – VIOLATIONS OF 18 U.S.C. § 1962(C)G  (D) THE RACKATEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against Defendants Christie + Allstate + GEICO + TD + Stolz + DiOrio + Crist + Solomon + Hafner)...........................................44

D.  Description of the CAD RICO Enterprise......................................................46

E.  The CAD RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.....................................................................................................49

F.  Predicate Acts: Mail and Wire Fraud..............................................................53

COUNT THREE – VIOLATIONS OF 18 U.S.C. § 1962(C)G  (D) THE RACKATEER INFLUENCED AND CORRUPT ACT, 18 U.S.C. § 1961, *ET SEQ* (Against Defendants Christie + HUMC + AHS + Garrett +Hafner + Stein + NJBME) ..............................................................................57

G.  Description of the CAS RICO Enterprise......................................................58

H.  The CAS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.....................................................................................................63

I.  Predicate Acts: Mail and Wire Fraud..............................................................66

COUNT FOUR – VIOLATIONS OF 18 U.S.C. 1962(C)G  (D) THE RACKATEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ (Against Defendants Christie + NJMG +Washburn + HUMC)...................................................................................................69

J. Description of the CHN RICO Enterprise.........................................................70

K. The CHN RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.....................................................................................................74

L. Predicate Acts: Mail and Wire Fraud................................................................76

COUNT FIVE – FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTIONS 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (Against Defendants Kaufman + Staats + Przybylski + CNS + Heary + Lomazow + Cohen + HUMC +AHS).............................................................................................................................83

iii

COUNT SIX – FOR MONOPOLIZATION (Against Defendants Przybylski + Kaufman + Staats + Cohen + Heary + HUMC + AHS)..................................................................................85

COUNT SEVEN – FOR CONSPIRACY TO MONOPOLIZE UNDER STATE LAW (Against Defendants Przybylski + Kaufman + Staats + Lomazow + Cohen + Heary + HUMC + AHS).........................93

COUNT EIGHT – FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (Against Defendants Przybylski + Kaufman + Solomon + Staats + Cohen + Heary + HUMC + AHS) ................................................................................................................101

COUNT NINE – FOR UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Heary + Cohen + HUMC + AHS)..108

COUNT TEN – UNJUST ENRICHMENT (Against Defendants ASIPP + Kaufman + Przybylski + CNS +Heary + Cohen + HUMC + AHS + Stolz + DiOrio)....................................................113

COUNT ELEVEN – DEPRIVATION OF RIGHT UNDER COLOR OF LAW (By Plaintiff against Defendants Kaufman (in his official capacity) + Przybylski (in his official capacity) + Solomon (in his official capacity) + Hafner (in her official capacity) + Allstate + GEICO + NJBME)...............114

COUNT TWELVE – COMMERCIAL DISPARAGEMENT (Against Defendants ASIPP + Kaufman + Przybylski + Allstate + GEICO + Heary + Cohen + HUMC + AHS)................................................112

COUNT THIRTEEN – INTENTIONAL INTERFERENCE WITH PROPSPECTIVE ECONOMIC ADVANTAGE (Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Allstate + GEICO + Heary + Cohen + HUMC + AHS) ..........................................................................113

COUNT FOURTEEN – AID IN THE COMMISSION OF TORT (Against all Defendants)................120


VII.    DEMAND FOR JUDGMENT............................................................................................121

VIII.   JURY FOR DEMAND......................................................................................................123

IX.     DEMAND FOR INSURANCE..........................................................................................123

Plaintiff Richard Arjun Kaul, MD brings this action against Defendants Christopher j. Christie, Esq ("Christie"), Jay Howard Solomon, Esq ("Solomon"), The New Jersey Board of Medical Examiners ("NJBME"), Steven Lomazow, MD ("Lomazow"),  Andrew Kaufman, MD ("Kaufman"), Peter Staats, MD ("Staats"), Marc Cohen, MD ("Cohen"), Robert Heary, MD ("Heary"), Gregory Przybylski, MD ("Przybylski"), Allstate New Jersey Insurance Company ("ANJ"), GEICO ("GEICO"), Hackensack University Medical Center ("HUMC"), Atlantic Health System ("AHS"), Robert Garrett ("Garrett"), North Jersey Media Group, Inc. ("NJMG"), Lindy Washburn ("Washburn"), Lewis Stein, Esq ("Stein"), Doreen Hafner, Esq ("Hafner"), Richard Crist ("Crist"), John DiOrio, Esq ("DiOrio"), Daniel Stolz, Esq ("Stolz"), TD Bank, NA ("TD"), American Society of Interventional Pain Physicians ("ASIPP"), Congress of Neurological Surgeons ("CNS" (collectively, "Defendants") to redress Plaintiff's economic and reputational injuries due to the Defendants' scheme to permanently eliminate Plaintiff from the practice of medicine anywhere in the world. Plaintiff's allegations are based on his own experiences and personal knowledge, his research, publicly available articles, studies, reports and other sources, a reasonable inquiry under the circumstances, and on information and belief. Plaintiff's allegations are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery.

## I.  PARTIES

1.     Plaintiff, **RICHARD ARJUN KAUL, MD,** ("Kaul") is a resident of the State of New York and was formerly a Medical Doctor licensed to practice medicine in the State of New Jersey.

2.     Defendant **CHRISTOPHER J. CHRISTIE, ESQ,** ("Christie") was the Governor of the State of New Jersey from 2010 to 2018. He was the head of the Executive Branch of State Government and exercised control of Defendant **NEW JERSEY BOARD OF MEDICAL EXAMINERS.**

3.     Defendant **JAY HOWARD SOLOMON, ESQ,** ("Solomon") was a New Jersey Administrative Law Judge, who was employed by the State of New Jersey in the Office of Administrative Law (OAL). The OAL, Defendant **NEW JERSEY BOARD OF MEDICAL EXAMINERS** and The New Jersey Office of

the Attorney General are agencies under the sole control of the Executive Branch of State Government.

4.      Defendant **NEW JERSEY BOARD OF MEDICAL EXAMINERS ("NJBME")** ("NJBME") is a state agency whose members are political appointees that serve at the pleasure of the Governor. The New Jersey Office of the Attorney General simultaneously prosecutes cases against physicians, while providing internal counsel to Defendant **NJBME**. The New Jersey Attorney General is appointed by the Governor.

5.      Defendant **STEVEN LOMAZOW, MD,** ("Lomazow") is a neurologist who was a senior member of Defendant **NJBME** from 2008 to 2014, who engaged in healthcare related business with defendants, **HEARY, KAUFMAN, PRZYBYLSKI, ALLSTATE and GEICO.**

6.      Defendant, **LEWIS STEIN, ESQ.** ("Stein") is a New Jersey, Morris County based medical malpractice attorney.

7.      Defendant, **ALLSTATE NEW JERSEY INSURANCE COMPANY** ("ANJ") is the New Jersey subsidiary of Allstate Insurance Company.

8.      Defendants, **GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY, GEICO GENERAL INSURANCE COMPANY** and **GEICO CASUALTY** ("GEICO") are the largest providers of auto insurance in New Jersey.

9.      Defendant, **ATLANTIC HEALTH SYSTEM** ("AHS"), is private healthcare company whose headquarters are in Morristown, New Jersey. It is the parent company for Morristown Memorial Hospital, Overlook Hospital, Chilton Memorial Hospital and Hackettstown Hospital. Its business covers Morris, Sussex and Passaic counties. Defendants, **COHEN, HEARY, LOMAZOW and KAUFMAN** engage in healthcare business with AHS.

10.     Defendant, **HACKENSACK UNIVERSITY MEDICAL CENTER** ("HUMC"), is 900-bed private hospital seven miles west of New York City. Defendant neurosurgeons, **PETERSON and HEARY,** engage in healthcare business with Defendant **HUMC.**

11.     Defendant, **DR. ROBERT HEARY,** ("Heary") is the Director of the Neurological Institute of the New Jersey Spine Center and Neurosurgical Intensive Care Unit located in Newark, New Jersey. The latter is part of defendant Rutgers. The defendant is also an attending at **HUMC** and Overlook Hospital in Summit, New Jersey, which is part of Defendant **ATLANTIC HEALTH SYSTEM.**

12.     Defendant, **DR. GREGORY PRZYBYLSKI,** ("Przybylski") is the director of neurosurgery at the New Jersey Neuroscience Institute at JFK Medical Center located in Edison, Middlesex County, New

Jersey. He was also the 2011 President of the North American Spine Society and is a member of Defendant **CONGRESS OF NEUROLOGICAL SURGEONS.**

13.     Defendant, **DR. PETER STAATS,** ("Staats") was the 2015 President of defendant **AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS** and is the editor of Pain Medicine News.

14.     Defendant, **DR. MARC COHEN,** ("Cohen") is an orthopedic spine surgeon with a medical office at 221 Madison Avenue, Morristown, New Jersey 07960. He is a member of defendant NASS and engages in healthcare business with defendant **ATLANTIC HEALTH SYSTEM.**

15.     Defendant, **DR. ANDREW KAUFMAN,** ("Kaufman") is an individual with a business located at 90 Bergen Street #3400, Newark, New Jersey 07103, and was paid by the State of New Jersey to provide testimony against the Plaintiff. Defendant Kaufman was a market competitor of the Plaintiff, and engaged in healthcare business with Defendants **HEARY, PRZYBYLSKI and HUMC.**

16.     Defendant, **LINDY WASHBURN,** ("Washburn") is an individual located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. Defendant, **NORTH JERSEY MEDIA, INC,** employs her as a journalist.

17.     Defendant, **NORTH JERSEY MEDIA, INC** ("NJMG") is a corporation located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. It publishes The Bergen Record and engages in business with Defendant **HUMC** and **AHS.**

18.     Defendant, **ROBERT GARRETT,** ("Garrett") is an individual located at 30 Prospect Avenue, Hackensack, New Jersey 07601. He is the president of Defendant **HUMC.**

19.     Defendant **CONGRESS OF NEUROLOGICAL SURGEONS** ("CNS") is a professional medical society with a business located at 725 Fifteenth Street, NW, Suite 500, Washington, D.C. 20005. Defendants **HEARY** and **PRZYBYLSKI** are members.

20.     Defendant **AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS** ("ASIPP") is a professional medical society located at 2831 Lone Oak Road, Paducah, Kentucky, 42003. Defendant **STAATS** was the 2015 President and Defendant **KAUFMAN** is senior board member.

21.     Defendant **HAFNER** ("Hafner") is a Deputy Attorney General in the Office of the New Jersey Attorney General.

22.     Defendant **TD BANK, NA,** ("TD") is a Canadian bank, that is publicly traded on the New York Stock Exchange and that purchased Commerce Bank in 2008. Commerce Bank was a privately held New Jersey Bank.

23.     Defendant **DANIEL STOLZ, ESQ**, ("Stolz") is a New Jersey based attorney, who is the Chapter 7 trustee for the Plaintiff's corporations and the NJSR real estate holding. **STOLZ** receives money from Defendant **ALLSTATE** for purported legal services.

24.     Defendant **JOHN DIORIO, ESQ**, ("DiOrio") is a New Jersey based attorney, who represented the Plaintiff in his capacity as the Debtor in the Chapter 7 proceeding, which is ongoing. Defendant DIORIO commenced representing Defendant **GEICO** in approximately late 2015.

25.     Defendant **RICHARD CRIST** ("Crist") was the CEO of Defendant ALLSTATE from 2012 to 2016. Defendant **CRIST** is a major shareholder in Defendant **ALLSTATE**.

26.     Defendant **JAY HOWARD SOLOMON, ESQ** ("Solomon") is an attorney based in Bergen County. Defendant **SOLOMON** acted as the administrative law judge in the administrative proceedings that caused the illegal revocation of the Plaintiff's medical license. Defendant SOLOMON was a private practitioner and part-time county prosecutor before he provided administrative law services.

27.     Defendants, **JOHN ROE 1-50**, and **JOHN DOE 1-50** are as yet unidentified individuals who have assisted the named defendants in the commission of their crimes.

28.     Defendants, **ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50** are as yet unidentified corporations that have assisted the named Defendants in the commission of their crimes.

## II. JURISDICTION AND VENUE

29.     U.S.C. § 1331 because Plaintiff's claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 because this action alleges violations of an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. And 15 U.S.C. § 4 and § 16 confer subject matter jurisdiction on this Court over claims brought under the Sherman Act. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), (5), because Plaintiff is a citizen of a different state to certain Defendants, the aggregate amount in controversy exceeds seventy-thousand dollars.

30.    Personal Jurisdiction. The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New York.

31.    Venue is appropriate in this District for Plaintiff's claims under 28 U.S.C. § 1391, 18 U.S.C. § 1965 and 29 U.S.C. § 1132(e)(2) because Plaintiff resides in the State of New York and resided in the State of New York when the Defendants directed their actions against the Plaintiff, a New York citizen.

### III.    OVERVIEW OF PLAINTIFF'S LEGAL CLAIMS

**32.**    Defendants' commission of the crimes of wire fraud and mail fraud are the predicate acts that constitute the definition of a Racketeering Enterprise under the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO) (18 USC 1961, et seq.).

**33.**    RICO, as enacted, constitutes a potent weapon against enterprise liability. RICO's civil law provisions (hereinafter "civil RICO") provide injured plaintiffs with the incentive to sue by providing a treble damage award plus attorneys' fees. As does antitrust litigation, civil RICO suits enable private party enforcement of criminal statutes.

**34.**    With deterrence in mind, RICO includes a provision allowing private parties to bring a civil suit for treble damages. The plaintiff must overcome two pleading burdens to state a claim for damages under RICO.

**35.**    First, the plaintiff must allege that the defendant has violated the substantive RICO statute, commonly known as "criminal RICO." In so doing, the plaintiff must allege the existence of seven constituent elements: **(1)** that the defendant **(2)** through the commission of two or more acts **(3)** constituting a "pattern" **(4)** of "racketeering activity" **(5)** directly or indirectly invests in, or maintains an interest in, or participates in **(6)** an "enterprise" **(7)** the activities of which affect interstate or foreign commerce. Second, the plaintiff must allege that he was injured in his business or property by reason of a violation of section 1962.

**36.**    Plaintiff submits that he can meet all of the requirements to establish a violation of Section 1962 of the Federal RICO Act and, thus, is entitled to an award of treble damages, attorney's fees and costs.

### IV.    PRELIMINARY STATEMENT

1

37.     This case brings together the worlds of American politics, business, medicine and law at the corrupt intersection of New Jersey. It occurred at a time when it's Governor, Defendant Christie, had taken political corruption to an unprecedented level, even by the jaded standards of New Jersey.

38.     The Plaintiff, a recognized pioneer in minimally invasive spine surgery, revolutionized the specialty when in 2005 he performed the first outpatient minimally invasive lumbar fusion: https://www.youtube.com/watch?v=JX4bnRPPucI&t=1s. He achieved this feat due to the evolution of a high-resolution intra-operative device, otherwise known as a fluoroscope or C-arm. The technology permitted the Plaintiff to safely and effectively remove painful degenerated spinal discs and replace them with devices that stabilized the spine and reduced the pain. The Plaintiff, because of his decades long expertise in Fluoroscopic Guidance and Interpretation (FGI), the most critical component of minimally invasive spine surgery, was able to perform complex spinal reconstructions with minimal blood loss and muscle destruction. This permitted the Plaintiff's patients to be discharged the same day, and thus avoid the nosocomial infections that plague patients who undergo spinal surgery in hospitals.

39.     The Plaintiff, as with other similarly trained physicians, came into professional conflict with neurosurgeons, who believed that they were the only practitioners with the skills necessary to perform these procedures. However, the majority of neurosurgeons had received no training in FGI during their residencies, and they obtained little experience after graduation. This was in contrast to the vast experience obtained by the Plaintiff and similarly trained physicians. From the mid 1990s onwards, the video-endoscopic technology and fluoroscopic technologies continued to evolve, as did anesthetic techniques that permitted rapid post-operative recoveries: https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=9s

40.     When the Plaintiff performed the first outpatient lumbar interbody fusion, he used an expandable interbody device to place bone graft in the intervertebral space. This was performed through an 8mm incision, and did not require any destruction of the muscles, bones or ligaments in the patient's back. The device was inserted in a collapsed format and was then expanded when in the correct position. This specific part of the procedure revolutionized the spine industry and has

2

led to the development of numerous other expandable devices. This technique has become the standard of care for the treatment of degenerative spinal disorders.

41.    The Plaintiff's work caused immense professional jealousy that caused the physician Defendants to engage in conduct that was unethical, unprofessional and illegal **(Exhibit 1)**. Their racketeering schemes commenced in approximately 2007/8, and incorporated multi-pronged strategies that involved encouraging patients to file lawsuits and medical board complaint against the Plaintiff, threatening to withdraw business from spinal device representatives unless they stopped supplying the Plaintiff, conspiring to prevent the Plaintiff from obtaining hospital privileges, and issuing reports for insurance companies that denied the Plaintiff reimbursement for procedure he performed.

42.    However, when it became apparent that none of the aforementioned tactics had worked, the Defendants conspired and bribed Defendant Christie, to have him order Defendant NJBME to revoke the Plaintiff's license **(Exhibit 2)**. The proceedings to revoke the Plaintiff's license were a foregone conclusion, because the administrative agency (Defendant NJBME) and administrative judge (Defendant Solomon) were subordinate to Defendant Christie, whom the Defendants had bribed and whose political ambition gave no consideration to the Plaintiff's right to due process. The Plaintiff was subjected to political corruption and judgments that were summary in nature, that deprived him of his livelihood and his ability to support his family. The proceedings in the New Jersey Office of Administrative Law were a massive fraud **(Reference: IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, MD TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY – OAL DOCKET NO.: BDS 08959-2012N),** in which Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury and evidential omission, misrepresentation and gross mischaracterization **(Reference: DNJ - 16-CV-02364 – D.E. 225 + 225-1 + 225-2: PageID4940 to 5273).**

3

# V. STATEMENT OF FACT

**A.**    <u>**Defendant Allstate and GEICO have corrupted the New Jersey Superior Court, Union County into using the IFPA (N.J.S.A. 17:33A-1 et seq.) to violate the Constitutional due process rights of members of the medical community.**</u>

**43.**    The IFPA is an ostensibly civil statute designed to combat insurance fraud in New Jersey, but the text and applications of the statute are decidedly criminal in nature. There is a symbiotic relationship between the Special Investigations Units of the Insurance Carriers and the New Jersey Office of the Insurance Fraud Prosecutor, the latter being affiliated with the Department of Banking and Insurance.

**44.**    Defendant GEICO filed a lawsuit against the Plaintiff, in the United States District Court, District of New Jersey on April 24, 2013, in which it alleged he had violated the IFPA. The claim was dismissed with prejudice on December 8, 2014, with no evidence ever having been presented. Defendant Allstate filed a claim on against the Plaintiff on February 15, 2015 that was identical to the dismissed IFPA claims filed by GEICO on April 24, 2013.

**45.**    The IFPA has been increasingly used by joint SIU(private)/OIFP(state) to conduct investigations that portend to be civil but are in actuality investigations whose purpose is to improperly collect evidence to file criminal charges. Defendant Allstate has repeatedly conspired with the OIFP on to use the civil process to circumvent the protections normally afforded to individual who are the subject of criminal investigations.

**46.**    The IFPA has been interpreted by the corrupted courts to deny physician defendants the right to a jury. The argument adopted by the lower court was based on an erroneous finding that the relief sought by Defendant Allstate was in equity and not law, and thus there was no entitlement to a jury. In these cases, Defendant Allstate argued that the reason the legislature did

not expressly ascribe the right of a jury trial, was because it allegedly did not want anything impeding a speedy trial.

47.    The IFPA and its unconstitutional application in certain New Jersey Superior Courts, has been associated with jury denials and motion applications that are rarely decided in favor of the Defendant.

48.    Defendants Allstate and GEICO have engaged in widespread violations of the due process rights of the provider community in multiple states. They have been able to perpetrate these schemes through the purchasing of local politicians and collusion with state agencies

**B.    Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization in the proceeding in the New Jersey Office of Administrative Law (April 9, 2013 – June 28, 2013) + The Defendants committed bribery in quid pro quo schemes with Defendant Christie, in order to have the Plaintiff's medical license revoked.**

49.    In or about the beginning of September 2017, the Plaintiff obtained, for the first time, an entire copy of the trial transcript IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, MD, TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY. The proceeding was conducted in the New Jersey Office of Administrative Law between April 9, 2013 and June 28, 2013, and was adjudicated, without a jury, by Defendant Jay Howard Solomon, Esq. Defendant Solomon issued his Final Opinion on December 13, 2013.

50.    Between September 2017 and January 11, 2018, the Plaintiff conducted a detailed comparative analysis of Defendant Solomon's Final Opinion with the trial transcript and submitted evidence. The analysis resulted in the production of a document entitled, 'The Solomon Critique', that proves that Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury and evidential omission, misrepresentation and gross mischaracterization. Defendant Solomon's fraudulent opinion provided an illegal basis for the revocation of Kaul's license. The revocation of Kaul's license caused the loss of his livelihood

and the collapse of six (6) medium sized corporations, that were forced to file for Chapter 11

Bankruptcy on June 17, 2013 in the District of New Jersey **(Reference: Case No. 13-23366(VFP).**

51.     The Defendants bribed and conspired with Defendant Christie and his agents, to have
Defendant NJBME revoke Kaul's license. The Defendants were economic competitors of the
Plaintiff, that all lost money when the Plaintiff made money. The financial reserves for which the
Parties competed, consisted of the auto/health premiums paid by patients/clients to Defendants
Allstate and GEICO. This reservoir of capital, intended to cover the costs associated with auto
related injuries, was finite, and as the Plaintiff's minimally invasive spine surgery practice expanded,
he commandeered a greater percentage of the reservoir. The Defendants calculated that the return
on their bribes, would be more than compensated for by **(i)** the debt avoidance (Defendants
Allstate + GEICO) that the revocation of the Plaintiff's license would permit, and **(ii)** by the diversion
to the Defendant Physicians and Hospitals of an increased percentage of the capital reservoir, for
reimbursement for their professional services. Defendant Christie benefitted by receiving these
racketeering profits into his political campaigns, and off-shore bank accounts and trusts located in
tax havens.

C.     **The Plaintiff has consistently been denied substantive justice in administrative, state and
federal courts in New Jersey.**

52.     In early January 2012 two inspectors from the State made an unannounced visit to NJSR
Surgical Center, the Plaintiff's Medicare Certified, AAAHC accredited surgical center in Pompton
Lakes, NJ. These individuals willfully concealed the purpose of their visit from Kaul, as they
interviewed Kaul's staff and collected evidence. When asked by Kaul the reason for the visit they
falsely told him that it was a routine inspection. They did not inform him that it was part of an
investigation, the purpose of which was to revoke his medical license. These individuals appeared on
a Tuesday January 3, 2012, a time when Kaul was operating and demanded to enter the operating
room while Kaul was performing a minimally invasive spinal fusion. Kaul denied their request.

53.     The inspectors presented no warrants, despite the fact that the proceedings were quasi-
criminal in nature and sought to deprive him of his property. These individuals did not inform Kaul
or his staff of their rights, before they commenced their interviews and gathering of evidence.

6

54.     On April 2, 2012 Defendant NJBME suspended the Plaintiff's license based principally on false allegations that he was not qualified to perform minimally invasive spine. The allegations were premised on the reports of two 'experts', Defendants Przybylski and Kaufman, who were market competitors of Kaul, and who had received money from the State to testify. Defendants Przybylski and Kaufman continued their false testimony in April 2013, when they testified against Kaul in the OAL proceedings in Newark, NJ. The latter proceeding resulted in the revocation of Kaul's license. Defendants Kaufman and Przybylski took an oath, and then participated in the massive fraud detailed that is detailed in 'The Solomon Critique'.

55.     The Plaintiff commenced performing minimally invasive spine surgery in 2002 and had successfully performed eight hundred (800) cases with good to very good outcomes in 90-95% of cases with a 0.1% complication.

56.     The Plaintiff was more educated, qualified, trained and credentialed to perform minimally invasive spine surgery than the Defendants Przybylski and Kaufman. The Plaintiff (i) possessed a license to practice medicine and surgery; (ii) was board certified by the American Academy of Minimally Invasive Spinal Medicine and Surgery; (iii) was credentialed by at least six (6) surgical centers to perform minimally invasive spine surgery; (iv) was credentialed by the federal government to perform minimally invasive spine surgery; (v) had commenced his training in minimally invasive spine surgery in 2002, three (3) years before Defendant Przybylski.

57.     On May 9, 2012 Kaul signed an interim consent order with Defendant NJBME, in which he agreed, pending the outcome of a full hearing, to limit his practice to interventional spinal procedures. The order permitted Kaul to apply for minimally invasive spine privileges at a hospital, and on, or about May 16, 2012, Kaul submitted an application to a local hospital.

58.     On May 9, 2012 Defendant Christie's Attorney General, Jeffrey Chiesa, made highly prejudicial pre-hearing comments to Marla Diamond, a New York radio show host, in which he stated that the Plaintiff was not qualified to perform minimally invasive spine surgery. These

comments were made before any evidentiary proceedings and were intended to prejudice the Plaintiff's right to a fair hearing **(Exhibit 3).**

59.    On or about May 16, 2012 the Plaintiff commenced discussions with Bayonne Medical Center in Bayonne, NJ, to obtain privileges for minimally invasive spine surgery.

60.    On May 22, 2012 the Acting Director of the Division of Consumers Affairs, Eric Kaneksky, filed a motion to suspend the Plaintiff's CDS prescribing license, in the knowledge that it would prevent him from obtaining hospital privileges. This was an illegal and unilateral act perpetrated by a subordinate of the New Jersey Governor, and denied the Plaintiff his right to due process **(Exhibit 3).**

61.    The Plaintiff indicated that unless the CDS license was reinstated he would commence legal cation, and on May 29, 2012, in a retaliatory action, Kanefsky filed a motion to rescind the consent agreement. The motion was based on false allegations that the Plaintiff had not modified his website or complied with an improper subpoena.

62.    On June 7, 2012 the Plaintiff, based on the aforesaid actions of Defendant Chiesa and Kanefsky, filed a motion in the Mercer County Superior Court that sought the appointment of a special prosecutor and ad hoc medical board. The Plaintiff argued that he would not receive a fair and impartial hearing in New Jersey, and that Defendant Chiesa's prejudicial comments had evidenced that the outcome of his hearing had been pre-judged **(Exhibit 4).**

63.    The motion was denied, as was the appeal, and neither Defendant Chiesa nor Kanefsky responded to testimony subpoenas, arguing that the proper forum was the pending hearing before Defendant NJBME.

64.    On June 13, 2012 Kanefsky's motion to rescind the consent agreement was argued before Defendant NJBME and once again Defendant Chiesa and Kanefsky ignored testimony subpoenas and had them quashed by Defendant NJBME. The Plaintiff's right to cross examine parties who

were seeking to deprive him of his property violated his Fourteenth Amendment right to due process **(Exhibit 5-12:9)**

65.    On June 13, 2012, Defendant Hafner played a video of a patient, who improved after Kaul had performed a successful minimally invasive outpatient lumbar fusion:

https://www.youtube.com/watch?v=guwx5kuBiEg&t=3s

Hafner considered the video evidence that Dr. Kaul had deviated from Defendant Przybylski's fictitious standard of care, a standard that he admitted on May 6, 2013 did not exist. However, it mattered not to Hafner that the patient improved, because she must have held the same view that Defendant Lomazow expressed at the end of his 2014 video interview, which is that patients *"know nothing"*

https://www.youtube.com/watch?v=sFtE8EvEMsU

66.    On June 13, 2012 Defendant NJBME rescinded the consent agreement, based on false allegations that the Plaintiff had not modified his website and had not responded to subpoenas from Defendant NJBME. The subpoenas were improper, because the matter had been transferred from Defendant NJBME to the New Jersey Office of Administrative Law on May 28, 2012, which thus assumed subpoena jurisdiction. Upon the transfer from Defendant NJBME the Plaintiff became entitled to discovery from Defendant NJBME, and submitted testimony subpoenas to AG Jeffrey Chiesa, DCA Acting Director Eric Kanefsky and Investigator Susan Sugalski, an individual who had worked with Defendant NJBME as an investigator. Defendant Hafner did not produce these witnesses because she falsely claimed that the matter had been transferred back to Defendant NJBME. The subpoenas were then quashed by Defendant NJBME, and the Plaintiff was denied his due process right to examine two witnesses who had respectively made public prejudicial comments and illegally suspended the Plaintiff's CDS prescribing license.

67.    The Plaintiff never had the opportunity to cross-examine Defendants Chiesa, Hafner and the Acting Director of the Division of Consumer Affairs, Eric Kaneksky. The Plaintiff's motions for a special prosecutor and ad hoc medical board were denied in the New Jersey Superior Court System at both the trial and appellate levels, and his testimony subpoenas were quashed by Defendant NJBME.

**68.**    On August 30, 2012, Kaul's attorney sent a letter to an attorney who represented a surgical center at which Kaul had worked. In the well,  reasoned and factually supported letter, Randolph explained that Defendant NJBME's assertion that Kaul should have had alternative privileges to perform minimally invasive spine surgery was wrong. Defendant Solomon prevented this letter from being entered into evidence in the administrative law proceedings, because Defendant Hafner falsely claimed she had not received the document **(Exhibit 31).**

**69.**    On December 20, 2012 the State issued a cease and desist letter to Kaul that ordered him to close the NJSR Surgical Center. Subsequent to the suspension of Kaul's license, other physicians had been performing procedures at the facility. Kaul appealed the order, which was stayed pending the outcome of the licensure proceedings. The cease and desist letter was arbitrary and had no basis in law or fact. It was just one of many examples of how Defendant Christie abused state agencies, to further his RICO Enterprise against the Plaintiff's properties and interests.

**70.**    From April 9, 2013 to June 28, 2013 the matter was tried in the New Jersey Office of Administrative Law (**Case caption + Docket No. – IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, MD TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY – BDS 08959H  2012N**).  The two main issues litigated in the hearing pertained to patient outcomes, and whether Kaul was qualified to perform minimally invasive spine surgery.

**71.**    The case advanced by Hafner was founded principally on the opinions of Defendants Przybylski and Kaufman, who falsely testified that Kaul had grossly deviated from the standard of care in his treatment of eleven (11) patients in the following six (6) clinical and administrative categories: **(1)** clinical outcomes; **(2)** hospital privileges; **(3)** education and training; **(4)** surgical technique; **(5)** consent forms; **(6)** discography.

**72.**    Defendants Przybylski and Kaufman falsely testified that: **(a)** the patients had poor clinical outcomes – **however,** the clinical files indicated that the patients improved after the care they received from Kaul; **(b)** because Kaul did not have hospital privileges, he had grossly deviated from the standard of care – **however,** as Defendants Przybylski and Kaufman either knew or ought to

have known, the possession or non-possession of hospital privileges has no legal relevance to the standard of care, as was articulated by Judge Howard Coburn on January 25, 2012 in the matter of Jarrell v Kaul (MRS-L-2634-07); **(c)** because Kaul had obtained his minimally invasive spine surgery training through mini-fellowships and continuing medical education courses, he had grossly deviated from the standard of care – **however**, Defendant Przybylski admitted that he had obtained his minimally invasive spine surgery training by attending the same continuing medical education courses as Kaul, but had commenced his training in 2005, three (3) years after Kaul. Defendants Przybylski and Kaufman either knew or ought to have known that education and training have no legal relevance to the standard of care, as was articulated Judge Howard Coburn in Jarrell v Kaul; **(d)** because Kaul used devices in an off-label manner he had grossly deviated from the standard of care – **however**, Defendant Przybylski admitted that he frequently used devices in an off-label manner; **(e)** because patient consent forms were allegedly unsigned, Kaul had deviated from the standard of care – **however**, Kaul submitted into evidence signed consent forms for all eleven (11) patients; **(f)** because Kaul utilized discography in as a diagnostic tool, that he had deviated from the standard of care – **however**, the use of discography contributed to the fact that the eleven (11) patients improved after surgery

73.    The proceeding was adjudicated by Defendant Solomon, prosecuted by Defendant Hafner, and 'expert' testimony was provided by Defendants Przybylski and Kaufman. The entire proceeding was a massive fraud, in which Defendants Solomon, Przybylski and Kaufman collectively committed **two hundred and seventy-eight (278) separate instances of perjury and evidential misrepresentations, omissions and gross mischaracterizations.** These are detailed in 'The Solomon Critique', copies of which were sent to the nine justices of the United States Supreme Court. Letters were also sent to the US Attorney and the New Jersey Attorney General, that sought the matter be criminally investigated.

74.    On the days that Defendant Przybylski testified, Kaul ensured that an independent transcriptionist recorded the proceedings, an act that visibly agitated Defendant Solomon.

75.    In support of their case, the state relied on eleven (11) patients, whom they alleged had sustained complications consequent to surgeries performed by Kaul. Only six (6) patients actually

testified, but Defendant Solomon permitted Defendant Przybylski's testimony about the other five (5) patients to be entered onto the record. This testimony was subsequently used by Defendant Solomon to wrongfully recommend the revocation of Kaul's license. Kaul was denied the opportunity to examine these five (5) patients.

76.     In early September the Plaintiff was made aware that evidence from the OAL hearing had been tampered with and falsified. The Plaintiff sent letters, dated September 12 and 13, 2013 respectively, to Defendants Solomon and Christie, that requested the matter be investigated **(Exhibit 6).** The matter was not investigated.

77.     On September 16, 2013 Kaul filed an ethics complaint against Defendant Hafner **(Exhibit 7).** In 2014 Kaul brought this complaint to the attention of the attorney assisting him with his application for license reinstatement. Kaul suggested that Hafner should have no involvement in the proceeding. The attorney, Michael Keating dismissed Kaul's concerns, despite the fact that Hafner had used prejudicial and pejorative language in her opposition to Kaul's application. Kaul subsequently discovered that Keating was a partner at the law firm at which Defendant Christie had been a partner. Keating never disclosed this conflict of interest to Kaul.

78.     On October 15, 2013 the Plaintiff submitted a post-trial brief in the administrative law proceeding **(Reference: DNJ - 16-CV-02364 – D.E. 179-1 PageID:2672 to 2711).**

79.     On Sunday November 17, 2013, Defendant NJMG published Defendant Washburn's illegally recorded interview. It was six-thousand (6000) word article that slandered Kaul's appearance and accent. Washburn described Kaul was having a *"frayed wallet ... lace-less shoes"* and referred to his accent disparagingly as an *"upper-crust British accent."* The purpose of this characterization was to portray Kaul as an elitist, an individual out of touch with the 'common man.' Defendant Washburn did this in the knowledge that it would create antipathy and eliminate any sympathy for Kaul. The truth, however, of Kaul's life is that he grew up in poverty and became an orphan at sixteen (16), after his mother died of cancer when he was fourteen (14) and his father died of a heart attack when he was sixteen (16). Kaul entered medical school at the age of eighteen (18). These were details Defendant Washburn knew, but chose not to include in her defamatory and slanderous

story, a story that involved her criminally violating Kaul's rights under federal and state law. Defendant Washburn illegally recorded the interview. Kaul sent Defendant Washburn a letter dated January 9, 2014 that requested a copy of the illegally obtained audio recording **(Exhibit 7)**, but Defendant Washburn refused to send one.

80.    In response to Defendant Washburn's article, a number of Kaul's patients provided a video response and on December 26, 2013 Kaul sent a letter **(Exhibit 8)** to Defendant Solomon, in which he asked Defendant Solomon, a Bergen County resident, if he had read the article. If Solomon had read the article it would have been an act of judicial misconduct, because Solomon was effectively the judge, jury and prosecutor. The timing of the release of Defendant Washburn's was intended to prejudice the local population against Kaul. Members of Defendant NJBME lived in this population. This was the same tactic used by Defendant Chiesa on May 9, 2012 when he declared to CBS-New York journalist, Marla Diamond, that Kaul was not qualified to perform minimally invasive spine surgery. These acts are further evidence of Kaul's assertion that it is impossible for him to procure justice in New Jersey.

81.    Defendant NJMG **removed** Defendant Washburn's article from the internet in approximately late 2017.

82.    On December 13, 2013 Defendant Solomon issued his opinion. It was a one hundred and five-page (105) document that bore little resemblance to the trial testimony and evidence. Defendant Solomon recommended that the Plaintiff's license be revoked. In his opinion Defendant Solomon ignored the law that permits the holder of a plenary license the right to practice Medicine and Surgery. Kaul had an active unrestricted plenary license, for the period during which he performed minimally invasive spine surgery.

83.    The law regarding plenary licenses was stated by Judge Howard Coburn in the matter of Jarrell v Kaul **(MRS-L-2634-07).** His recitation directly contradicts the fraudulent testimony that was given on June 12, 2012 and in April 2013 by Defendant Przybylski regarding what constitutes the standard of care **(Exhibit 9).**

13

84.    On January 5, 2014 Kaul sent a letter to President Obama that sought the assistance of the federal government in the investigation of the tampering with evidence **(Exhibit 10).** Kaul, confident in the strength of his case, had no hesitation in sending a letter to the President of the United States.

85.    On January 9, 2014 Kaul sent a letter to Defendant Washburn that requested a copy of the audio recording of the interview she had conducted with Kaul on August 13, 2013, at the commencement of which she acknowledged that evidence had been tampered with.

86.    After the issuance on December 13, 2013 of Defendant Solomon's fraudulent opinion, the matter was sent back to Defendant NJBME, and a hearing was scheduled for February 12, 2014. The Plaintiff sent a letter to Defendant NJBME, dated February 6, 2014, in which he brought their attention to the malfeasant conduct of Defendants Kaufman and Lomazow and advised them that he would not attend the hearing **(Exhibit 11).**

87.    On March 12, 2014 Defendant NJBME entered its final order, which revoked the Plaintiff's license and imposed a financial penalty of $450,000.00. The amount was based on the inflated legal fees of the New Jersey Attorney General and fines imposed for alleged instances of 'gross malpractice'. These alleged instances were entered onto the record in the administrative law proceedings (April 9, 2013 to June 28, 2013) through the testimony of Defendant Przybylski, who as is detailed in 'The Solomon Critique', committed perjury thirty (30) times,

88.    The Plaintiff chose not to appeal the matter in New Jersey Superior Court, Appellate Division, as he did not believe, based on his experience, that he would be able to procure justice in New Jersey.

89.    On January 29, 2015 Kaul filed a complaint with the US Attorney for the District of New Jersey that sought an investigation into the evidence tampering **(Exhibit 12)**. Two weeks after Kaul had filed the complaint, he telephoned the office of the US Attorney to ascertain the status of the complaint and was told, *"We are not an investigative agency"*. Kaul had initially approached the FBI but was

referred to the US Attorney, Paul Fishman. The latter individual had worked under Defendant Christie, when he was the US Attorney for the District of New Jersey (**Exhibit 12**).

90.    In 2015 Kaul submitted multiple letters to the New Jersey Attorney General, the US Attorney for the District of New Jersey and insurance carriers, that sought their assistance in retrieving a copy of his file from Defendant NJBME, and investigating the evidence tampering and illegal audio recording. Kaul received no responses **(Exhibit 13)**.

91.    The Plaintiff filed a lawsuit on February 22, 2016 in the United States District Court, Southern District of New York (**16-CV-1397**) in which the Defendants were accused, amongst other things, of violating RICO and committing anti-trust violations. The Complaint sought the reinstatement of the Plaintiff's medical license, monetary compensation and a public apology. The Plaintiff filed the matter in the SDNY because he had been a New York resident from 2005 to 2012, had venue privilege and was convinced that he would not receive justice in New Jersey, due to the politico-legal nexus he described in his brief to the Second Circuit Court of Appeals (**Reference: UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT – CASE NO. 16-1397-CV – D.E. 41**)

92.    The Judge assigned to the case, Richard Sullivan, transferred the matter sua ponte to the District of New Jersey. The Plaintiff sent the Judge a letter, in which he objected to the transfer, based on his opinion that he would not receive justice in New Jersey **(Exhibit 14)**. The Judge ignored the Plaintiff's pleas and on April 27, 2016 transferred the file to the District of New Jersey. The Plaintiff filed an interlocutory appeal (**Reference: ¶ 90**) with the Second Circuit Court of Appeals, which was denied by a three-member panel on September 9, 2016, based on the Court's assertion that because the order from the SDNY was not a final order, it did not have jurisdiction. The Plaintiff filed a motion for an *en banc* review but received no response from the Court.

93.    On July 26, 2016, the Plaintiff submitted a motion to the DNJ that sought to have the matter transferred back to the SDNY. Counsel for Defendant Cohen objected **(Exhibit 15)** and the Court entered a TEXT ORDER on July 27, 2016 that stated, ***"The issue, however, may be discussed during the next scheduled conference."*** The next conference was held on March 23, 2017 and was limited to discussions regarding a motion by Defendant Heary and Rutgers to vacate default.

94.     On September 8, 2016 Kaul submitted a letter to the District of New Jersey, that highlighted the Plaintiff's profound concerns about the impartiality of the venue and requested that his motion to transfer the matter back to the S.D.N.Y be considered **(Exhibit 16).** The Court never considered the motion.

95.     In mid-August 2016 the Plaintiff served information subpoenas on a number of Third Party Witnesses. The State Defendants objected to the Plaintiff's efforts at evidence gathering, the Plaintiff responded, but the Court prohibited the Plaintiff from gathering evidence relevant to the claims **(Exhibit 17).**

96.     The matter has been pending in the DNJ since April 27, 2016, during which time the Plaintiff has filed several motions for default judgment against Defendant Lewis Stein, Esq. On March 3, 2016, Defendant Stein was sent a Waiver of Summons and Notice of Litigation **(Exhibit 18)** that was accompanied with a flash drive that contained a copy of the Summons, Complaint and Exhibits. On the flash drive was a small white label with the number four (4) written on it. Defendant Stein ignored the Waiver of Summons. On May 2, 2016 Defendant Stein was served with a hard copy of the Summons and Complaint **(Exhibit 18)** but failed to plead or otherwise answer. On December 22, 2016 the Plaintiff requested entry of Default against Defendant Stein **(Exhibit 18)** and Default was entered by the Clerk on December 28, 2016. On June 13, 2017 the Plaintiff filed a motion to enter Default Judgment **(Reference: DNJ – 16-CV-02364 – D.E. 192-2 – PageID: 3567 to 3611)** and on July 7, 2017 the Court denied the motion **(Reference: DNJ – 16-CV-02364 – D.E. 202 – PageID: 3767 to 3772).** In its opinion the Court suggested that one of the reasons Defendant Stein failed to answer, was that he might have been confused about the venue of the case. Defendant Stein was served again on November 11, 2017 and signed a document entitled CONFIRMATION OF SERVICE **(Exhibit 18).**

97.     On June 30, 2017 the Court entered an Order that dismissed the Plaintiff's First Amended Complaint, but permitted him to file a Second Amended Complaint, which he submitted on August 10, 2017.

98.     On October 18, 2017 the Court filed an Order that required the Second Amended Complaint be reduced in length. At a case management conference on October 18, 2017, the Court and the Plaintiff agreed to submit a revised Second Amended Complaint of approximately one and hundred and forty (140) pages. The Defendants were granted forty-five (45) days to respond, and the Plaintiff was granted thirty (30) days to file his response.

99.     On October 18, 2017, during the case management conference, the Court denied the Plaintiff's request to commence the service of information subpoenas.

100.    Similarly, the Court has not permitted the Plaintiff any discovery, and quashed information subpoenas that the Plaintiff served on Third Party Witnesses in July/August 2016 **(Reference: DNJ – 16-CV-02364 – D.E. 111 – PageID: 990)**.

101.    On October 27, 2017 the Plaintiff filed a revised Second Amended Complaint that was, with exhibit dividers, one hundred and fifty (150) pages.

102.    Forty-five (45) days later, the Defendants had failed to respond to the Plaintiff's revised Second Amended Complaint, and on December 22, 2017 the Plaintiff sent a letter to the Court that brought its attention to the issue **(Exhibit 19).**

103.    The Court issued a letter order on February 8, 2018 that identified deficiencies in the Plaintiff's revised Second Amended Complaint. The Plaintiff responded by filing on February 22, 2018, an abbreviated version of the revised Second Amended Complaint.

104.    The Defendants have not responded to the Plaintiff's revised Second Amended Complaint, and on April 4, 2018 the Plaintiff filed a letter with the Court that requested it set a deadline for the Defendants to answer or otherwise plead **(Exhibit 20).**

105.    The Plaintiff's Complaint has been pending in the DNJ for two (2) years, during which the Plaintiff's efforts at discovery have been quashed or denied. The Plaintiff's motions for default judgment have been denied.

106.    The illegal suspension and revocation of the Plaintiff's license in 2012 and 2014 respectively, were accompanied by a prolonged period of highly defamatory and prejudicial media coverage. This caused the Plaintiff to become the target of multiple lawsuits from patients and insurance carriers, that were filed in the New Jersey Superior Court System. The Plaintiff was arrested on September 21, 2016 on a warrant for unpaid child support, at which time he became aware that the State, a defendant in K1, had, in May 2016, initiated proceedings against him for unpaid taxes. These actions were a direct consequence of the suspension and revocation of the license.

107.    In October 2016 Kaul submitted a request with the Court that sought permission to file a TRO and injunction against the state, pending the outcome of the federal proceedings **(Exhibit 21).**

108.    Within the New Jersey State Courts, the Plaintiff's motions for various forms of relief have been universally denied. The Union County Court has repeatedly denied the Plaintiff's requests for discovery in Allstate v Kaul (Docket No. UNN-L-322-15 **(Exhibit 22)** but has continued to enter adverse orders against the Plaintiff due to his inability to provide discovery (**Exhibit 23).**

109.    A large majority of the State Judges were appointed to their positions by Defendant Christie, and in one particularly egregious case, Allstate v Kaul, the State Judge has denied every motion filed by the Plaintiff, granted every motion filed by Defendant Allstate, and repeatedly denied the Plaintiff's requests for discovery from Defendant Allstate.

110.    The same Judge, in December 2016 and February 2017 in the matter of Santos v Kaul (Docket No. UNN-L-322-15) quashed deposition and document subpoenas served by the Plaintiff on Third Party Witnesses, the majority of whom are neurosurgeons **(Exhibit 24).** The denials were based, illegally, on the res judicata and collateral estoppel effect of the K1 federal claims. The Plaintiff explained to the Court that there had been no adjudication of the K1 claims, and that the preclusion doctrines were thus inapplicable. The argument was met with silence.

111.    The subpoenas were directed to multiple neurosurgeons and a member of the medical board, Jacqueline Degregorio, who had voted on June 13, 2012 against the rescinding of the consent agreement into which the Plaintiff and the medical board had entered on May 9, 2012.

112.    **The irrefutable evidence of the administrative, state and federal proceedings indicate that the Plaintiff has not been the recipient of Justice in New Jersey, and has, at least since 2012 been the victim of a profoundly corrupt politico-legal network, that has suppressed the Plaintiff's efforts at gathering evidence necessary to advance and defend his interests. These are some of the reasons the Plaintiff sought the appointment of a special prosecutor and ad hoc medical board, to oversee Defendant NJBME's administration of the Plaintiff's licensing proceeding in 2012.**

113.    The Plaintiff vigorously fought to have K1 remain in the SDNY for good cause. The central thrust of the Plaintiff's argument in early 2016 was that he would not be afforded substantial justice in New Jersey, and the evidence in 2018 has proven that to be exactly the case.

114.    The Plaintiff has brought the 'The Solomon Critique' to the attention of the Justices of the United States Supreme Court. The Plaintiff did this in order to alert them to the criminal nature and grave professional departure of individuals, who as the evidence proves, so willfully perverted the course of justice, to suit the economic and political agendas of the K1 + K2 Defendants. Defendants Solomon, Przybylski, Kaufman and Hafner 'pulled the trigger', while their co-conspirators supplied the bribes, propagated the lies and profited from the Plaintiff's losses **(Reference: DNJ – 16-CV-02364 – D.E. 233 – PageID: 5545 to 5600).**

**D.  The Plaintiff's medical license was revoked because of Political Corruption at the New Jersey Board of Medical Examiners and because the Mechanism of Physician Regulation in New Jersey is illegally Configured**

115.    The Division of Consumer Affairs controls the medical board. Its members are political appointees, with no senate approval, who occupy their positions at the pleasure of the Governor.l

116.    The Office of the Attorney General is controlled by the Department of Law and Public Safety (DLPS), and assigns lawyers who simultaneously prosecute cases against physicians, while acting as internal counsel to the board. The Governor controls the DLPS. There is an unconstitutional, and illegal merger of investigative, prosecutorial and adjudicatory functions of physician regulation.

117.    The Office of Administrative Law is part of the executive branch of state government, and its members are politically appointed. The executive is the Governor.

118.    The unconstitutional configuration of physician regulation permitted the Governor to exercise complete control of the legal proceedings that caused the revocation of Kaul's license. At best it was a charade, at worst a 'kangaroo' court, that dispensed a politically motivated judgment based on false expert and patient testimony. The Defendants have many decades of experience in 'kangaroo' justice and went to immense lengths to ensure that there was an appearance of the "full panoply" of due process. The earliest indication that the outcome had been pre,  ordained was when Defendant Christie's Attorney General, Jeffrey Chiesa, on May 9, 2012, broadcast to the media, that Kaul was not qualified to perform minimally invasive spine surgery. These comments were made before the commencement of any evidentiary proceedings **(Exhibit 3)**.

119.    The Defendants exercised control of the aforementioned process by funneling bribes, to Defendant Christie, disguised as 'campaign donations', and by paying fees to lobbyists and public relation companies commercially intertwined with New Jersey politicians.

120.    The process is not independent, is purely political and is in gross violation of the due process clause of the Fourteenth Amendment, that requires an impartial tribunal, when life, liberty and property are at stake. Simply by virtue of the fact that the mechanism of physician regulation is unconstitutional, none of these protections/rights were afforded to the Plaintiff.

121.    On April 5, 2018 a Physician's Bill of Rights (SENATE BILL NO. 286) introduced by Louisiana Senator, John Milkovich, was approved by the Louisiana Senate **(Exhibit 25).** The Bill's purpose is to ensure that the mechanism of physician regulation, is conducted lawfully and in accordance with

the due process protections of the United States Constitution. Kaul was not afforded these protections. The Defendants gross violations of his Constitutional right to due process, were criminal.

**E.    The Plaintiff's pioneering work in the field of minimally invasive spine surgery caused professional jealousy amongst his business and professional competitors**

122.    In 2005 Kaul performed the first outpatient lumbar spinal fusion at the Market Street Surgical Center Saddle Brook, New Jersey. Kaul's innovative work caused overt hostility within the New Jersey neurosurgical community, whose members frequently slandered Kaul. One such example occurred in late 2013, when neurosurgeon Thomas Peterson publicly called Kaul a *"murderer"* in front of one of Kaul's employees, Linda Reyes, on whose brother Peterson had just operated **(Exhibit 33).**

123.    The Plaintiff, based upon his own knowledge of the views held by many neurosurgeons, understood that their hostility towards Kaul was partly rooted in their **false** belief that anyone who did not participate in their training programs, could not possibly have the skills to perform minimally invasive spine surgery. This self,   serving view, however, does not accurately reflect the technological advances that have occurred in the field of minimally invasive spine surgery. The most significant advance has been that of Fluoroscopic Guidance and Interpretation (FGI), which is the most critical component of minimally invasive spine surgery.

124.    Kaul, through multiple communications with members of the New Jersey medico,   legal community came to know that the commercial success of his practice, and the publicity associated with his philanthropic work with The Spine Africa Project, contributed to the jealousy that is evidenced in the Zerbini Affidavit **(Exhibit 2).**

125.    In 2005 the Defendant neurosurgeons used their influence within the credentialing committees of hospitals, to prevent Kaul from obtaining clinical privileges at Meadowlands Hospital.

126.    Between 2010 to 2012 multiple articles were published about the Plaintiff's minimally

21

invasive spine surgery work and in 2011 it was reported in the Bergen Record, that NJSR Surgical Center had a zero percent (0%) post-operative infection rate.

127.    On March 3, 2011 the Kaul opened the NJSR Surgical Center, a Medicare certified, AAAHC accredited facility in Pompton Lakes, New Jersey. It is a four,,,thousand (4000) square foot facility, in which Kaul successfully performed interventional spinal procedures and outpatient minimally invasive fusions and discectomies.

128.    In the period from 2005 to 2012 Kaul came to know through conversations with spine device representatives, patients and physicians, that his professional and commercial success had caused immense jealousy within the medical community. Examples of this defamatory conduct included: **(i)** comments made by Defendant Heary to Kaul's patient, Frances Kuren in 2008, in which Defendant Heary told Kuren that Kaul was not qualified to perform minimally invasive spine surgery, and that she should file a complaint with Defendant NJBME and initiate a lawsuit. Kuren's fraudulent actions precipitated the proceeding that resulted in the illegal revocation of Kaul's license; **(ii)** comments made by Defendant Kaufman to Kaul's patients Corey Johnson in 2010,in which Defendant Kaufman, just before he stuck a large needle into Johnson's spine, loudly exclaimed, *"That motherfucker Richard Kaul is trying to take over the spine business, and we are going to put stop to it*."; **(iii)** comments made by Defendant Kaufman to John Zerbini in 2012, in which Defendant Kaufman described how he and another group of doctors were going to destroy Kaul's reputation and medical career, and leave him and his family with nothing **(Exhibit 2).**

129.    From April 2013 to June 2013 there were several press releases and articles that highlighted the Defendants' misconduct **(Exhibit 34).**

130.    On September 23, 2013 Johnson filed a complaint with the President of University Hospital, James Gonzalez, but received no reply **(Exhibit 1).**

131.    Kaul's commercial success presented an economic threat to the Defendants Allstate and GEICO, who used their purchased political leverage with the Christie administration to have Kaul's license revoked. The purpose was to negate their statutory economic obligation to pay Kaul for

clinical services that he had legitimately rendered to their customers.

132. From approximately 2006 to 2012 the Plaintiff successfully treated thousands of patients who had sustained spinal injuries consequent to car accidents. Hundreds of these individuals had purchased expensive personal injury protection policies from Defendants GEICO and Allstate, on the understanding that should they require medical attention for traumatic injuries, the costs would be covered. New Jersey has a no-fault system, that over the last decade has incorporated a fee arbitration system that ensures healthcare providers and facilities are compensated for the provision of clinical services. The arbitrators are lawyers, well versed in healthcare law, and render payment decisions based on the medical evidence presented.

133. From 2006 to 2012 the Plaintiff prevailed on almost ninety-nine percent (99%) of all claims presented for arbitration. Defendants GEICO and Allstate employed their legions of lawyers to contest each and every claim and lost almost ninety-nine percent (99%) of all claims. When the Defendants Allstate and GEICO are unable to prevail in the state sanctioned arbitration forum, they resort to filing frivolous lawsuits in receptive federal and state courts, in the knowledge that the majority of providers are unable to match their legal resources.

134. Defendants Allstate and GEICO's pattern of racketeering is that Defendant GEICO runs into federal court, while its racketeering comrade, Defendant Allstate, runs into the New Jersey Superior Court, Union County. Defendant GEICO, unable to defeat the Plaintiff in the arbitration forums, filed a one-hundred and eight-page (108), three hundred and thirty-nine paragraph complaint against the Plaintiff, his corporations, and three of his employee physicians, on April 24, 2013.

135. The matter was dismissed without prejudice on December 8, 2014, with absolutely no evidence ever having been presented to support any of the eleven (11) causes of action.

136. On February 15, 2015 Defendant Allstate filed an almost identical lawsuit against the Plaintiff in the New Jersey Superior Court, Union County Court, and as with Defendant GEICO, Defendant Allstate has not presented any evidence in support of its one hundred and eleven (111) page, three hundred and sixty-four (364) paragraph, seventeen (17) count complaint. It is simply

23

Defendant Allstate's avenue to re-litigate claims it lost against the Plaintiff in state sanctioned arbitration forums.

**137.**    Kaul's practice grew three hundred percent (300%) from March 2011 to April 2012, and he performed cases on an outpatient basis, that although termed 'complex' by neurosurgeons, proved to be simple, because of the surgical techniques he employed. Kaul observed, during many of the CME courses, that many neurosurgeons do not have good stereo,   tactical hand,,, eye coordination, a prerequisite for the effective use of FGI, the most critical component of minimally invasive spine surgery. These technical deficits are a consequence of neurosurgical training, which does not expose the student to FGI, to the same degree experienced by physicians from interventional pain and radiological backgrounds.

**138.**    In the US the completion of a residency and board certification do not require the graduate to pass a technical skills test, but simply a written and oral examination. That would be akin to issuing a driver's license without the road test. Thus, the only way that one could compare the abilities of two surgeons, as for example with two baseball players, is to observe them in action. Kaul's videos demonstrate him in action, while no video evidence exists to support the technical abilities, or lack thereof, of any of the other physician defendants. In fact, many of Kaul's colleagues observed him operating, and submitted letters that attested to his surgical skills **(Exhibit 27)**. When Kaul's license was suspended in April 2012, he suggested to Defendant NJBME that he be independently observed. This common,   sense suggestion was ignored.

**139.**    Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002, and he frequently taught his technique to other physicians, who both observed him in the operating room and attended hands,, on cadaver training courses. At many of these courses the attendees included neurosurgeons and orthopedic spine surgeons **(Reference: DNJ – 16H   CVH   02364 – D.E. 225H   1 – PageID: 5119)**.

**140.**    Commencing in 2010 Kaul's philanthropic and professional work received extensive media coverage. A segment on Channel 12 news in August 2011 apparently caused members of the New

24

Jersey neurosurgical community to tell Spineology representative, Robert McGann that *"it* [the Channel 12 interview] *was the last straw"*: https://www.youtube.com/watch?v=q_HBzqfggrg

### F.   The Defendants conspired to eliminate the Plaintiff from the practice of medicine by encouraging patients to file complaints with Defendant New Jersey Board of Medical Examiners

**141.**   Defendants Kaufman, Heary, Przrbylski, Cohen and Staats commenced a campaign of legal harassment in approximately 2007, when they began to file complaints against the Plaintiff with Defendant NJBME. At approximately the same time these Defendants encouraged patients to file lawsuits against the Plaintiff. These Defendants conspired with Defendant Hafner and local malpractice lawyers to initiate the claims, in which Defendants Kaufman and Przybylski invariably provided 'expert testimony'.

**142.**   Defendants Kaufman, Heary, Przybylski, Cohen and Staats used their senior positions within their professional societies and hospitals to further these schemes, which were planned and orchestrated at meetings that occurred in New Jersey, Illinois and Washington, D.C. A majority of the communications occurred via e-mail and text.

**143.**   Defendants Kaufman, Heary, Przybylski, Cohen and Staats discussed these schemes with other physicians and patients on the premises of Defendants HUMC and AHS, in a period that commenced in approximately 2007 and continues to this day.

### G.  The Defendants conspired to engage in media censorship and suppress the Plaintiff's First Amendment Right to Free Speech

**144.**   In early April 2013, Rutgers student, Sidra Bajwa, attended the administrative proceeding in the New Jersey Office of Administrative Law on the seventh (7th) floor of 33 Washington Street, Newark, NJ.

145.    Bajwa wrote an opinion piece about her experience of the event. The article was published the following week in the print and online version of the Observer, the Rutger's student newspaper **(Exhibit 28).**

146.    The story garnered significant attention from the student body and eventually came to the attention of Defendant Christie, who upon information and belief, contacted the President of Rutgers, Dr. Robert Barchi, and demanded that the online version be removed.

147.    The student editors not only removed Bajwa's article but published a story that attacked Bajwa's objectivity and falsely reported a detail about a case from the UK that had occurred in 1999, in which Kaul had provided intravenous sedation to a patient. This act of censorship caused a number of students to protest and caused Bajwa to complain to the Dean of Rutgers. **(Exhibit 32).**

148.    In response to the false Observer article, Kaul's lawyer sent the student editors a letter that demanded a retraction **(Exhibit 29)**.

149.    From the commencement of the proceedings against Kaul, the Defendants conspired with Defendant NJMG and other NJ media outlets to publish stories that were slanderous, defamatory and illegally procured.

**H.    The Plaintiff's medical license was revoked because of the massive fraud detailed in, 'The Solomon Critique'.**

150.    The Defendants tampered with evidence to fit their fraudulent narrative. The irrefutable evidence of this is contained within, 'The Solomon Critique' **(Reference: DNJ – 16-CV-02364 – D.E. 225 – PageID: 4940 to 5273)**, which proves that Defendants Solomon, Przybylski and Kaufman collectively committed **two hundred and seventy-eight (278) separate instances of perjury and evidential misrepresentation, omission and gross mischaracterization**. Defendant Washburn discussed the issue of evidence tampering with the Plaintiff on August 13, 2013, at the commencement of an interview that took place on the second floor of the Plaintiff's Medicare Certified, AAAHC accredited surgical center in Pompton Lakes, NJ **(Exhibit 7).** The Plaintiff's public

relations officer, Kelley Blevins, was present during this interview and two weeks earlier had discussed the issue with Defendant Washburn, during a meeting at a hotel in **Manhattan, New York.**

151.    Defendant NJBME took no internal or external investigatory action when the Plaintiff informed them in February 2014 **(Exhibit 11),** that evidence had been tampered with in the proceedings in the Office of Administrative Law. Defendant NJBME simply discounted the Plaintiff's claims, referring to them as *"insubstantial"* **(Exhibit 30).** 'The Solomon Critique' has proven them to be immensely substantial and proves that Defendant NJBME provided cover to a criminal conspiracy in which they played a pivotal role.

152.    Physician Kenneth Zahl, described to the Plaintiff in 2016, how members of the Office of the New Jersey Attorney General had engaged in the illegal shredding of critical pieces of evidence in other cases. In Zahl v Warhaftig (Docket No. 13,  CV,  01345), Zahl filed a motion on August 6, 2013 that sought access to the OAL servers, based on the report of an expert in digital forensics, who raised the issue of **evidence tampering**. The expert, Robert Gezelter, stated in ¶ 29 of his report, *"I can conclude, with a high degree of professional certitude, based upon my professional experience and familiarity with Microsoft Word that, assuming that ALJ Gerson correctly dated his signature on Exhibit "3" before the close of court (4:00 PM EST) on December 7, 2008, that one or more individuals made changes to Exhibit "3" which are recorded as having been made after ALJ Gerson purportedly executed the subject Initial Decision."* Zahl asserted, *"There is clear evidence of an altered administrative law court decision, a coverr  up of the tampering, and missing evidence."*

153.    Zahl had his license revoked in New Jersey in approximately 2005 and filed suit against Defendant Lomazow in the United States District Court, District of New Jersey in approximately 2009. The claim was dismissed and Zahl's appeal to the Third Circuit was denied. However, the litigation involved allegations that members of the Office of the New Jersey Attorney General had shredded critical pieces of evidence, and that Defendant Lomazow had used the power of his office to intimidate Zahl's experts into not testifying for him. This was a tactic used by Defendant NJBME to professionally isolate Kaul. The experts that testified on behalf of Kaul in the administrative law

proceedings were Drs Solomon Kamson and Kent Remley, who are based, respectively, in the States of Washington and Indiana.

154.    On or about January 22, 2014, Defendant Lomazow gave an interview, in which he discussed the events of his eight (8) year tenure at Defendant NJBME. During the interview he suggested that Dr. Kenneth Zahl was responsible for the **death/suicide** in 2006 of Deputy Attorney General, Paul Kenny, and described his interactions with Zahl. For three years Kenny's wife tried unsuccessfully to have her husband's untimely death investigated. The interview concludes with Lomazow's scathing description of the patients who had come to support Zahl:
https://www.youtube.com/watch?v=sFtE8EvEMsU

I.  **Defendants Allstate + GEICO propagated knowing falsehoods that Kaul had committed insurance fraud.**
    **Defendant TD negligently failed to perform any due diligence before acting on Defendants Allstate and GEICO's patent falsehoods.**
    **Defendants Stolz + DiOrio conspired with Defendants Allstate + GEICO to commit fraud against Kaul + Creditors of the Bankruptcy Estate.**

155.    In approximately 2008/2009 Kaul entered into loan agreements with Defendant TD, in order to procure funding for the development of the NJSR Surgical Center, in Pompton Lakes, NJ. Defendant TD demanded that Kaul assign them all of his banking and financial services, both business and personal.

156.    In May 2011 Defendant TD accelerated their loans and demanded full repayment on their business and personal loans. At this time Kaul was unaware of their conspiracy with other Defendants. Kaul had two meetings with legal and business representatives of Defendant TD. The first was with senior loan officer, Terry McCoy at the Lawrenceville location in NJ, and the second was with the Defendant's lawyer, William Fiore, Esq in Newark. Both meetings were exceptionally hostile, and demands were made for immediate repayment of the loans. Kaul was current with the loans, and no good cause was given by Defendant TD. In fact, at the meeting in Newark, when Kaul

28

explained he first had to service a federal IRS debt, Fiore retorted: *"I don't give a fuck about the IRS."* The meeting concluded shortly thereafter.

157.    Kaul agreed to increase the monthly payments and repeatedly requested that Defendant TD provide a structured payment plan. Defendant TD ignored Kaul's efforts to structure an agreement.

158.    On October 26, 2012, Defendant TD filed a lawsuit in the New Jersey Superior Court, Morris County, that sought to mandate that Kaul and his corporations immediately repay Defendant TD's loans. Kaul, upon receiving the complaint, gave it to a lawyer, and requested that it be answered. The lawyer failed to file answers, and because Kaul was busy preparing for the administrative law proceeding, he did not follow up, and therefore the complaint went unanswered.

159.    Defendant TD obtained a default judgment and then on April 2, 2013 the Morris County Court entered an order for the appointment of a receiver. On April 9, 2013, the first day of the administrative law proceeding, the receiver seized all of Kaul's personal and corporate assets and as a consequence, Kaul's attorney filed a motion to withdraw from the administrative case. The motion was denied.

160.    At the end of May 2013 Kaul became homeless.

161.    On June 17, 2013 Kaul, on behalf of his corporations filed for Chapter 11 Bankruptcy. The proceedings were converted into a Chapter 7 liquidation in approximately July 2014, consequent to the revocation of Kaul's license on March 12, 2014.

162.    Kaul retained Defendant DiOrio to defend his interests in the Chapter 7. The Court appointed Defendant Stolz as the trustee to the estate. The estate's largest asset was its Accounts Receivable (AR), which were approximately forty-five million dollars ($45,000,000.00). The estate also possessed a surgical center registration for NJSR Surgical Center and a license to build a new surgical center. Kaul obtained one of the last licenses issued by the State in 2009, before the commencement of a moratorium on surgical center development.

163.    Defendant Stolz has collected less than 0.1% of the AR from Defendants Allstate and GEICO, and none of the forty, four (44) plus creditors have received any monies from Defendant Stolz. In fact, the only monies that were 'clawed back' were from lawyers and accountants who had provided professional advice to Kaul and his corporations. Defendant Stolz filed numerous claims against these practitioners, the majority of whom have small businesses.

164.    Defendant DiOrio provided fraudulent legal advice to Kaul during the Chapter 7 proceedings. The real estate that contained the NJSR Surgical Center was not part of the Chapter 11 estate. However, on its conversion to a Chapter 7 Defendant Stolz and his now deceased partner, Robert Wasserman, threatened to file claims against Kaul and his ex, wife, unless he signed over the deed to the real estate. Kaul sent Wasserman a letter, dated December 14, 2015, in which Kaul advised Wasserman of the civil and criminal penalties that he would incur, if evidence emerged that he had aided and abetted the Defendants crimes **(Exhibit 35).** Kaul initially refused, but DiOrio advised Kaul that if he did not transfer the deed, then it was likely that his ex, wife and children would become homeless. Under immense duress and fraudulent legal representation, Kaul was improperly divested of his ownership in the NJSR real estate.

165.    In late 2015 Defendant DiOrio suggested to Kaul that he file for personal bankruptcy. Kaul did not.

166.    In mid, May 2017, upon checking the Bankruptcy Docket, Kaul discovered that Defendant DiOrio was listed as legal counsel for Defendant GEICO. Kaul sent a letter to Defendant DiOrio that explained his concerns and his intention to commence legal action if Di Orio did not consent to an interview **(Exhibit 26).** DiOrio did not respond to Kaul's letter.

167.    In 2017 Kaul also sent several e, mails to Defendant Stolz that requested information on how much of the Accounts Receivable he had collected. Defendant Stolz, who provides legal services to Defendants Allstate and GEICO, did not provide the information. Upon information and belief Defendant Stolz has collected less than 0.1% of the monies owed to Kaul by Defendants Allstate and GEICO.

30

**J.    Kaul is Qualified, Educated, Credentialed and Trained to perform Minimally Invasive Spine Surgery, contrary to the Defendants' false allegations. Kaul has performed eight hundred (800) cases with good to very good outcomes in 90-95% of cases.**

168.    Kaul is a minimally invasive spine surgeon, who graduated in 1988 from the Royal Free Hospital School of Medicine in London, UK. He subsequently underwent eight (8) years of post-graduate training in the US and UK, in the fields of general surgery, anesthesiology, interventional pain and minimally invasive spine surgery.

169.    In August 1996 Kaul became licensed to practice Medicine and Surgery in New Jersey.

170.    In September 1996 Kaul became Board Certified by the American Board of Anesthesiology.

171.    From 2002 to 2012 performed eight hundred (800) minimally invasive spine surgeries and a total of six thousand (6000) spine procedures, with good to very good outcomes in 90-95% of cases, and a complication rate of 0.1%: https://www.youtube.com/watch?v=9NjJV7XhBB0&t=172s

172.    From 1992 to 2001 Kaul administered approximately ten thousand (10,000) anesthetics.

173.    In 2005 Kaul performed the first outpatient minimally invasive lumbar fusion: https://www.youtube.com/watch?v=50R5N9bJMAg&t=202s and in 2011 Kaul performed the first outpatient corrections of an adolescent spondylolisthesis and a multi-level degenerative scoliosis https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=1s

174.    From 2003 to 2012 Kaul was credentialed by at least six (6) state licensed surgical centers to perform minimally invasive spine surgery.

175.    From 2002 to 2012 Kaul attended approximately eighty (80) hands on cadaver training courses, and also educated other physicians in the minimally invasive spinal technique.

31

176.    Defendant Przybylski commenced performing minimally invasive spine surgery in 2005, three (3) years after Kaul.

177.    In 2004 Kaul became board certified by the American Academy of Minimally Invasive Medicine and Surgery.

178.    None of the Physician Defendants are board certified by the American Academy of Minimally Invasive Spinal Medicine and Surgery.

179.    In 2008 Kaul established the Spine Africa Project, a 501 (c) 3 US based charity whose mission is to provide free healthcare and education to impoverished communities in Africa, India and the US: https://www.youtube.com/watch?v=Zu50ik2l2Sc&t=1227s. Defendant Christie's criminal conduct caused immense harm to the charity, that resulted, in 2012, in the cessation of Kaul's philanthropic work.

180.    On June 22, 2009 an independent arbitrator entered a judgment **(NJSR a/s/o Frances Kuren v Palisades Ins.-Forum File No. NJ1232047)** against Palisades Ins. and awarded Kaul his fee for having performed a minimally invasive spinal fusion on patient FK. The arbitrator found that Kaul was properly licensed; the procedure was properly performed and was medically necessary. Significantly the arbitrator found, after a review of all of the clinical evidence, ***"Dr. Kaul recommended pain management intervention followed by surgical intervention. The course of treatment performed by Dr. Kaul was consistent with the clinically supported symptoms, diagnosis and indications of the patient. Dr. Kaul's treatment plan was the most appropriate level of service that is in accordance with the standards of good practice and standard professional treatment protocols".*** Kaul utilized the same treatment algorithms on all of his patients.

181.    On March 3, 2011 Kaul opened NJSR Surgical Center, a Medicare certified, AAAHC accredited facility in Pompton Lakes, New Jersey. The Center credentialed Kaul to perform interventional spinal procedures and minimally invasive fusions and discectomies.

182.    Kaul's practice grew three hundred percent (300%) from March 2011 to April 2012, and he

increasingly performed cases on an outpatient basis, that although termed 'complex' by neurosurgeons, proved to be simple because of the surgical techniques employed by Kaul: https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=11s

**183.** Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002, and he frequently taught his technique to other physicians, who observed him in the operating room and attended his lectures: https://www.youtube.com/watch?v=AObxnXGmQkk&t=303s. The following video was presented at the medical board hearing on June 13, 2012 by Defendant Hafner, as evidence, incredulously, of Kaul's alleged malfeasance. A procedure is done perfectly, the patient gets better, and the Plaintiff is criticized:

https://www.youtube.com/watch?v=guwx5kuBiEg&t=162s

# VI. CLAIMS FOR RELIEF

## COUNT ONE

### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)

### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.

### (By Plaintiff against Defendants Christie + Kaufman + Przybylski + Heary + Staats + Lomazow + Hafner + Cohen + CNS + ASIPP)

### The CHC RICO Association-In -Fact-Enterprise

**184.** Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

**185.** Plaintiff brings this Count against Defendants Christie + Kaufman + Przybylski + Heary + Staats + Lomazow + Hafner + Cohen + CNS (inclusively, for the purpose of this count, the "CHC RICO Defendants'). At all relevant times each of the CHC RICO Defendants has been a "person" under 18 U.S.C. § 1961(3), because each is capable of holding, and does hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." See 18 U.S.C. § 1962(c).

33

186.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

187.    As explained in detail below, the CHC RICO Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing.

188.    The CHC RICO Defendants pursued these ends through a fraudulent scheme designed to secure increased revenues and market share, increase their political power within the medical community and secure their commercial relationships with each other. As explained in detail below, the CAC RICO Defendants years-long misconduct violated sections 1962(c) and (d).

A.    **Description of the CHC RICO Enterprise**

189.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961 (4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationship among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

190.    For years ASIPP played a small but meaningful role in the emerging field of minimally invasive spine surgery. It entered into verbal agreements with the neurosurgical members of Defendant CNS, from whom its members were referred patients. The horizontal agreement required that members of Defendant ASIPP would artificially limit their members scope of practice to percutaneous discectomies.

191.    In the past decade, however, Defendant ASIPP began to exert influence in their role as the arbiters of who was qualified to perform minimally invasive spine surgery, to influence the success or failure of high profile interventional pain physicians who did not contribute financially to ASIPP, but who had expanded their scope of practice. Defendant ASIPP, because of its horizontal

34

agreements with Defendant CNS and other spine societies, sought to control who entered the interventional pain and minimally invasive spine surgery sector.

192.    Negotiations between the CHC RICO Defendants regarding the division of the spine market, took place in complex, closed-door meetings, during which the parties discussed the threat of the Plaintiff's expanding outpatient minimally invasive spine surgery practice. In order to ensure that their members continued to receive referrals from the neurosurgeons who had become concerned that the Plaintiff's practice would expand nationally. The Defendants ASIPP agreed to participate in a scheme to have the Plaintiff's medical license revoked and stop him from performing minimally invasive spine surgery. The Defendant Neurosurgeons had become aware that the Plaintiff was training other minimally invasive spine surgeons, and that his work was being widely publicized.

193.    At all relevant times, the CHC RICO Defendants operated an ongoing association-in-fact enterprise, which was formed for the purpose of ensuring that that the horizontal agreements and market share distributions of the other CHC RICO Defendants continued to grow, by fraudulently excluding the Plaintiff, monopolizing the market and then artificially increasing their prices. Most of these meetings occurred behind closed doors in Morris County, NJ and Washington, D.C. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

194.    Alternatively, each of the CHC RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the CHC RICO Defendants conducted their pattern of racketeering activity. The CHC RICO Defendants separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the CHC RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CHC RICO Association-In-Fact- Enterprise".

195.    At all relevant times, the CHC RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated- in-fact for the common purpose of engaging in the CHC RICO Defendants profit making scheme, and the fraudulent scheme to provide 'experts' to ensure the revocation of the Plaintiff's license.

**196.**   The CHC RICO Association-In-Fact Enterprise consisted of the following entities and individuals: **(a)** Defendants ASIPP, Kaufman and Staats; **(b)** Defendants CNS, Heary and Przybylski; **(c)** Defendants Christie, Lomazow and Hafner; **(d)** Defendant Cohen.

**197.**   While each of the CHC RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CHC RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CHC RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each CHC RICO Defendant; **(b)** was separate and distinct from the pattern of racketeering in which the CHC RICO Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CHC RICO Defendants, along with other individuals and entities, including unknown third parties.

**198.**   The CHC RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CHC RICO Association-In-Fact Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CHC RICO Association-In-Fact Enterprise's activities by illegally conspiring to have the Plaintiff's license revoked, protecting their illegal horizontal 'fusion-percutaneous' agreements, monopolizing the markets, artificially elevating their prices, and illegally reducing competition.

**199.**   Defendants Staats, Kaufman, Przybylski, Heary and Cohen orchestrated the CHC RICO Association-In-Fact Scheme, whereby they leveraged their dominant political positions to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate competition and facilitate the Defendant Neurosurgeons monopolization of the minimally invasive spine surgery market, from which Defendants Kaufman and Staats profited through increased referrals from the Defendant Neurosurgeons.

**200.**   The CHC RICO Association-In-Fact Enterprise was provided with the use of state agencies (Defendant NJBME) personnel (Defendant Hafner + Defendant Solomon) and resources (State Treasury) which they illegally used to revoke the Plaintiff's license. These services were provided in

return for bribes and 'campaign donations' paid by the CHC RICO Association-In-Fact Defendants to Defendant Christie.

**201.**    In furtherance of the scheme, Defendants Kaufman, Staats, Heary, Przybylski and Cohen each affirmatively misrepresented or concealed from their members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. These Defendants understood that if the general members became aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Specifically, these Defendants claimed that the monies paid to Defendant Christie, were intended to assist them in their efforts to counter pending fee reductions from Defendant Allstate and GEICO, when, in fact, they were quid pro quo payments to Defendant Christie to have the Plaintiff's license revoked. The majority of ASIPP and CNS members were not direct commercial competitors of the Plaintiff, as was the case with Defendants Kaufman, Staats, Heary, Przybylski and Cohen, all of whom competed for patients from the same pool. i.e. New Jersey.

A. **The CHC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues**

**202.**    Each CHC RICO Association, In, Fact Defendant benefited financially from the CHC RICO Association, In, Fact Enterprise, as they took on the treatment of patients that had been under the care of the Plaintiff. In addition, Defendants Kaufman and Staats, for their cooperation with the scheme, received more referrals from Defendants Heary, Przybylski and Cohen. The increased patient flow led to increased revenues, and the perception within the medical community of their increased professional standing, which in turn caused an increase in referrals from community physicians.

**203.**    In exchange for the bribes paid to Defendant Christie by Defendants Staats and ASIPP, one of Staats's partners was appointed to Defendant NJBME, a position he used to block the Plaintiff's application in 2014 for license reinstatement.

**204.**    At all relevant times, the CHC RICO Association, In, Fact Enterprise: **(a)** had an existence separate and distinct from each CHC RICO Association, In, Fact Defendants; **(b)** was separate and

distinct from the pattern of racketeering in which the CHC RICO Association-In-Fact Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CHC RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Governor Christie, in order to have the medical board revoke the Plaintiff's license. The revocation led to an increase in revenue to the CHC RICO Association-In-Fact Defendants, but not necessarily to the general members of Defendants ASIPP and CNS.

205.    The CHC RICO Association-In-Fact Defendants, as well as Defendant Staats's partner, Scott Metzger, MD, all consult for the insurance industry, and regularly provide opinions that deny payment to other physicians, for services for which they themselves are reimbursed.

206.    The CHC RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries. These activities included the marketing, promotion, advertisement and delivery of minimally invasive spine surgery throughout the country, and the receipt of monies from the provision of such services.

207.    Within the CHC RICO Association-In-Fact Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CHC RICO Association-In-Fact Enterprise used this network for the purpose of promoting the revocation of the Plaintiff's license, in order to intimidate other minimally invasive spine surgeons into not performing minimally invasive spinal fusions. The network was also used to attack the Plaintiff's character and disseminate false allegations that he had engaged in insurance fraud. The falsity of these latter claims was proved when Defendant GEICO's lawsuit filed in the United States District Court, District of New Jersey on April 27, 2013, was dismissed with prejudice on December 8, 2014.

208.    Each participant in the CHC RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CHC RICO Association-In-Fact Enterprise, the CHC RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the

CHC RICO Association-In-Fact Scheme. The CHC RICO Association-In-Fact Defendants participated in the operation and management of the CHC RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the CHC RICO Association-In-Fact Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

209.    The CHC RICO Association-In-Fact Defendants exerted substantial control over the CHC RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: **(a)** deciding how monies were dispersed from the political action committees; **(b)** communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; **(c)** developing policies and guidelines for clinical care, that were consistent with the horizontal agreements and market share plans; **(d)** procuring appointments to regulatory boards and insurance panels, which they used to further their personal economic agendas; **(e)** procuring positions on hospital credentialing committees, which they used to exclude competition from the hospital; **(f)** procuring positions on medical expert panels, which they used to testify against their competition in medical malpractice suits; **(g)** misrepresenting and/or concealing from the general members the true nature of the relationship and agreements between the members of the enterprise and the scheme in their conspiracy to have the Plaintiff's license revoked ; **(h)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; **(i)** ensuring that the other CAC RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

210.    Without each CHC RICO Association-In-Fact Defendants willing participation, the CHC RICO Association-In-Fact Scheme and common course of conduct would not have been successful. The CHC RICO Association-In-Fact Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

39

A.    **Predicate Acts: Mail and Wire Fraud**

211.    To carry out, or attempt to carry out, the scheme to defraud, the CHC RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CHC RICO Association-In-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CHC RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

212.    Specifically, the CHC RICO Association-In-Fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

213.    The multiple acts of racketeering activity which the CHC RICO Association-In-Fact Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CHC RICO Association-In-Fact Defendants' regular use of the facilities, services, distribution channels, and employees of the CHC RICO Association-In-Fact Enterprise. The CHC RICO Association-In-Fact Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

214.    The CHC RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

215.    In devising and executing the illegal scheme, the CHC RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the

40

public and the Plaintiff's patients, that the Plaintiff was not qualified to perform minimally invasive spine surgery, a materially false representation. For the purpose of executing the illegal scheme, the CHC RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

216.    The CHC RICO Association-In-Fact Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

(a) Mail Fraud: The CHC RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to revoke the Plaintiff's medical license by means of misrepresentations and omissions.

(b) Wire Fraud: The CHC RICO Association-In-Fact Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

217.    The CHC RICO Association-In-Fact Defendants' use of the mails and wires include, but are not limited to: **(a)** the transmission of letters, e-mails and other materials negotiating the horizontal agreements and market share distributions; **(b)** the transmission of letters, emails and other materials indicating that the CHC RICO Association-In-Fact Defendants had instructed their members not to support the Plaintiff in any litigation; **(c)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(d)** written, telephone, or electronic communications instructing its members not to support the Plaintiff in any litigation; **(e)** written, telephone, or electronic communications regarding discussions between the CHC RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(f)** the use of the mails or wires to bill for or collect the increased revenues that flowed from the elimination of the Plaintiff from the practice of medicine.

218.    The CHC RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United

41

Kingdom, and other healthcare related third-party entities in furtherance of the scheme. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the Plaintiff from the practice of medicine.

219.    Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

220.    The CHC RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CHC RICO Association-In-Fact Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CHC RICO Association-Fact Defendants in these offenses. They have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators, through the illegal scheme and their common course of conduct. The CHC RICO Association-In-Fact Defendants aided and abetted others in violation of the above laws.

221.    To achieve their common goals, the CHC RICO Association-In-Fact Defendants encouraged patients to file lawsuits against the Plaintiff, filed complaints with state and federal healthcare regulatory authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles.

222.    The CHC RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CHC RICO

Association-In-Fact Defendants and their co-conspirators had to agree to conceal their fraudulent scheme and illegal tactics. The CHC RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease treating and engaging in healthcare commerce with the Plaintiff.

223.    The CHC RICO Association-In-Fact Defendants engaged in this pattern of related and continuous predicate acts against the Plaintiff for eight years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eliminating the competition he presented, and increasing the CHC RICO Association-In-Fact Defendants revenues. The predicate acts were related and not isolated events.

224.    During the CHC RICO Association-In-Fact Defendants' perpetration of their scheme, the true purpose of the fraudulent nature of their racket, to increase revenues through the elimination of the Plaintiff from the practice of medicine, was revealed to each of the CHC RICO Association-In-Fact Defendants. Nevertheless, in furtherance of their scheme, the CHC RICO Association-In-Fact Defendants continued to disseminate falsehoods that the Plaintiff was not qualified to perform minimally invasive spine surgery.

225.    By reason of, and as a result of the misconduct of the CHC RICO Association-In-Fact Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his medical practice and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of his children's home and the fracturing of his relationship with his children.

226.    The CHC RICO Association-In-Fact Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

COUNT TWO

VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)

THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.

(By Plaintiff against Defendants Christie + GEICO + Allstate + TD + Stolz + DiOrio + Crist + Solomon

+ Hafner)

<u>The CAD RICO Association-In -Fact-Enterprise</u>

227.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

228.    Plaintiff brings this Count against Defendants Christie + GEICO + Allstate + TD + Stolz + DiOrio + Crist + Solomon + Hafner (inclusively, for the purposes of this Count, the "CAD RICO Association-In-Fact Defendants").

229.    At all relevant times the CAD RICO Association-In-Fact Defendants have been "persons" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

230.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

231.    As explained in detail below, the CAD RICO Association-In-Fact Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to manufacture an excuse to avoid paying the Plaintiff's bills for the minimally invasive spine surgeries he had performed on customers of CAD RICO Association-In-Fact Defendants, Allstate and GEICO. The CAD RICO Association-In-Fact Defendants sought to achieve these ends, so

44

that that the Plaintiff would leave the country, and not litigate the CAD RICO Association-In-Fact Defendants wrongful conduct. The CAD RICO Association-In-Fact Defendants pursued these ends through a fraudulent scheme of bribes and kickbacks to Defendant Christie, that were designed to secure increased revenues, an increased NYSE share price, increased political power over state legislators, increased market-share of the banking and insurance sector, and the manufacture of anticompetitive case law advantageous to their commercial agendas.  As explained in detail below, the CAD RICO Association-In-Fact Defendants' years-long misconduct violated sections 1962(c) and (d).

232.     Defendants Stolz and DiOrio benefitted from the illegal scheme through increased revenues from legal work from Defendants GEICO and Allstate. Stolz abused his position as the trustee of the Chapter 7 proceeding in refusing to file claims against Defendants Allstate and GEICO for the monies they owed the Plaintiff's corporations. Stolz has collected less than 0.1% of the approximately ten million dollars ($10,000,000.00) owed by Defendants Allstate and GEICO to the Plaintiff and his creditors.

233.     Defendant DiOrio represented the Plaintiff in the Chapter 7 proceeding. Defendant DiOrio received legal work from Defendant GEICO in return for advising the Plaintiff to transfer the real estate title of his surgical center (NJSR Surgical Center) to the Chapter 7 estate. Defendant Stolz is the trustee of the Chapter 7 estate. Defendant Allstate is a client of Defendant Stolz and his law firm.

234.     Defendant Crist was the CEO of Defendant Allstate. Defendant Crist is a major shareholder in Defendant Allstate. Defendant Crist reaped enormous profits from the four hundred percent (400%) increase in Defendant Allstate's share price that occurred between 2012 and 2016. This increase was a direct consequence of the monies that Defendant Allstate illegally obtained from not paying the Plaintiff the millions they owed him.

235.     Defendants Allstate and GEICO used the revocation of the Plaintiff's license as an excuse to not pay hundreds of other minimally invasive spine surgeons the fees owed to them, and thus illegally diverted their clients' monies away from clinical care into executive compensation. As a

consequence, their clients were deprived of pain relieving procedures and many resorted to opiate painkillers. This is one of the causes of the opiate epidemic in New Jersey. The Defendants continue to increase the cost of insurance premiums, while denying care to patients and reducing fees to healthcare providers.

236.    Defendant Solomon and members of his family received material favors from Defendants Allstate and GEICO, in exchange for issuing a fraudulent legal opinion and recommending the revocation of the Plaintiff's license. Defendant Solomon was brought out of retirement to adjudicate the case against the Plaintiff and returned to retirement immediately after the case.

237.    Defendant Hafner knowingly cooperated with the other Defendants in a scheme that she understood was illegal, in both motive and means. Defendant Hafner played a central role in the drafting of Defendant Solomon's fraudulent opinion and knew that the document had been falsified. Defendant Hafner knew that she had a duty to report the crime to federal authorities, but willfully ignored that duty and did not report the crime to federal authorities. Defendant Hafner was a willing participant in the criminal conspiracy, and because of her cooperation is criminally liable.

B.  **Description of the CAD RICO Enterprise**

238.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features **(1)** a purpose; **(2)** relationships among those associated with the enterprise; and **(3)** longevity sufficient to permit those associates to pursue the enterprise's purpose.

239.    The CAD RICO Association-In-Fact Defendants have, through the increased revenue generated through their decades old scheme of kickbacks and bribery, increased their control of the state government, its agencies, its legislature and certain members of its judiciary. This permitted them to exert control over the mechanism of physician regulation in order to revoke the Plaintiff's medical license. The excuse given by the medical board to revoke the Plaintiff's license was that he

had, according to Defendants Przybylski and Kaufman, deviated from a standard of care, a standard that they ultimately admitted did not exist. The real reason for the revocation was their desire to avoid their financial obligations to the Plaintiff. Discussions between the CAD RICO Association-In-Fact Defendants regarding the Plaintiff's invoices for minimally invasive spine surgery took place in complex closed-door meetings, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

240.    In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant insurance carriers co-orchestrated a scheme, with the other CAD RICO Association-In-Fact Defendants to have the Plaintiff's medical license revoked. As part of the scheme the defendant insurance carriers disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

241.    The illegal scheme to maintain and increase the profits of Defendants Allstate and GEICO through the elimination of the Plaintiff's practice, benefited the shareholders and Defendants Crist, Christie, Solomon, Stolz and DiOrio, all of whom are corrupted members of the political and legal establishment. The illegal scheme also benefitted political lobbyists and public relations personnel, the 'middle-men' through whom Defendants Allstate and GEICO funneled bribes.

242.    At all relevant times the CAD RICO Association-In-Fact Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A large majority of these meetings occurred behind closed doors in Newark and Trenton, many of which were attended by members of the Office of the New Jersey Attorney General, and most frequently by Defendant Hafner. The Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

243.    Alternatively, each of the CAD RICO Association-In-Fact Defendants constitutes a single legal

entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CAD RICO Association-In-Fact Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CAD RICO Association-In-Fact Enterprise."

244.    At all relevant times, the CAD RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CAD RICO Association-In-Fact Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

245.    The CAD RICO Association-In-Fact Enterprise consisted of the following entities and individuals: **(a)** Defendant Allstate New Jersey Insurance Company; **(b)** Defendant GEICO; **(c)** Defendant TD Bank; **(d)** Defendant Christie; **(e)** Defendant Stolz; **(f)** Defendant DiOrio; **(g)** Defendant Christie; **(h)** Defendant Crist; **(i)** Defendant Solomon; **(j)** Defendant Hafner. While each of the CAD RICO Association-In-Fact Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CAD RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CAD RICO Association-In-Fact Enterprise: (a) had an existence separate and distinct from each CAD Association-In-Fact Enterprise Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAD RICO Association-In-Fact Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAD RICO Association-In-Fact Enterprise Defendants, along with other individuals and entities, including unknown third parties.

246.    The CAD RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CAD RICO Association-In-Fact Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAD RICO Association-In-Fact Enterprise's activities by conspiring to have the Plaintiff's license illegally revoked, in order to manufacture an excuse to not pay the Plaintiff monies for the provision of minimally invasive spine surgery. Defendants Allstate and GEICO used the revocation of the Plaintiff's license as a basis to deny

payment to other similarly trained minimally invasive spine surgeons.

247.    Defendants Allstate and GEICO orchestrated the CAD RICO Association-In-Fact Enterprise's scheme, whereby they leveraged their control of Defendant NJBME to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate the Plaintiff from the practice of medicine, and thus eradicate their debt and eliminate any future financial liability that would have developed had the Plaintiff continued to practice minimally invasive spine surgery. The CAD RICO Association-In-Fact Defendants knew that the Plaintiff planned to open a four-operating room state licensed surgical center in New Jersey and had plans to expand nationally.

248.    Defendant Christie provided the CAD RICO Association-In-fact Enterprise with the use of state agencies (Defendant NJBME), personnel (Defendant Solomon + Defendant Hafner) and the resources (State Treasury) necessary to revoke the Plaintiff's license. Defendant Christie provided these services in return for bribes and monies disguised as 'campaign donations'. The monies were part of a quid pro quo scheme, not protected by Noerr-Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

249.    In furtherance of the scheme, the CAD RICO Association-In-Fact Defendants each affirmatively misrepresented or concealed from their shareholders and the public, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. Defendants Allstate and GEICO understood that if the shareholders had become aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Defendants Christie, Solomon and Hafner understood that if the public became aware of the illegal use of their taxes to fund the illegal scheme, they would have demanded an investigation and not voted for Defendant Christie in the 2013 New Jersey Gubenatorial election. Specifically, the CAD RICO Association-In-Fact Defendants claimed that the bribes paid were intended to assist them in their legislative efforts, when in fact they were quid pro quo payments to Defendant Christie, in order to have the Plaintiff's license revoked.

## C.  The CAD RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

250.    Each CAD RICO Association-In-Fact Defendant benefited financially from the CAD RICO Association-In-Fact Enterprise. Defendants Allstate and GEICO eliminated past debt, and future liability. Defendant TD was rewarded with regulatory favors not offered to their banking competitors. These favors led to increased profits, increased executive compensation and an increased NYSE share price. Defendant Christie in return acquired funds for his political campaigns.

251.    As part of a quid pro quo that existed within the CAD RICO Association-In-Fact Enterprise, Defendant Christie discouraged the NJ Department of Banking and Insurance from enforcing regulatory violations against Defendant TD. This was in return for Defendant TD's **(i)** foreclosure in 2012 of the Plaintiff's business loans, **(ii)** their scheme in 2013 to prevent the sale of his Manhattan townhouse and **(iii)** the appointment in 2013 by a Morris County Court of a receiver who seized control of the Plaintiff's businesses. The latter event precipitated the filing by the Plaintiff on June 17, 2013, for Chapter 11 protection. This caused many of the Plaintiff's employees, a large percentage of whom were single mothers to become unemployed and lose their health insurance. This has resulted in vast profits for the CAD RICO Association-In-Fact Enterprise Defendants which would not have occurred, but for their involvement in quid pro quo schemes with Defendant Christie.

252.    At all relevant times, the CAD RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each of the CAD RICO Association-In-Fact Defendants; **(b)** was separate and distinct from the pattern of racketeering in which the CAD RICO Association-In-Fact Enterprise Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CAD RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Defendant Christie. The purpose of the bribery was to have him order Defendant NJBME to revoke the Plaintiff's license. The revocation caused an increase in revenue to the CAD RICO Association-In-Fact Defendants. Defendants Allstate, GEICO and TD's increased profits and increased share prices, have not resulted in lower insurance and banking fees to the public.

253. The CAD RICO Association-In-Fact Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAD RICO Association-In-Fact Defendants and other entities and individuals associated-in-fact with the Enterprise's activities. The CAD RICO Association-In-Fact Defendants illegal scheme to have the Plaintiff's license revoked, caused them to profit from the increased revenues that flowed from the eradication of past debt and the elimination of future liability. These illegal profits were distributed to Defendants Christie, Solomon, Crist, Stolz and DiOrio disguised as executive compensation, share dividends, legal fees, campaign donations and no-show jobs for family members. The CAGTK RICO Defendants, comprise a group of "persons" who simultaneously regulate and profit from the New Jersey Banking and Insurance Sector.

254. The CAD RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the commercialization of risk, the lending of capital and the sale of financial products, the consequences of which have generated enormous profits.

255. The CAD RICO Association-In-Fact Enterprise used their common communication network to promote false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud. Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

256. Defendant TD filed a complaint in 2013 with www.checksystems.com that prevented the Plaintiff access to banking services. Defendant TD's misconduct caused the Plaintiff to become homeless in 2013 and compromised his economic position, which temporarily hindered his ability to litigate pending legal matters, and collect monies owed by Defendants Allstate and GEICO.

257. Defendant GEICO filed a frivolous lawsuit against the Plaintiff on April 24, 2013. The falsity of its insurance fraud claims was proved when Defendant GEICO's lawsuit filed was dismissed with prejudice on December 8, 2014.

258.    The network was used to disseminate the aforementioned falsehoods to the minimally invasive spine surgery community, in order to dissuade them from pursuing their accounts receivable. This permitted Defendants Allstate and GEICO to improperly profit from a scheme polluted with bribes, fraud, kickbacks, obstruction of justice, perjury and a criminally fraudulent opinion rendered by Defendant Solomon.

259.    Each participant in the CAD RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CAD RICO Association-In-Fact Enterprise, the CAD RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the CAD RICO Association-In-Fact Scheme.

260.    The CAD RICO Association-In-Fact Defendants participated in the operation and management of the CAD RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the CAD RICO Association-In-Fact Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

261.    The CAD RICO Association-In-Fact Defendants exerted substantial control over the CAD RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: **(a)** deciding how monies were dispersed from the political action committees; **(b)** communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; **(c)** developing policies, guidelines and fee schedules for clinical care, in which the Defendants Allstate and GEICO colluded with other New Jersey No-Fault Carriers to fix the prices of both auto insurance and the fees paid to healthcare providers; **(d)** procuring appointments to regulatory state agencies, which they abused to further their personal economic agendas; **(e)** writing healthcare related legislation; **(f)** funding state administered litigation against minimally invasive spine surgeons to whom they owed substantial monies; **(g)** misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant

Christie in order to revoke the Plaintiff's medical license; **(h)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; **(i)** ensuring that the other CAD RICO Association-In-Fact Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

**262.**    Without each CAD RICO Association-In-Fact Defendants' willing participation, the CAD RICO Association-In-Fact scheme and common course of conduct would not have been successful. The CAD RICO Association-In-Fact Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

**F.  Predicate Acts: Mail and Wire Fraud**

**263.**    To carry out, or attempt to carry out, the scheme to defraud, the CAD RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CAD RICO Association-In-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CAD RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

**264.**    Specifically, the CAD RICO Association-In-fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

**265.**    The multiple acts of racketeering activity which the CAD RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CAD RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CAD RICO Enterprise. The CAD RICO Association-In-Fact

Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

266.    The CAD RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

267.    In devising and executing the illegal scheme, the CAD RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CAD RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

268.    The CAD RICO Association-In-Fact Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

(a)  Mail Fraud: The CAD RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, eradicate debt, eliminate future financial liability and prevent other minimally invasive spine surgeons from collecting monies that they were owed. These ends were pursued by means of false representations and omissions.

(b)  Wire Fraud: The CAGTK RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of monies he was owed for the provision of minimally invasive spine surgery, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

(c)  The CAD RICO Association-In-Fact Defendants' use of the mails and wires include, but are not limited to: (i) the transmission of letters, e-mails and other materials regarding the price fixing of

auto insurance policies and physician fee schedules; **(ii)** the transmission of letters, emails and other materials indicating that the CAD RICO Association-In-Fact Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; **(iii)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(iv)** written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; **(v)** written, telephone, or electronic communications regarding discussions between the CAD RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(vi)** the use of the mails or wires to further schemes to eradicate the CAD RICO Association-In-Fact Defendants' debt to the Plaintiff, and eliminate future liability; **(vii)** the use of the mails and wires to instruct the Chapter 7 trustee not to pursue the monies owed to the Plaintiff's corporations, and creditors.

269.    The CAD RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and reputational standing. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the debt owed to the Plaintiff, and the eradication of future financial liability. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

270.    The CAD RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CAD RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CAD RICO

55

Association-In-Fact Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

271.    The CAD RICO Association-In-Fact Defendants aided and abetted others in violation of the above laws. To achieve their common goals, the CAD RICO Association-In-Fact Defendants encouraged their clients to file lawsuits against the Plaintiff, filed complaints with state and federal healthcare regulatory authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles. The CAD RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CAD RICO Association-In-Fact Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics.

272.    The CAD RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would cease communicating and engaging in healthcare commerce with the Plaintiff, consequent to the material misrepresentations and omissions made by them. Indeed, the Defendants knew that their only chance of eradicating their debt, and eliminating any future financial liability was to professionally and economically isolate the Plaintiff, with the expectation that he would leave the country.

273.    The CAD RICO Association-In-Fact Defendants engaged in a pattern of related and continuous predicate acts for eight (8) years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus for **(i)** Defendants Allstate and GEICO eradicating their debt and increasing their revenues, executive compensation and NYSE share price and thus for **(ii)** Defendant Christie increasing political donations into his political campaign and bribes into off-shore bank accounts and trusts, and thus for **(iii)** Defendant Solomon bribes into off-shore bank accounts and trusts and no-show jobs for family members, and thus for **(iv)** Defendant Crist increasing executive compensation and share dividends, and thus for **(v)** Defendants Stolz and DiOrio increasing legal fees, and thus for **(vi)** Defendant Hafner bribes funneled into off-shore accounts and trusts.

274.    The predicate acts also had the same or similar results, participants and methods of commission.

275.    During the CAD RICO Association-In-Fact Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to the CAD RICO Association-In-Fact Defendant, TD. Nevertheless, in furtherance of their scheme, Defendants TD continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

276.    By reason of, and as a result of the conduct of the CAD RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

277.    The CAD RICO Association-In-Fact Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

## COUNT THREE
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.
### (By Plaintiff against Defendants Christie + HUMC + AHS + Garrett + Hafner + Stein + NJBME)
### The CAS RICO Association-In -Fact-Enterprise

278.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

279.    Plaintiff brings this Count against Defendants Christie + HUMC + AHS + Garrett + Hafner + Stein + NJBME (inclusively, for the purposes of this Count, the "CAS RICO Association-In-Fact Defendants"). At all relevant times the CAS RICO Association-In-Fact Defendants have been

"persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

280.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

281.    As explained in detail below, the CAS RICO Association-In-Fact Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, eliminate the competition he and his surgical center presented, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to divert patients requiring minimally invasive spine surgery away from the Plaintiff's surgical center, and towards their facilities and physicians. As explained in detail below, the CAS RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

## G.  Description of the CAS RICO Association-In-Fact Enterprise

282.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features **(1)** a purpose; **(2)** relationships among those associated with the enterprise; and **(3)** longevity sufficient to permit those associates to pursue the enterprise's purpose.

283.    For years Defendants HUMC and AHS occupied the dominant role in the delivery of spine care in New Jersey, that positioned them at the center of the political and business sectors, with a wide and deep network of middleman known as 'political lobbyists' and 'public relation gurus'. The Defendants market share in the minimally invasive spine surgery sector began to decrease in approximately 2004, with increased development of free standing, predominantly physician owned, surgical centers.

58

**284.** The Plaintiff's performance in 2005 of the first outpatient minimally invasive spine fusion proved that the procedure could be done on a same day basis. As a consequence, Defendants HUMC and AHS lost business, and then engaged in a scheme of bribes and kickbacks, in which Defendant Christie used Defendants NJBME, Hafner and Solomon to revoke the Plaintiff's license, an event that caused his surgical center to file for Chapter 11 bankruptcy. As a consequence of the Defendant HUMC and AHS bribing Defendant Christie, he vetoed a bill in approximately 2011 that would have permitted one operating room surgical centers to apply for state licensure. The effect of the veto was to artificially reduce competition.

**285.** Defendants HUMC and AHS also engineered legislative changes that reduced surgical center funding from Defendants Allstate and GEICO and restricted the performance of minimally invasive spinal fusions to the Defendant Hospitals. This caused the closure of approximately fifty percent of facilities from 2004 to 2012. The effect of these changes has been to reduce the availability of minimally invasive spine surgery, an etiological factor in the opiate epidemic. The Defendant HUMC and AHS monopolization of the minimally invasive spine surgery sector has permitted them to engage in price gouging with private health insurers, the extra cost of which has been passed onto the public.

**286.** In the past five years, the Defendant HUMC and AHS monopolization of the minimally invasive spine surgery market has caused an exponential increase in revenues, increased political power and disproportionate leverage in negotiations with private insurance companies. The increased monies have resulted in aggressive expansion projects that have focused on highly profitable outpatient spine centers. The reduced competition from surgical centers has given the CAS RICO Association-In-Fact Defendant Hospitals increased bargaining power with private health insurers, in which the CAS RICO Association-In-fact Defendants have forced excessive reimbursement rates, under threat of boycott to the private health insurer's clients. The Plaintiff's outpatient spine surgery model presented an enormous threat to Defendants HUMC and AHS, whose revenues would have been reduced if the Plaintiff's four operating room surgical center had opened.

**287.** Defendants HUMC and AHS conspired with Defendants Christie, Hafner and NJBME to

59

eliminate and legally compromise physicians and surgical centers that competed in their market. This was achieved through bribing Defendant Christie into signing legislation that **(i)** limited surgical center development, **(ii)** eliminated reimbursement to surgical centers for minimally invasive spine surgery, **(iii)** entered legislation that permitted Defendants Allstate and GEICO to stop paying surgical centers for minimally invasive spine surgery and **(iv)** initiated medical licensing prosecutions against physicians who practiced minimally invasive spine surgery independently in surgical centers with no hospital affiliations.

288.    Defendants HUMC and AHS illegal scheme to revoke the Plaintiff's license was perpetrated through a series of quid pro quos with Defendant Christie in which Defendants HUMC and AHS funneled bribes into off-shore accounts and aggressively funded Defendant Christie's political activities.

289.    Defendant Christie used state resources (State Treasury), agencies (Defendant NJBME) and personnel (Defendants Hafner + Solomon) to revoke the Plaintiff's license. The revocation caused the Plaintiff's corporations to file for Chapter 11 Bankruptcy and permitted Defendant Stolz to seize the Plaintiff's surgical center and a license he had obtained in 2009 to build a thirty-six thousand square foot, four operating room surgical center in Pompton Lakes, NJ. A moratorium on surgical centers was issued in 2009 because of pressure from Defendants HUMC, AHD, Allstate and GEICO.

290.    The Plaintiff obtained one of the last licenses issued, and it was illegally seized, along with all of the Plaintiff's property, as a consequence of the illegal schemes **(i)** orchestrated by Defendant Christie, **(ii)** perpetrated by Defendants Hafner, Solomon, NJBME, Lomazow, Stolz and DiOrio and **(iii)** funded by Defendants Allstate, GEICO, HUMS, AHS, Heary, Kaufman, Przybyslski, Staats, Crist, Stein, Cohen, ASIPP and CNS, Garrett, **(iv)** facilitated by Defendants TD, NJMG, Washburn.

291.    Discussions occurred between the CAS RICO Association-In-Fact Defendants regarding the Plaintiff, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

292.    In order to ensure that their corporate profits were not affected by the increasing

commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant HUMC and AHS co-orchestrated a scheme, with the other CAS RICO Association-In-Fact Defendants to have the Plaintiff's medical license revoked. As part of the scheme the CAS RICO Association-In-Fact Defendants disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

293.   The CAS RICO Association-In-Fact Defendants fraudulent scheme to eliminate the Plaintiff's practice and increase the profits of the Defendants HUMC and AHS, benefited their corporate executives, and permitted increased monies to be funneled through middlemen to Defendant Christie.

294.   At all relevant times the CAS RICO Association-In-Fact Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A majority of these meetings occurred behind closed doors in Morris County and Bergen County, many of which were attended by members of the Office of the New Jersey Attorney General, and most frequently, Defendant Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

295.   Alternatively, each of the CAS RICO Association-In-Fact Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CAS RICO Association-In-Fact Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CAS RICO Association-In-fact Enterprise."

296.   At all relevant times, the CAS RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the

61

CAS RICO Association-In-Fact Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

**297.**    The association-in-fact CAS Enterprise consisted of the following entities and individuals: **(a)** Defendant HUMC; **(b)** Defendant AHS; **(c)** Defendant Garrett; **(d)** Defendant Stein; **(e)** Defendant NJBME; (f) Defendant Hafner; **(g)** Defendant Christie.

**298.**    While each of the CAS RICO Association-In-Fact Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CAS RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CAS RICO Association-In-fact Enterprise: **(a)** had an existence separate and distinct from each CAS RICO Association-In-Fact Defendants; **(b)** was separate and distinct from the pattern of racketeering in which the CAS RICO Association-In-Fact Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CAS RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties.

**299.**    The CAS RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CAS RICO Association-In-Fact Enterprise engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAS RICO Association-In-Fact Enterprise's activities by bribing Defendant Christie to have the Plaintiff's license revoked. The revocation was publicized by Defendants NJMG and Washburn, who defamed and slandered the Plaintiff. The benefit to Defendant Stein of the revocation and defamation, was that it facilitated litigation he had commenced against the Plaintiff. Defendants NJMG and Washburn publicized this litigation on multiple occasions, which assisted the litigation, and gave Defendant Stein information about the Plaintiff's personal affairs.

**300.**    Defendant Christie provided the CAS RICO Association-In-Fact Enterprise with the use of state agencies (Defendant NJBME + New Jersey Office of Administrative Law)) personnel (Defendants Solomon + Hafner) and resources (State Treasury) necessary to revoke the Plaintiff's license. These services were provided in return for bribes funneled into off-shore accounts and trusts, and monies disguised as 'campaign donations' to Defendant Christie. The monies were part

of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

301.   In furtherance of the scheme, the CAS RICO Association-In-Fact Defendants each affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. Defendants HUMC, AHS and Garrett understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, the CAS RICO Association-In-Fact Defendants claimed that the monies paid to Defendant Christie were intended to assist them in their legislative efforts, when in fact, they were quid pro quo payments in order to have the Plaintiff's license revoked.

## H.   The CAS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

302.   At all relevant times, the CAS RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each CAS RICO Association-In-fact Defendant; **(b)** was separate and distinct from the pattern of racketeering in which the CAS RICO Association-In-Fact Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CAS RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise.

303.   The CAS RICO Association-In-Fact Enterprise was formed for the purpose of bribing Governor Christie, in order to **(i)** have him instruct the medical board to revoke the Plaintiff's license, to **(ii)** veto legislation contrary to the commercial interests of the Defendant HUMC and AHS, and to **(iii)** use the licensing proceedings against the Plaintiff to mischaracterize the clinical significance of hospital privileges. In fact, there is no evidence that connects clinical outcomes with the possession of hospital privileges, and hospitals have a far higher mortality and morbidity rate than outpatient surgical centers.

304.   Defendants HUMC and AHS are able to conceal their complications because of the influence they have purchased with regulatory agencies and the media. The internal counsel for Defendant

NJMG is on the board of Defendant HUMC. Defendants HUMC and AHS comprise a group of "persons" who simultaneously wield immense influence with regulatory agencies, while trading in the market regulated by these agencies.

305.    The CAS RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as national marketing strategies and the treatment of patients from within the tri-state area, the consequences of which have generated enormous profits.

306.    Within the CAS RICO Association-In-Fact Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CAS RICO Association-In-Fact Enterprise used this common communication network for purposes of promoting false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

307.    Each participant in the CAS RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CAS RICO Association-In-Fact Enterprise, the CAS RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the CAS RICO Association-In-Fact Scheme.

308.    The CAS RICO Association-In-Fact Defendants participated in the operation and management of the CAS RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the CAS RICO Association-In-Fact Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. The CAS RICO Association-In-Fact Defendants exerted substantial control over the CAS RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: **(a)** deciding how monies were dispersed from the political action committees; **(b)** communicating directly with lawyers, public relation agents and political lobbyists with direct

connections to Defendant Christie, and members of both state and federal governments; **(c)** developing policies, guidelines and regulations that controlled where and by whom clinical care was delivered; **(d)** procuring appointments to regulatory state agencies, which they abused to further their personal economic agendas; **(e)** writing healthcare related legislation; **(f)** misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to revoke the Plaintiff's medical license; **(g)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; **(h)** ensuring that the other CAS RICO Association-In-Fact Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

**309.**   Without each CAS RICO Association-In-Fact Defendants' willing participation, the CAS RICO Association-In-fact Scheme and common course of conduct would not have been successful.

**310.**   The CAS RICO Association-In-Fact Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

**311.**   To carry out, or attempt to carry out, the scheme to defraud, the CAS RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CAS RICO Association-In-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CAS RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

**312.**   Specifically, the CAS RICO Association-In-Fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

313.    The multiple acts of racketeering activity which the CAS RICO Association-In-Fact Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CAS RICO Association-In-Fact Defendants' regular use of the facilities, services, distribution channels, and employees of the CAS RICO Association-In-Fact Enterprise. The CAS RICO Association-In-Fact Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

314.    The CAS RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in perpetration of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

315.    In devising and executing the illegal scheme, the CAS RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CAS RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

I.   **Predicate Acts: Mail and Wire Fraud**

316.  The CAS RICO Association-In-Fact Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

(a) Mail Fraud: The CAS RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, and impede the growth of minimally invasive spine surgery in free standing outpatient surgical centers. These ends were

66

pursued by means of false representations and omissions.

**(b)** Wire Fraud: The CAS RICO Association-In-Fact Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of the property rights of his medical license, reputation and minimally invasive spine surgery business, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

317.    The CAS RICO Association-In-Fact Defendants' use of the mails and wires include, but are not limited to: **(a)** the transmission of letters, e-mails and other materials with Defendant Hafner, regarding the scheme to eliminate the Plaintiff from the practice of medicine; **(b)** the transmission of letters, emails and other materials indicating that the CAS RICO Association-In-Fact Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; **(c)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(d)** written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; **(e)** written, telephone, or electronic communications regarding discussions between the CAS RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(f)** the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; **(g)** the use of the mails and wires to communicate the illegal scheme with Defendants Washburn and North Jersey Media Group.

318.    The CAS RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every New Jersey hospital, surgical center, American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and global reputation.

319.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the

elimination of the competition presented by the Plaintiff and by those minimally invasive spine surgeons he had trained and planned on training.

320.    Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

321.    The CAS RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CAS RICO Association-In-Fact Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CAS RICO Association-In-Fact Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct. The CAS RICO Association-In-Fact Defendants aided and abetted other in violations of the above laws.

322.    To achieve their common goals, the CAS RICO Association-In-Fact Defendants **(i)** fostered an environment in which they encouraged their staff to defame the Plaintiff; **(ii)** filed complaints with state and federal healthcare regulatory authorities; **(iii)** instructed their members to discontinue communications with the Plaintiff and; **(iv)** encouraged the media to publish defamatory articles. The CAS RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct, agreeing to conceal the fraudulent intent of the scheme, and its illegal tactics. The CAS RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff.

323.    As described herein, the CAS RICO Association-In-Fact Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating the competition, and increasing the CAS RICO Association-In-Fact Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

324.    During the CAS RICO Association-In-Fact Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to CAS RICO Association-In-Fact Defendant Garrett. Nevertheless, in furtherance of their scheme, Defendant Garrett continued to disseminate falsehoods, that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

325.    By reason of, and as a result of the conduct of the CAS RICO Association-In-Fact Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings. The CAS RICO Association-In-Fact Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT FOUR
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.
### (By Plaintiff against Defendants Christie + HUMC + Washburn + NJMG)
### The CHN RICO Association-In -Fact-Enterprise

326.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

327.    Plaintiff brings this Count against Defendants NJMG + Washburn + Christie + HUMC (inclusively, for the purposes of this Count, the "CHN RICO Association-In-Fact Defendants").

328.    At all relevant times the CHN RICO Association-In-Fact Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

329.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

330.    As explained in detail below, the CHN RICO Association-In-Fact Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, eliminate the competition he presented to parties with whom they engaged in commerce, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to divert patients requiring minimally invasive spine surgery away from the Plaintiff's surgical center, and towards the facilities and physicians, with whom they engaged in commerce. As explained in detail below, the CHN RICO Association-In-Fact Defendants' eight-year campaign of misconduct violated sections 1962(c) and (d).

## J.   Description of the CHN RICO Enterprise

331.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

**332.**    For many years CHN RICO Association-In-Fact Defendants Washburn and NJMG occupied a critical role in deciding what stories they published about state government actions and politicians. The CHN RICO Association-In-Fact Defendant NJMG was a privately-owned company, before it was sold to national media conglomerate, Gannet Media, in July 2016. Its business holdings extended way beyond the reporting of news, and it depended on state government permits and approvals to further these non-news economic ends. Its news cycles also depended on sources within the state administration.

**333.**    CHN RICO Association-In-Fact Defendants NJMG and Washburn were not informed of the June 13, 2012 medical board hearing in Trenton, as was the Star Ledger, its competition. CHN RICO Association-In-Fact Defendants were subsequently promised access to the administration of Defendant Christie, after having agreed to publish defamatory articles about the Plaintiff, on which agents of Defendant Christie collaborated. These actions aligned the political and commercial interests of the Defendants from the CHC RICO Association-In-Fact Enterprise, the CAD RICO Association-In-Fact Enterprise, the CAS RICO Association-In-Fact Enterprise with the Defendants of the CHN RICO Association-In-Fact Enterprise, all of whom engaged directly or indirectly in conduct that furthered their commercial/political agendas.

**334.**    In the past five years, Defendant NJMG experienced a decrease in its annual revenues, and came under extreme financial pressure, which caused an increased reliance on advertising revenue from the CHC RICO Defendants, the CAD RICO Defendants and the CAS RICO Defendants. These Defendants used their financial leverage with the Defendant NJMG, to publish defamatory stories to eliminate the commercial competitive threat presented to them by the Plaintiff's rapidly expanding minimally invasive spine surgery practice.

**335.**    Discussions occurred between the CHN RICO Association-In-Fact Defendants regarding the Plaintiff, during which the parties discussed the threat to their commercial interests, because the Plaintiff's expanding outpatient minimally invasive spine surgery practice had diverted business away from the CHC, CAD and CAS RICO Association-In-Fact Defendants, whose advertising revenues permitted Defendant NJMG to remain solvent. Defendant NJMG recognized the indirect

commercial advantage that would ensue from publicly attacking the Plaintiff and surgical centers generally.

336.    In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, Defendant NJMG co-orchestrated a scheme with the other CHN RICO Association-In-Fact Defendants, to have the revocation of the Plaintiff's medical license widely publicized across the internet. As part of the scheme the CHN RICO Association-In-Fact Defendants disseminated false information within the medico-legal community that the Plaintiff had committed insurance fraud, bank fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

337.    The scheme to maintain and increase the profits of Defendant NJMG through the destruction of the Plaintiff's reputation and elimination of his practice, benefited the other Defendants, many of whom advertised with Defendant NJMG. The scheme also enriched its corporate executives, its non-media interests, and permitted increased monies to be funneled through the middleman to Defendant Christie.

338.    At all relevant times the CHN RICO Association-In-Fact Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. Many of the association-in-fact enterprise meetings occurred behind closed doors in Morris and Bergen County, a large percentage of which were attended by members of the Office of The New Jersey Attorney General, and most frequently by Defendant Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4).

339.    Alternatively, each of the CHN RICO Association-In-Fact Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CHN RICO Association-In-Fact Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from

liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CHN RICO Association-In-Fact Enterprise."

340.    At all relevant times, the CHN RICO Association-In-Fact Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CHN RICO Association-In-Fact Defendants profit making scheme, a fraudulent scheme that involved collusion with state agencies and actors, to ensure the revocation of the Plaintiff's license, destruction of his reputation and decimation of his economic standing.

341.    The association-in-fact CHN Enterprise consisted of the following entities and individuals: **(a)** Defendant NJMG; **(b)** Defendant Washburn; **(c)** Defendant HUMC: **(d)** Defendant Christie. While each of the CHN RICO Association-In-Fact Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CHN RICO Association-In-Fact Enterprise's affairs, at all relevant times, the CHN RICO Association-In-Fact Enterprise: (a) had an existence separate and distinct from each CHN RICO Association-In-Fact Defendants; (b) was separate and distinct from the pattern of racketeering in which the CHN RICO Association-In-Fact Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CHN RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties.

342.    The CHN RICO Association-In-Fact Defendants and their co-conspirators, through their illegal CHN RICO Association-IN-Fact Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CHN RICO Association-In-Fact Enterprise's activities by bribing Defendant Christie to have the Plaintiff's license revoked, and conspiring to publish defamatory stories about the Plaintiff. The purpose of the revocation and defamation was to eliminate the threat that his work presented to the Defendants who advertised with Defendant NJMG.

343.    The CHN RICO Association-In-Fact Defendants were provided with improper access to state agencies (Defendant NJBME + OAL) resources and personnel (Defendant Solomon + Defendant

Hafner) that were involved in the revocation of the Plaintiff's license, in return for bribing Defendant Christie with monies disguised as 'campaign donations'. The monies were part of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license. Defendant NJMG was given preferential access to the state government information, in return for the publication of slanderous stories about the Plaintiff. In furtherance of the scheme, the CMS RICO Association-In-Fact Defendant NJMG and Defendant HUMC affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, quid pro quo schemes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, CHN RICO Association-In-Fact Defendant NJMG mischaracterized the nature of Kaul v Christie, when it was sold to Gannett Media in July 2016.

### K. The CHN RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

**344.**    Each CHN RICO Association-In-Fact Defendant benefited financially from the CHN RICO Association-In-Fact Enterprise. Defendant NJMG increased its revenues, through the expedited issuance of state permits for it non-media, real estate based commercial interests.

**345.**    As part of a quid pro quo that existed within the CHN RICO Association-In-Fact Enterprise, Defendant Christie, in return for favorable political publicity from Defendant NJMG, and bribes from Defendant HUMC, instructed his staff to provide personal and professional information about the Plaintiff to the CHN RICO Association-In-Fact Defendants.

**346.**    At all relevant times, the CHN RICO Association-In-Fact Enterprise: **(a)** had an existence separate and distinct from each CHN RICO Association-In-Fact Defendant; **(b)** was separate and distinct from the pattern of racketeering in which the CHN RICO Association-In-Fact Defendants engaged; and **(c)** was an ongoing and continuing organization consisting of legal entities, including the CHN RICO Association-In-Fact Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise. The CHN RICO Association-In-Fact Enterprise was formed for the purpose of bribing and providing favorable publicity to

74

Defendant Christie, in order to procure expedited and preferential state permits, and personal/professional information about the Plaintiff.

347.    The CHN RICO Association-In-Fact Defendants comprise a group of "persons" who influence public opinion, while engaging in political and commercial activities, that are contrary to independent news reporting. They and their co-conspirators engaged in a pattern of racketeering activity, which involved a revenue enhancing fraudulent conspiracy, that was part of a wider scheme to have the Plaintiff's license revoked.

348.    The CHN RICO Association-In-Fact Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the internet marketing of legal services and news reporting, the consequences of which have generated enormous profits.

349.    Within the CHN RICO Association-In-Fact Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CHN RICO Association-In-Fact Enterprise used this common communication network for purposes of promoting false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

350.    Each participant in the CHN RICO Association-In-Fact Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CHN RICO Association-In-Fact Enterprise, the CHN RICO Association-In-Fact Defendants functioned as a continuing unit with the purpose of furthering the CHN RICO Association-In-Fact Scheme.

351.    The CHN RICO Association-In-Fact Defendants participated in the operation and management of the CHN RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the CHN RICO Association-In-Fact Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses,

75

different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

352.    The CHN RICO Association-In-Fact Defendants exerted substantial control over the CHN RICO Association-In-Fact Enterprise, and participated in the affairs of the enterprise by: **(a)** communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; **(b)** procuring appointments to regulatory state agencies and the board of Defendant HUMC, which they used to further their economic agendas; **(c)** misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to revoke the Plaintiff's medical license; **(d)** otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; **(e)** ensuring that the other CHN RICO Association-In-Fact Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

353.    Without each CHN RICO Association-In-Fact Defendants' willing participation, the CHN RICO Association-In-Fact Scheme and common course of conduct would not have been successful.

354.    The CHN RICO Association-In-Fact Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

**L.   Predicate Acts: Mail and Wire Fraud**

355.    To carry out, or attempt to carry out, the scheme to defraud, the CHN RICO Association-In-Fact Defendants, each of whom is a person associated-in-fact with the CHN RICO Association-Fact Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CHN RICO Association-In-Fact Enterprise through a pattern of racketeering activity within the meaning of

18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

356.    Specifically, the CHN RICO Association-In-Fact Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten (10) years.

357.    The multiple acts of racketeering activity which the CHN RICO Association-In-Fact Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CHN RICO Association-In-Fact Defendants' regular use of the facilities, services, distribution channels, and employees of the CHN RICO Association-In-Fact Enterprise. The CHN RICO Association-In-Fact Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

358.    The CHN RICO Association-In-Fact Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

359.    In devising and executing the illegal scheme, the CHN RICO Association-In-Fact Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud. These were and are, materially false representations. For the purpose of executing the illegal scheme, the CHN RICO Association-In-Fact Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

360.    The CHN RICO Association-In-Fact Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

**(a)** Mail Fraud: The CHN RICO Association-In-Fact Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, and impede the growth of minimally invasive spine surgery in free standing outpatient surgical centers. These ends were pursued by means of false representations and omissions.

**(b)** Wire Fraud: The CHN RICO Association-In-Fact Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of the property rights of his medical license, reputation and minimally invasive spine surgery business, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and that he had committed insurance and bank fraud.

361.    The CHN RICO Association-In-Fact Defendants' use of the mails and wires include, but are not limited to: **(a)** the transmission of letters, e-mails and other materials with Defendant Hafner, regarding the scheme to eliminate the Plaintiff from the practice of medicine; **(b)** the transmission of letters, emails and other materials indicating that the CHN RICO Association-In-Fact Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; **(c)** written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; **(d)** written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; **(e)** written, telephone, or electronic communications regarding discussions between the CHN RICO Association-In-Fact Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; **(f)** the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; **(g)** the use of the mails and wires to communicate the illegal scheme with unnamed third party co-conspirators.

362.    The CHN RICO Association-In-Fact Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with New Jersey hospitals, surgical centers, American state licensing boards, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, New Jersey politicians, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was

to globally harm the Plaintiff's economic and reputational standing.

363.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the competition presented by the Plaintiff, and by those minimally invasive spine surgeons he had trained, and planned on training, who competed against the patrons of CHN RICO Association-In-Fact Defendants, NJMG and HUMC.

364.    Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

365.    The CHN RICO Association-In-Fact Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CHN RICO Association-In-Fact Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CHN RICO Association-In-Fact Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators, through the illegal scheme and common course of conduct. The CMS RICO Association-In-Fact Defendants aided and abetted other in violation of the above laws.

366.    To achieve their common goals, the CHE RICO Association-In-Fact Defendants **(i)** fostered an environment in which they encouraged their staff to defame the Plaintiff; **(ii)** filed complaints with state and federal healthcare regulatory authorities; **(iii)** encouraged other media outlets to publish defamatory articles and **(iv)** illegally recorded the Plaintiff in violation of state and federal law. The CHN RICO Association-In-Fact Defendants and each member of the conspiracy, with knowledge and

intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CHN RICO Association-In-Fact Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics. The CHN RICO Association-In-Fact Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff.

367.    As described herein, the CHN RICO Association-In-Fact Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating the competition, and indirectly increasing the CMS RICO Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

368.    During the CHN RICO Association-In-Fact Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to CHN RICO Association-In-Fact Defendant, Washburn. Nevertheless, in furtherance of their scheme, Defendant Washburn continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

369.    By reason of, and as a result of the conduct of the CHN RICO Association-In-Fact Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

370.    The CHN RICO Association-In-Fact Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**ANTITRUST IMPACT**

371.    Subsequent to the downgrading of the relative value units for endoscopic discectomy in 2011, the commercial potential of the Plaintiff's practice was harmed. The scheme was engineered by a group of neurosurgeons, led by Defendant Gregory Przybylski, the 2011 President of the North American Spine Society. These neurosurgeons, because of their influential positions within their professional societies, had the codes modified on the understanding that the majority of minimally invasive spine surgeons, from interventional pain backgrounds, would be unable to perform open micro-discectomies. The neurosurgeons effectuated the change without publicizing it for comment, thus denying the Plaintiff the opportunity to object. This act was in violation of both NASS and AMA bylaws and regulations.

372.    These changes lowered the reimbursement rate for endoscopic discectomies, which caused a larger percentage of the insurance health fund to be diverted to the Defendant Neurosurgeons and Hospitals, who subsequently raised their fees for the same procedure. The code change, however, did not apply if the endoscopic discectomy was performed in a hospital, as the fee remained unaltered. This benefited the neurosurgeons who had hospital privileges to perform spinal procedures, and it benefitted the hospitals. It also benefitted Defendants Allstate and GEICO, whose clients had personal injury policies that most hospitals did not accept. This caused these patients to be deprived of access to minimally invasive spine surgery.

373.    As a consequence, the Plaintiff sustained substantial losses and damage to his business and property, because of the reduced reimbursement associated with outpatient minimally invasive spine surgery.

374.    The Defendant Neurosurgeons, Hospitals, Allstate and GEICO have, through the bribing of politicians, effectuated legislation and regulatory changes that harmed the Plaintiff's minimally invasive spine surgery practice. These included **(i)** a downgrading in the Relative Value Unit associated with the CPT code for endoscopic discectomy **(ii)** the veto of a bill in 2011 by Defendant

Christie, that was designed to permit state licensure of one-room surgical centers and **(iii)** the refusal of the insurance carriers to reimburse surgical centers for minimally invasive spine surgery. These acts artificially and arbitrarily reduced the availability of outpatient minimally invasive spine surgery.

375.    The aforementioned acts resulted in an increase of the fees charged by the Defendant Neurosurgeons and Hospitals, and excluded patients with accident related injuries, most of whom have no secondary insurance, from receiving minimally invasive spine surgery. In 2012 Defendants Allstate and GEICO stopped reimbursement to surgical centers for minimally invasive spine surgery, and reduced physician fees by more than eighty percent (80%). The majority of physicians affected were outpatient minimally invasive spine surgeons, such as the Plaintiff.

376.    The Defendant Neurosurgeons and Hospitals have monopolized the New Jersey minimally invasive spine market. The rise in opiate consumption is related to a reduction in the availability of minimally invasive spine surgery, as patients' options for pain relief became constricted. As a consequence, The Defendant Hospitals, Neurosurgeons, Allstate and GEICO reaped larger profits, at the expense of their clients and the public. These grossly elevated profits caused a four hundred percent (400%) increase in Defendant Allstate's share price but did not result in a reduction in their clients' premiums. In fact, the premiums have continued to increase.

377.    The rise in Defendant Allstate's share price, since the implementation of the aforesaid changes, is the product of nothing but bribery and legal chicanery.

378.    The Defendant Neurosurgeons and Hospitals passed on their inflated prices to private insurance companies, such as United, Aetna and Cigna, who have passed on the increased costs to their customers. Defendants Allstate and GEICO's increased profits were not shared with the New Jersey public, who have continued to incur annual increases in their auto premiums.

379.    The Defendant Neurosurgeons and Hospitals anticompetitive conduct enabled it to

82

indirectly charge consumers and third-party payors, prices in excess of what they would otherwise would have been able to charge, absent their unlawful actions.

380.    The prices were inflated as a direct and foreseeable result of the Defendants' anticompetitive conduct individually and with the hospitals. The inflated prices the End-Payor i.e. the public and the private insurance companies are now forced to pay are traceable to, and the foreseeable result of the reduction in availability of minimally invasive spine services, and the consequent price gouging by the defendant neurosurgeons and hospitals

## COUNT FIVE

**For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violations of Sections 1 and 2 of the Sherman Act (By Plaintiff Against Defendants Kaufman + Staats + Przybylski + CNS + Heary + Cohen + HUMC + AHS)**

381.    Plaintiff incorporates by reference the preceding allegations.

382.    Defendants knowingly and intentionally engaged in an anticompetitive scheme designed to block the Plaintiff, his surgical center and similarly trained physicians, from incorporating minimally invasive spine surgery into their outpatient practices. This scheme included, amongst other things **(i)** obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy; **(ii)** procuring through bribery the veto of a bill in 2009 by Governor Christie, that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by Defendants Allstate and GEICO to deny payment to outpatient facilities and physicians; **(iii)** the procuring through bribery of the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery in free standing surgical centers; **(iv)** encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians; **(v)** obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for one room outpatient surgical centers, unless they were commercially partnered with a hospital; **(vi)** unlawful agreements between representatives of Defendants ASIPP and CNS, that the

83

market for minimally invasive spine surgery would be divided in such a way, that physicians with similar training as the Plaintiff, would be limited to performing only discectomies, and not fusions and; **(vii)** otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and/or, allocate the market for minimally invasive spine surgery.

**383.** Defendants conspired to monopolize, and did wrongfully and intentionally maintain monopoly power, with respect to minimally invasive spine surgery in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiff and his surgical center were excluded from the minimally invasive spine fusion market, as were similarly trained physicians and the New Jersey surgical center community. By their agreements, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and his surgical center were excluded from the minimally invasive spine surgery market, as were similarly trained physicians and the New Jersey surgical center community.

**384.** Plaintiff and his surgical center were injured in their business or property by Defendants' antitrust violations. Their injury consists of being deprived of the ability to incorporate minimally invasive spine surgery into their commercial strategy. Such an injury of "exclusion" is of the type antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful, and Plaintiff and his surgical center are the proper entities to bring a case concerning this conduct.

**385.** Plaintiff continues to suffer and will continue to suffer in the future from being excluded from the minimally invasive spine surgery market, more than he would have absent the Defendants' anticompetitive conduct.

**386.** Defendants' anticompetitive conduct, pursued in the context of bribery, kickbacks, obstruction of justice, fraud, and falsified legal documents, is absolutely not entitled to Noerr-Pennington protection, a shield not for those with criminal intent.

387.    Plaintiff and his surgical center, pursuant to Fed. R. Civ. P. 57 and U.S.C. § 2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 and 2 of the Sherman Act.

388.    Plaintiff and his surgical center further seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not occur in the future.

### COUNT SIX

**For Monopolization (By Plaintiff Against Defendants Przybylski + Kaufman + Staats + Cohen + Heary + HUMC + AHS).**

389.    Plaintiff incorporates by reference the preceding allegations described above.

390.    From at least 2002, neurosurgeons and hospitals held a monopoly on the minimally invasive spine surgery market, and in particular minimally invasive spine fusions. This monopoly was threatened in 2005, when the Plaintiff performed the first minimally invasive outpatient lumbar fusion, which allowed patients to be discharged the same day.

391.    The Defendants willfully and unlawfully acquired and maintained their monopoly power in the minimally invasive spine surgery market by engaging in an anticompetitive scheme to keep the Plaintiff and similarly trained physicians out of the market – not as a result of providing a superior product, business acumen, or historical accident. The Defendants engaged in a quid pro quo scheme with Defendant Christie, in which he received bribes, disguised as 'campaign donations' in return for having the medical board revoke the Plaintiff's medical license. The revocation caused the economic collapse of six medium sized corporations, and the commencement of Chapter 11 proceedings on June 17, 2013.

392.    The Defendants knowingly and intentionally engaged in an anticompetitive scheme to

monopolize the minimally invasive spine surgery market. The Defendants accomplished this scheme by, amongst other things, encouraging patients to file lawsuits against the Plaintiff, and filing complaints against the Plaintiff, with state and federal regulatory authorities.

393.    The goal, purpose and effect of the Defendants' scheme was to prevent the Plaintiff and similarly trained physicians from increasing the availability of outpatient minimally invasive spine surgery, and from increasing the number of physicians able to provide the service. The Defendants illegal scheme allowed them to continue to charge supra-competitive prices for minimally invasive spine surgery, reaping substantial unlawful monopoly profits, while reducing the availability of the service to patients, particularly those in lower socio-economic brackets, whose injuries were caused by auto accidents. This latter group rarely had secondary insurance and was thus unable to procure minimally invasive spine care, which caused them to use opiates for pain control. The Plaintiff, because he owned his surgical center, provided free care to those patients with no insurance. The Defendant hospitals and neurosurgeons did not.

394.    The Neurosurgeon Defendants knowingly and intentionally participated in sham litigation against the Plaintiff, that included encouraging patients to file lawsuits and complaints with Defendant NJBME, and then providing fraudulent 'expert' testimony for the patients and Defendant NJBME. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because he did not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

395.    The Defendants knowingly and intentionally engaged in sham litigation that resulted in the

revocation of the Plaintiff's medical license. Defendant Przybylski provided knowingly false testimony that the Plaintiff had deviated from a supposed standard of care for minimally invasive spine surgery, but then admitted under cross-examination that no such standard existed. The Defendants perpetrated these falsehoods in multiple courts and in the public domain, for almost eight (8) years, for the purpose of protecting their monopoly on minimally invasive spine surgery. The knowingly false testimony provided by Defendants Kaufman and Przybylski during the proceedings in the New Jersey Office of Administrative Law, fabricated a basis for Defendant Solomon to revoke the Plaintiff's license. The revocation caused the collapse of six medium sized corporations, the loss of jobs, the loss of tax revenue, the loss of healthcare to hundreds of patients with no insurance, which forced a number of these patients to seek pain relief through street grade heroin. The Defendants co-opted the Plaintiff's patients into their scheme to protect their 'turf', with the promise that the patients' malpractice suits would be strengthened if the Plaintiff's license was revoked.

396.    The goal, purpose and effect of the Defendant's scheme was to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery. This restricted the availability of the service to the Defendant Hospitals and Neurosurgeons, which permitted them to artificially raise their prices, in the absence of competition. The Defendants knew that the Plaintiff had, in 2009, obtained one of the last surgical center licenses issued by the state, and had plans to develop a thirty-six thousand (36,000) square foot, four (4) operating room, multi-disciplinary surgical center, that was to provide the template for a national, and then global expansion program in minimally invasive spine surgery.

397.    The goal, purpose and effect of the Defendants schemes were to maintain and extend their monopoly power in minimally invasive spine surgery. The Defendants illegal schemes allowed them to continue charging supra-competitive prices for minimally invasive spine surgery This caused harm to the public by reducing the availability of the service and permitted the Defendants to reap substantial unlawful monopoly profits.

398.    The Defendants knowingly and intentionally engaged in sham litigation against the Plaintiff's

physician employees. The Defendants fraudulently asserted that the Plaintiff's employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery, and that they had engaged in insurance fraud. Defendants GEICO and Allstate filed frivolous claims in federal and state courts. The complaint filed by GEICO on April 27, 2013 was dismissed with prejudice on December 8, 2014, with no evidence submitted to support the claims. Defendant Allstate filed an almost identical action on February 15, 2015 in the New Jersey Superior Court. The purpose of the sham litigation was to manufacture an excuse to not pay the Plaintiff for the minimally invasive spine surgery services he had provided to the Defendants' clients. The Neurosurgeon Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anti-competitive weapon to exclude the Plaintiff's employees and similarly trained physicians from the minimally invasive spine surgery market.

**399.**    The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's employees' medical licenses, initiating medical board investigations that were intended to ostracize the Plaintiff from his professional colleagues, the purpose of which was to force the Plaintiff to leave the country, and forego the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly.

**400.**    As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct, the competitors would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care.

**401.**    Had the Plaintiff and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants then the public would not have been denied the benefits of competition.

402.    By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

a.    Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

b.    Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

c.    Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

d.    Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.    Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

f.    Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to

89

the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

**g.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

**h.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

**i.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

**j.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

**k.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

**l.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the

Plaintiff had plans to expand nationally.

**m.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

**n.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

**o.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

**p.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to the availability of minimally invasive spine surgery in Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

**q.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

**r.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to the availability of minimally invasive spine surgery inTennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

s.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, et seq., with respect to the availability of minimally invasive spine surgery in Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

t.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to the availability of minimally invasive spine surgery in Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

u.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

v.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et seq., with respect to the availability of minimally invasive spine surgery in Wisconsin, and in the knowledge that the Plaintiff had plans to expand nationally.

**403.**  Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff from the minimally invasive spine surgery market which has permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license and real estate, and (4) the loss of the Plaintiff's professional reputation developed over thirty (30) years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful. Plaintiff seeks damages and treble damages as permitted by law for their injuries

by Defendants' violation of the aforementioned statutes.

## COUNT SEVEN

### For Conspiracy to Monopolize under State Law

### (By Plaintiff Against Defendants Przybylski + Kaufman + Staats + Lomazow + Cohen + Heary + HUMC + AHS)

404.  Plaintiff incorporates by reference the preceding allegations

405.  As described above, from at least 1980 to March 2005, the Defendants possessed monopoly power in the market for traditional inpatient 'open' spine surgery. This changed in March 2005 when the Plaintiff performed the first minimally invasive outpatient spinal fusion. Defendants willfully and unlawfully engaged in a continuing conspiracy from at least 2008 to 2016 to ensure that their monopoly extended to the outpatient minimally invasive spine surgery market. To achieve this goal, they engaged in an anticompetitive scheme intended to exclude the Plaintiff and similarly trained physicians from commercially incorporating minimally invasive spine surgery into their practices – not as a result of providing a superior product, business acumen, or historical accident.

406.  Defendants knowingly and intentionally conspired to monopolize the minimally invasive spine surgery market. Defendants accomplished this scheme by, inter alia, **(i)** obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy, **(ii)** procuring through bribery the veto of a bill that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the Defendant Insurance Carriers to deny payment to physicians and one operating room outpatient facilities, **(iii)** procuring through bribery the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery, **(iv)** encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians, **(v)** obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for free standing outpatient surgical centers, unless they were commercially partnered with a hospital, **(vi)** Defendant Neurosurgeons unlawfully agreeing

93

with representatives of Defendant ASIPP that the market for minimally invasive spine surgery would only be divided in a way, that physicians such as the Plaintiff would be limited to performing only discectomies and not fusions, and **(vii)** otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and allocate the market for minimally invasive spine surgery.

407.    The goal, purpose and effect of the Defendants' scheme was to maintain and extend monopoly power with respect to the minimally invasive spine surgery market. Defendants' illegal scheme allowed them to artificially raise their prices due simply to the suppressed competition, and not due to increased costs. This allowed the Defendants to reap substantial unlawful monopoly profits.

408.    The agreements between the Defendants are overt acts between separate economic entities–actual and potential competitors–and are illegal per se under state antitrust laws. The agreements made between the Defendant Neurosurgeons, Hospitals, Allstate and GEICO were that payment for minimally invasive spine surgery, would be made only for cases performed in hospitals or their attached surgical centers, and not to independently owned surgical centers. The Defendant Neurosurgeons' agreement with the Defendant Hospitals was that they would not credential minimally invasive spine surgeons, such as the Plaintiff, for minimally invasive spine surgery. The effect of these agreements was to arbitrarily exclude the Plaintiff and his surgical center from participating commercially in the provision of minimally invasive spine surgery to patients with insurance policies issued by the Defendants Allstate and GEICO. Thus, Defendants Allstate and GEICO, Neurosurgeons and Hospitals profited, but the Plaintiff's independent surgical center and minimally invasive spine practice incurred losses.

409.    Alternatively, this Complaint alleges that the agreements and conspiracy to monopolize are a violation of state antitrust law under a "quick look" or "rule of reason" analysis. The Neurosurgeon Defendants knowingly and intentionally participated in sham litigation against the Plaintiff that included encouraging patients to file lawsuits and complaints with the medical board, and then providing fraudulent 'expert' testimony for the patients and the medical board. The

94

Defendants repeatedly and fraudulently asserted that the Plaintiff was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because he did not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery.

410.    The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

411.    In furtherance of the scheme to monopolize the minimally invasive spine surgery market, Defendant Przybylski, Kaufman and Solomon committed two hundred and seventy-eight (278) separate instances of Perjury, Evidential Omission, Misrepresentation and or Mischaracterization in THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, M.D. TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY (April 9, 2013 to June 28, 2013).

412.    The Defendants perpetrated these falsehoods in a coordinated campaign that lasted eight (8) years. These claims were false and designed to protect and further the monopoly held by Defendant Neurosurgeons and Hospitals on minimally invasive spine surgery. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market. The Defendants coopted the Plaintiff's patients into their scheme to protect their 'turf', with the promise that their malpractice suits would be strengthened if the Plaintiff's license were revoked.

413.    The goal, purpose and effect of the Defendants' scheme was to maintain and extend monopoly power with respect to the minimally invasive spine surgery market, and to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide

95

outpatient minimally invasive spine surgery. This restricted availability and suppressed competition, entirely consequent to their illegal scheme, allowed the Defendants to artificially raise their prices, and reap substantial unlawful monopoly profits.

414.    The goal, purpose and effect of the Defendant's fraudulent scheme was to maintain and extend its monopoly power in minimally invasive spine surgery. The scheme allowed them to continue charging supra-competitive prices for minimally invasive spine surgery, while causing harm to the public by reducing the availability of the service and reaping substantial unlawful monopoly profits.

415.    The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's employees' medical licenses, initiating medical board investigations that were intended to ostracize the Plaintiff from his professional colleagues, the purpose of which was to force the Plaintiff to leave the country, and forego the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly.

416.    As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct, the competitors would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The public was denied the benefits of competition.

417.    The Defendants anticompetitive scheme succeeded in monopolizing the minimally invasive spine surgery market, the consequences of which have been a reduction in the availability of services, an artificial elevation of price, reduced competition and a reduction in the rate of innovation. The last five years have witnessed a decrease in the development of new spinal techniques, with the majority of innovations originating outside the United States. These are the exact problems for which the antitrust laws were designed, and which the Defendants' violations have made evident. The reduced availability of service has contributed to the opiate epidemic.

**417.** By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

a.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

b.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

c.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

d.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

f.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly

97

power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

g.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

h.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

i.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

j.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§ 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

k.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

l.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§57-1-1, et seq., with respect to the

availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

**m.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

**n.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

**o.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

**p.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to the availability of minimally invasive spine surgery in Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

**q.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

**r.** Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to the availability of minimally invasive spine surgery in Tennessee, and in the knowledge that the

99

Plaintiff had plans to expand nationally.

s.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, et seq., with respect to the availability of minimally invasive spine surgery iñUtah, and in the knowledge that the Plaintiff had plans to expand nationally.

t.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to the availability of minimally invasive spine surgery in Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

u.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

v.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et seq., with respect to the availability of minimally invasive spine surgery in Wisconsin, and in the knowledge that the Plaintiff had plans to expand nationally.

418.    Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: **(1)** the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, **(2)** exclusion of the Plaintiff from the minimally invasive spine surgery market which has permitted the Defendants to raise their prices, and **(3)** the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and **(4)** loss of the Plaintiff's professional reputation developed over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct

unlawful.

**419.**   Plaintiff seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT EIGHT

**For Conspiracy and Combination in Restraint of Trade Under State Law (By Plaintiff Against Defendants Przybylski + Kaufman + Solomon (in his official + personal capacity) + Staats + Cohen + Heary + HUMC + AHS).**

**420.**   Plaintiff incorporates by reference the preceding allegations.

**421.**   Defendants willfully and unlawfully engaged in a continuing illegal contract, combination, and conspiracy to restrain trade in the minimally invasive spine surgery market, by engaging in an anticompetitive scheme to exclude the Plaintiff and similarly trained physicians from the market, and to allocate the market between horizontal competitors.

**422.**   Defendants Przybylski, Kaufman and Solomon committed and conspired to commit two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization IN THE MATTER OF THE SUSPENSION OR REVOCATION THE LICENSE OF RICHARD A. KAUL TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY (April 9, 2013 to June 28, 2013), in the knowledge that Defendant Solomon's fraudulent Final Opinion (issued December 13, 2013) would cause the revocation of the Plaintiff's license, and eliminate him from the practice of medicine. The Defendants knew this would cause an increase in their business.

**423.**   The agreements between the Defendants are horizontal market allocation and price fixing agreements between actual or potential competitors and are illegal per se under state antitrust laws. The Defendant Neurosurgeons and Interventional Pain Physicians agreed that the latter would limit their practice to minimally invasive endoscopic discectomies. The Defendant Insurance Carriers conspired with Defendants Przybylski, Staats, and Kaufman, in their capacities as presidents and senior members of CNS, NASS and ASIPP, to limit payment for minimally invasive spine surgery

to hospitals, or to surgical centers owned by hospitals. The aforementioned Defendants engage in healthcare business with hospitals, and through their controlling positions on the credentialing committees, were able to effectuate the illegal horizontal market allocation agreement.

424.    Alternatively, this Complaint alleges that these agreements are an unreasonable restraint of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis. The consequence of these improper agreements was the exclusion from the minimally invasive spine fusion market of the Plaintiff and his surgical center, with regards to treating patients who possessed insurance issued by the Defendant Insurance Carriers.

425.    The Neurosurgical Defendants knowingly and intentionally participated in sham litigation against the Plaintiff that included encouraging patients to file lawsuits and complaints with Defendant NJBME, and then providing fraudulent 'expert' testimony for the patients and Defendant NJBME. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because he did not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

426.    Defendant Solomon played a pivotal role in the perpetration of the Defendants' illegal schemes to have the Plaintiff's license revoked. Defendant Solomon committed and conspired to commit Obstruction of Justice and Evidence Tampering. Defendant Solomon aided and abetted Perjury and other acts of Official Malfeasance. Defendant Solomon turned his bench, and the New Jersey Office of Administrative Law, into racketeering enterprises, that restricted the Plaintiff's trade and has illegally deprived him of his livelihood.

427.    The goal, purpose and effect of the Defendant's scheme was to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery, and thus restrict the availability of the service to the Defendant Hospitals and Neurosurgeons. This permitted the Defendants to artificially raise their prices, in the absence of competition.

428.    The goal, purpose and effect of the Defendant's fraudulent scheme was to maintain and extend its monopoly power in minimally invasive spine surgery. The Defendants' scheme allowed them to continue charging supra-competitive prices for minimally invasive spine surgery, while causing harm to the public by reducing the availability of the service and reaping substantial unlawful monopoly profits.

429.    The Defendants knowingly and intentionally engaged in sham litigation against the Plaintiff's physician employees, and repeatedly and fraudulently asserted that the Plaintiff's employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery, and that the Plaintiff had engaged in insurance fraud.

430.    The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's physician employees, initiating medical board investigations that sought to ostracize the Plaintiff from his professional colleagues, and to force the Plaintiff to leave the country and relinquish the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly.

431.    As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market and were compelled to incur substantial legal fees in the defense of the sham board investigations. Had it not been for the Defendants' illegal conduct, the Plaintiff and his employees would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had

103

access to non-opiate modalities of spine care. The Defendants' eight-year campaign of greed motivated misconduct has contributed to the opiate epidemic in New Jersey.

432.    Had the Plaintiff and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants, then the public would not have been denied the benefits of competition.

433. By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

(a) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

(b) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.J. Stat. § 56:9-10, et seq., with respect to the availability of minimally invasive spine surgery in New Jersey.

(c) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

(d) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

(e) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly

power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

(f) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

(g) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

(h) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

(i) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

(j) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

(k) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly

power in the relevant market in violation of Neb. Code Ann. §§ 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

(l)  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

(m) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§57-1-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

(n)  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

(o) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

(p)  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

(q) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to the

availability of minimally invasive spine surgery in Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

(r) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

(s)  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to the availability of minimally invasive spine surgery inTennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

(t)  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, et seq., with respect to the availability of minimally invasive spine surgery inUtah, and in the knowledge that the Plaintiff had plans to expand nationally.

(u) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to the availability of minimally invasive spine surgery in Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

(v) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

(w) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et seq., with respect to the availability of minimally invasive spine surgery in Wisconsin, and in the knowledge that the Plaintiff

had plans to expand nationally.

434.    Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: **(1)** the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, **(2)** exclusion of the Plaintiff from the minimally invasive spine surgery market which has permitted the Defendants to raise their prices, and **(3)** the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and **(4)** the loss of the Plaintiff's professional reputation developed over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

435.    Plaintiff seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT NINE

**For Unfair and Deceptive Trade Practices Under State Law (By Plaintiff Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Heary + Cohen + HUMC + AHS)**

436.    Plaintiff incorporates by reference the preceding allegations.

437.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

438.    As a direct and proximate result of the Defendants' anticompetitive, deceptive, unfair, unconscionable and fraudulent conduct, the Plaintiff was prevented from nationally developing his outpatient minimally invasive spine surgery business because the market has been monopolized by neurosurgeons and hospitals. The Plaintiff, a recognized innovator in the field, commenced training other minimally invasive spine surgeons in approximately 2007, and had plans to develop a

fellowship and standards, that would have increased the number of minimally invasive surgeons in the national market. The Defendants' racketeering and illegal anticompetitive conduct derailed the Plaintiff's plans for global economic and educational expansion. The Defendants' illegal suppression of competition has restricted the public's access to minimally invasive spine surgery, has caused a reduction in innovation, an elevation in price and contributed to the opiate epidemic.

**439.** The revocation of the Plaintiff's license was disseminated nationally to every state medical board and was widely publicized on the Internet with stories that commenced in April 2012 and persisted until October 2015. These events have caused permanent damage to the Plaintiff's reputation and caused the regulatory bodies and public in all of the states, to be deceived by the Defendants' fraudulent and anticompetitive scheme against the Plaintiff.

**440.** By engaging in the foregoing conduct, Defendants have violated the following state Unfair and Deceptive Trade Practices and Consumer Fraud laws:

**(a)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

**(b)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq., with respect to the availability of minimally invasive spine surgery in Arkansas, and in the knowledge that the Plaintiff had plans to expand nationally.

**(c)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

**(d)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, et seq., with respect to the availability of minimally invasive spine surgery in Colorado, and in the knowledge that the Plaintiff had plans to expand nationally.

**(e)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110h, et seq., with respect to the availability of minimally invasive spine surgery in Connecticut, and in the knowledge that the Plaintiff had plans to expand nationally.

**(f)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq., with respect to the availability of minimally invasive spine

surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally.

**(g)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq., with respect to the availability of minimally invasive spine surgery in Idaho, and in the knowledge that the Plaintiff had plans to expand nationally.

**(h)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, et seq., with respect to the availability of minimally invasive spine surgery in Illinois, and in the knowledge that the Plaintiff had plans to expand nationally.

**(i)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

**(j)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

**(k)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq., with respect to the availability of minimally invasive spine surgery in Maryland, and in the knowledge that the Plaintiff had plans to expand nationally.

**(l)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, § et seq., with respect to the availability of minimally invasive spine surgery in Massachusetts, and in the knowledge that the Plaintiff had plans to expand nationally.

**(m)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

**(n)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

**(o)** Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010 , et seq., with respect to the availability of minimally invasive spine surgery in Missouri, and in the knowledge that the Plaintiff had plans to expand nationally.

(p) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 598.0903, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

(q) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, et seq, with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

(r) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat § 358-A: 1, et seq., with respect to the availability of minimally invasive spine surgery in New Hampshire, and in the knowledge that the Plaintiff had plans to expand nationally.

(s) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat § 57-12-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

(t) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

(u) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

(v) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. 15 § 751, et seq., with respect to the availability of minimally invasive spine surgery in Oklahoma, and in the knowledge that the Plaintiff had plans to expand nationally.

(w) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, et seq., with respect to the availability of minimally invasive spine surgery in Rhode Island, and in the knowledge that the Plaintiff had plans to expand nationally.

(x) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

111

(y)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, et seq., with respect to the availability of minimally invasive spine surgery in Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

(z)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, et seq., with respect to the availability of minimally invasive spine surgery in Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

(aa) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, et seq., with respect to the availability of minimally invasive spine surgery in Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

(bb) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, et seq., with respect to the availability of minimally invasive spine surgery in Washington, and in the knowledge that the Plaintiff had plans to expand nationally.

(cc)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

440.    Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: **(1)** the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, **(2)** exclusion of the Plaintiff and similarly trained physicians from the minimally invasive spine surgery market, which has reduced competition and permitted the Defendants to raise their prices, and **(3)** the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and **(4)** loss of the Plaintiff's professional reputation developed over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

441.    Plaintiff seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

112

## COUNT TEN

### Unjust enrichment

### (By Plaintiff Against Defendants ASIPP + Kaufman + Przybylski + CNS + Heary + Cohen + HUMC + AHS + Stolz + DiOrio)

**442.**   Plaintiff incorporates by reference the preceding allegations.

**443.**   Defendants have benefited from the monopoly profits on the increased revenues that have flowed from the illegal elimination of the competition presented by the Plaintiff and similarly trained physicians.

**444.**   Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to the price gouging, increased patient referrals and the charging of artificially elevated prices, consequent to the elimination of the competition presented by the Plaintiff and similarly trained physicians. The misconduct of the Defendants has conferred upon them an economic benefit attributable to monopoly profits that has been to the economic detriment of the Plaintiff and similarly trained physicians. It would be futile for the Plaintiff to seek a remedy from any party with whom they had privity of contract. Defendants have paid no *legal* consideration to anyone for any benefits received indirectly from the Plaintiff. Defendants did, however, engage in the bribing of public officials in order to further their illegal anticompetitive scheme.

**445.**   The financial benefits derived by Defendants rightfully belongs to the Plaintiff, because the monies were a consequence of the increased revenues that flowed from the provision of minimally invasive spine surgery to patients, who either belonged to the Plaintiff's practice, or who would, in all likelihood have sought treatment from the Plaintiff with the continued expansion of his practice and reputation.

**446.**   It would be inequitable under the laws of all states and jurisdictions within the United States for the

**447.**   Defendants to be permitted to retain any of the monies that derived from their unfair and unconscionable methods, acts and trade practices, as are alleged in this Complaint. Defendants should be compelled to disgorge in a common fund for the benefit of the Plaintiff all unlawful or inequitable proceeds received by them.

**448.**   Defendants Stolz defrauded the Plaintiff and the Bankruptcy Court, by willfully failing to collect the Plaintiff's monies from Defendants Allstate and GEICO. Defendant DiOrio defrauded the Plaintiff by providing knowingly false advice to the Plaintiff that caused him to relinquish the title to the real estate at 111 Wanaque Avenue, Pompton Lakes, NJ. Defendant DiOrio defrauded the Plaintiff because he had been promised legal work from Defendant GEICO, and in fact has provided that legal work since approximately late 2014.

**449.**   Defendants Stolz and Diorio procured monies through fraud and deceit at the expense of the Plaintiff, his corporations and the majority of its creditors.

**450.**   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff.

## COUNT ELEVEN

### Deprivation of Right under Color of Law

**(By Plaintiff against Defendants Kaufman (in his official capacity) + Przybylski (in his official capacity) + Solomon (in his official capacity) + Hafner (in her official capacity) + Allstate + GEICO + NJBME)**

**451.**   Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

**452.**   The Defendants deprived the Plaintiff of his right to due process by:

(a) Forging, altering and tampering with court transcripts and Defendant Solomon's Final Opinion, issued on December 13, 2013.

114

**(b)** Defendants Solomon, Przybylski and Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and gross mischaracterization in the administrative law proceeding (April 9 – June 28, 2013).

**(c)** Failure of Defendant NJBME to have an independent analysis and comparison of the state authored transcripts, the independent transcripts, the court audio recordings, and Defendant Solomon's Final Opinion.

**(d)** Failure of Defendant NJBME to respond to Plaintiff's written pleas for an investigation of the Tampered Evidence.

**(e)** Failure of NJBME to acknowledge the impartiality of the medical board, in adjudicating the Plaintiff's complaint of Evidence Tampering, in violation of the Plaintiff's Fourteenth Amendment right to an impartial tribunal. The Defendants acted with malicious and reckless disregard for the Plaintiff's due process rights. Defendant NJBME did this in the knowledge that the Plaintiff had, on June 7, 2012, requested that the Mercer County Court appoint a special prosecutor and ad hoc medical board. The latter request was submitted as a consequence of AG Chiesa's prejudicial comments to the media on May 9, 2012, and the illegal suspension of the Plaintiff's CDS prescribing license on May 22, 2012 by AG Chiesa's subordinate, and acting director of the Division of Consumer Affairs, Eric Kanefsky, Esq.

**(f)** Failure of Defendant NJBME to exclude Defendant Hafner from any involvement in the Plaintiff's application for license reinstatement in 2014, on the basis that the Plaintiff had filed an ethics complaint against Hafner, in September 2013.

**(g)** Failure of NJBME to suspend the legal proceedings, until DAG Hafner, had recused herself from the matter. Hafner's personal animus towards the Plaintiff, and her personal relationship with Defendant Kaufman, violated the Plaintiff's right to an impartial tribunal. This violation was magnified by the unconstitutional configuration of the mechanism of physician regulation.

**453.** The Defendants committed and conspired to commit perjury. The Defendants knew that the Plaintiff was qualified, credentialed and licensed to perform minimally invasive spine surgery. The Defendants abused their positions of public authority to mislead the public into believing their lies,

115

and thus violated the Plaintiff's right to substantial due process.

**454.**   The Defendants committed and conspired to commit a knowingly dishonest interpretation of the alternative privileges regulation. The Defendants knew the regulation was not required for the performance of minimally invasive spine surgery. In fact, during the OAL proceedings, when Defendant Hafner was unable to articulate an argument in support of her contention, Defendant Solomon interjected with his own interpretation, albeit flawed.  The Defendants committed and conspired to commit a knowingly dishonest interpretation of the rights afforded to the Plaintiff by his plenary medical license that permitted him to practice both **medicine and SURGERY.**

**455.**   The Defendants committed and conspired to commit a concealment of the truth of the clinical effectiveness of the Plaintiff's minimally invasive spine surgery practice, by refusing with ill intent, the Plaintiff's suggestion to have his practice independently analyzed and monitored. Defendants Allstate and GEICO are "persons" under 42 U.S.C. § 1983. Defendants Allstate and GEICO established and fund the Office of the Insurance Fraud Prosecutor.  Defendants Allstate and GEICO fund the Office of the Attorney General and share a common server with the Office of the Attorney General. Defendants Allstate and GEICO draft healthcare legislation for the state, a function that is governmental in nature.

**456.**   In 2009, the Seventh Circuit summarized the US Supreme Court's criteria, to determine whether the actions of private parties constituted governmental functions. The tests were (1) the symbiotic relationship test (Burton v Wilmington Parking Suth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed2d 45 (1961), (2) the state command and encouragement test (Moose Lodge No. 107, 407 U.S. at 176-77, 92 S.Ct (1965), (3) the joint participation doctrine (Lugar v Edmonton Oil Co., 1982), (4) the public function test (Jackson v Metro Edison Co., 419 U.S. 345, 353 95 S.Ct 449, 42 L.Ed2d 477 (1974).

**457.**   The State Actor Tests that confirm that Defendants Allstate and GEICO possess 1983 "person" status are the **(i)** symbiotic test, **(ii)** joint participation doctrine, **(iii)** state command and encouragement test, **(iv)** public function test, **(v)** pervasive entwinement.

**458.**   State action is found when a private corporation or actor provides a "public function" i.e. the

drafting of healthcare legislation, as in Marsh v Alabama, 326 U.S. 501 (1946). See also Terry v Adams 345 U.S. 461 (1953); Evans v Newton, 382 U.S. 296 (1966) ("That is to say, when private individuals or groups are endowed by the State with powers or function governmental in nature, they become agencies or instrumentalities of the State and subject to Constitutional limitations."). State action is found when the private corporation is heavily regulated by the state i.e. the Department of Banking and Insurance, thereby giving the state control of the corporations' acts.

459.    Defendants Allstate and GEICO are alleged to conduct criminal investigations outsourced from the Office of the Insurance Fraud Prosecutor. These investigations are disguised as civil matters, in order to deceive parties into believing that they do not need to take the usual legal precautions, associated with criminal investigations.

460.    The Plaintiff alleges, upon information and belief, that lawyers for Defendants Allstate and GEICO assisted, in the drafting of Defendant Solomon's Final Opinion, that was issued on December 13, 2013.

461.    The Defendants abused their official public and State Actor positions to advance their private commercial interests, at the expense of the Plaintiff's Constitutional right to due process. Defendants Przybylski, Kaufman and Solomon collectively committed two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omission and mischaracterization in the MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, M.D. TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY (April 9, 2013 to June 28, 2013).

462.    Defendants Allstate and GEICO are alleged to have conspired with Defendant Solomon to issue a fraudulent opinion, that contains **two hundred and seventy-eight (278) separate acts of perjury and evidential omissions, misrepresentations and gross mischaracterizations.**

463.    Defendants Przybylski, Kaufman, Hafner and Solomon abused the power of their public

117

function for personal gain. Defendants Przybylski and Kaufman in the knowledge that they were local business competitors of the Plaintiff, knew that their testimony was conflicted, but they failed to recuse themselves from the provision of 'expert' testimony. In fact, Defendant Przybylski, devoted four (4) days to providing false testimony against the Plaintiff, that was founded on a standard he knew did not exist. This was a fact he admitted on cross-examination.

## COUNT TWELVE
## Commercial disparagement
## (By Plaintiff against Defendants ASIPP + Kaufman + Przybylski + Allstate + GEICO + Heary + Cohen + HUMC + AHS)

464.   Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

465.   Commencing in 2005 the Defendants knowingly and with malice made false statements to patients, physicians, medical device suppliers and lawyers that the Plaintiff was not qualified to perform minimally invasive spine surgery.

466.   The false statements were intended to cause financial damage to the Plaintiff and his business and did in fact cause immense harm to the Plaintiff's reputation and business.

467.   The Defendants knew that the Plaintiff was qualified to perform minimally invasive spine surgery but acted with reckless disregard of its truth.

468.   The Defendant encouraged patients to file lawsuits against the Plaintiff, and criticized the Plaintiff's work, the purpose of which was to attack the Plaintiff's reputation and economic standing, and to have the Plaintiff's medical license revoked.

469.   The Defendants' wrongful acts caused immense and permanent harm to the Plaintiff's economic standing and reputation.

## COUNT THIRTEEN

### Intentional Interference with prospective economic advantage

**(By Plaintiff Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Allstate + GEICO + Heary + Cohen + HUMC + AHS)**

470.   Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth herein.

471.   In 2005, upon information and belief, members of the New Jersey neurosurgical community, filed a complaint against the Plaintiff with the medical board.

472.   On or about April 2008, Defendant Heary encouraged patient FK to file a lawsuit and a complaint with Defendant NJBME against the Plaintiff.

473.   In 2007, Defendant Cohen filed a complaint against the Plaintiff with Defendant NJBME.

474.   From 2008 to 2012 the Defendants encouraged spine device representatives to cease supplying the Plaintiff with the devices necessary to perform minimally invasive spine surgery.

475.   From 2005 to 2012 the Defendants encouraged physicians not to refer patients to the Plaintiff and slandered the Plaintiff's reputation by stating that he was not qualified to perform minimally invasive spine surgery.

476.   Upon information and belief, it is alleged that the Defendant Neurosurgeons, met with New Jersey politicians on multiple occasions, and engaged in discussions in which they sought the politicians' assistance to revoke the Plaintiff's license

477.   Upon information and belief, it is alleged that on or about 2011 the Defendants conspired with members of the medical board to revoke the Plaintiff's license

478.   The Defendant's aforesaid actions constituted knowing, intentional and voluntary

119

interference with the Plaintiff's minimally invasive spine surgery practice.

479.    The Defendant's aforesaid actions constituted negligent interference with the Plaintiff's minimally invasive spine surgery practice and caused the revocation of the Plaintiff's license in 2014.

480.    The Defendant actions constituted unjustified and wrongful interference with the Plaintiff's minimally invasive spine surgery, and a reasonable expectation of economic advantage as aforesaid. The Defendants wrongful interference did not rest upon a legitimate interest or have a legitimate purpose.

481.    As a result of the Defendants' actions, the Defendants are liable for the damages caused by their interference with the Plaintiff's minimally invasive spine surgery practice.

482.    The Plaintiff had a reasonable expectation of economic advantage or benefit flowing from the revenues of his minimally invasive spine surgery practice.

483.    The Defendants knew or should have known of the expectancy of the aforesaid economic advantage of the Plaintiff's minimally invasive spine surgery practice.

484.    In the absence of the Defendant's wrongful acts as foresaid, it is reasonably probable that the Plaintiff would have realized its aforesaid economic advantage or benefit with respect to his ongoing minimally invasive spine surgery practice.

485.    As a result of the Defendant's aforesaid wrongful acts, the Plaintiff has suffered immense and permanent damage to his reputation and economic standing.


## COUNT FOURTEEN

### Aid in the Commission of Tort (Against all Defendants)

486.    The Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs and

incorporates same as if set forth fully herein

487.   The Defendants pursued a common plan or design to commit a series of torts upon the Plaintiff, through their active participation, encouragement, or ratification of the harm done to the Plaintiff, which inured to Defendants' collective benefit

488.   The Defendants are jointly and severally liable to the Plaintiff for his damages suffered as a consequence of all of the aforementioned torts, claims and counts.

## VII.DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiff seeks judgment against the Defendants jointly and severally, as follows:

1. Compensatory + Consequential + Punitive Damages from all Defendants in their individual capacities in the amount demanded as per **Exhibit 35.**

2. Declaring that the mechanism of physician regulation in New Jersey as described herein, is unconstitutional and violated the Plaintiff's right to due process.

3. Declaring that the revocation of the Plaintiff's medical license was procured through illegal means and was an illegal act.

4. Declaring that the continued revocation of the Plaintiff's medical license is illegal and is a consequence of fraudulent legal proceedings and an unconstitutional mechanism of physician regulation.

5. Declaring that the May 22, 2012 suspension of the Plaintiff's CDS Registration was procured illegally.

6. Ordering the immediate reinstatement of the Plaintiff's plenary license to practice medicine and surgery in New Jersey.

7. Ordering the immediate reinstatement of the Plaintiff's CDS Registration + an unrestricted

plenary license to practice Medicine + Surgery.

8. Declaring that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act, of the other statutes set forth above, and of the common law of unjust enrichment under the laws of all states and jurisdictions within the United States.

9. Enjoining Defendants from continuing the illegal activities alleged herein and declaring unconstitutional the IFPA.

10. Granting Plaintiff equitable relief in the nature of disgorgement, restitution and the creation of a constructive trust to remedy Defendants' unjust enrichment.

11. Awarding the Plaintiff treble, multiple, punitive and/or other damages in the calculation demonstrated on the document enclosed as per **Exhibit 35**

12. Awarding the Plaintiff costs of suit, including reasonable attorneys' fees as provided by law.

13. Granting such other relief as is necessary to correct for the anti   competitive effects caused by the unlawful conduct of Defendants, and as the Court deems just.

14. Expunging the prior revocation of the Plaintiff's medical license from the public record + A Public Apology directed to Kaul's Children + Patients.

15. Declaring that the "New Jersey Insurance Fraud Prevention Act" ,   § 17:33A,   1 is in violation of the New Jersey Constitution as amended in 1947 which provides that "the right of trial by jury shall remain inviolate."

16. Declaring that the "New Jersey Insurance Fraud Prevention Act" ,   § 17:33A,   1 is in violation of the United States Constitution.

## VIII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

## IX. DEMAND FOR INSURANCE

Demand is hereby made for all insurance policies, which may cover the damages alleged in this Complaint.

Respectfully submitted this 9th day of April 2018

By: _____

Richard Arjun Kaul, MD

Propria Persona

120 Temple Terrace

Palisades Park, NJ 07650

201 989 2299

drrichardkaul@gmail.com

www.drrichardkaul.com

123

# Exhibit 1

Corey Johnson
113 Midland Place
Newark, NJ 07106

T: 973 207 0525

James Gonzalez
President
University Hospital
150 Bergen Street
Newark, NJ 07103

September 23 2013

Dear Mr.Gonzalez

I am writing to file a formal complaint against Dr.Andrew Kaufman for grossly unprofessional conduct on February 26th 2010 on the premises of UMDNJ in room E 178 between the hours of approximately 7.15am to 12pm and during which he verbally abused me immediately before I underwent a lumbar discogram.

Dr.Ira Goldstein initially referred me to Dr.Kaufman for a lumbar discogram which was to intended to assist in the accurate diagnosis of the lumbar discs that had been injured subsequent to a major accident at work in 2006. The severity of the pain and the possible benefit of a spinal fusion prompted Dr.Goldstein to recommend a lumbar discogram as a diagnostic tool.

My experience with Dr.Kaufman was horrific and I continue to have nightmares about what happened on February 26th 2010. The things he said and the almost brutal manner in which he behaved towards me have psychologically scarred me.

## CHRONOLOGY

I arrived at UMDNJ at 6am on 2/26/10 and was admitted through the front desk with instructions to go to room E-178 where I completed and signed further documents. At approximately 7.15am Dr. Kaufman walked into the room and made the following derogatory statements:

1. I can't believe this mother fucker is here
2. Are you really going to let me do this procedure to you?
3. You aren't shit and I am not going to help you with your legal case

His tone was threatening and I felt humiliated. I could not believe that a human let alone someone who is a physician, meant to heal, would make such abusive comments. I felt helpless and did not know where to look as he continued to rant and denigrate me in front of others. There were other people in the room and none of them asked him to stop. I had never felt this way before or been treated in such a humiliating way.

Dr.Kaufman then left the room and the nurse took me into the treatment area where I was given a patient gown and had an intravenous placed in my arm. I was then walked into the procedure room and Dr.Kaufman was standing in the opposite corner looking at me and continued to verbally attack me and made the following comments:

1. That mother fucker Richard Kaul is trying to take over the spine business and we are going to put a stop to it- I later worked out that he made this comment when he realized I had been under the care of Dr.Kaul since 2006 and who in my opinion had provided excellent care.

2.  Are you sure you want me to do this. You know I am not going to help you with your legal case.

I did not respond to any of his comments and just felt very confused and scared that I was about to undergo a spinal procedure which could paralyse me by a man that had just been verbally hostile. I could not, at that time, work out why he (Kaufman) was being so aggressive but I later realized it was because of the fact that Dr.Richard Kaul had taken care of me and as I have since found out he (Kaufman) testified against Dr.Kaul in the case regarding his medical license.

I was instructed to lie face down on the operating table and as the anesthesiologist was applying the mask I could hear and see Kaufman screaming about how Kaul was taking their business and that they were going to stop him. None of this made any sense to me and I just kept on praying to God asking him for help. I was petrified and felt completely humiliated.

I remember waking up in the recovery room with no recollection at all of answering any questions about my pain level during the procedure, which I remember thinking was odd as I had been told before the procedure by Dr.Goldstein that I would be asked questions by Kaufman and the answers I gave were essential to making an accurate diagnosis. Still to this day I have no recollection of this happening during the procedure. I started to cry as I remembered the way Kaufman had talked to me and I wondered if it was because of my ethnicity. I was confused, scared and just wanted to leave the facility as quickly as possible.

The nurse removed the intravenous and I changed back into my own clothes and was driven home by my friend. I have had ongoing nightmares since this horrific incident and have received psychological counseling to help me deal with the feelings and terror I experience every day. In researching Kaufman I have come to know that many other patients have posted complaints about his abusive conduct and derogatory language towards patients and about other physicians.

About 1 week after the discogram I received from UMDNJ a patient satisfaction survey, which I completed and returned, and in which I made very clear my immense dissatisfaction and anger at the manner in which I had been treated. I have still not had a response to the survey I submitted in 2010 and would request that this be addressed.

UMDNJ is a very well respected hospital that does a lot for underserved communities in Newark but the abusive and shocking conduct of Dr.Kaufman on February 26 2010 in room E-178 left me with the impression that the hospital does not really care. I am sure my experience is not isolated and other patients have had to endure the same demeaning attacks.

I write this letter to bring your attention to an issue which has psychologically scarred me and which I would not wish on my worst enemy. I would therefore respectfully ask that a full and thorough investigation be carried out so that no patient will ever again have to endure such abuse.

I look forward to your prompt response.

Yours sincerely

*Corey Johnson*

Corey Johnson

cc. Andrew Kaufman, MD, University Medicine and Dentistry of New Jersey

9/23/2013

JACKELINE J TORALES
Commission # 2405821
Notary Public, State of New Jersey
My Commission Expires
March 14, 2016

# Exhibit 2

Case 2:18-cv-08086-JMV-JAD    Document 2    Filed 04/09/18    Page 139 of 232 PageID:
143
Case 2:16-cv-02364-KM-SCM    Document 205-1    Filed 08/21/17    Page 1 of 9 PageID: 4275

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RICHARD ARJUN KAUL, MD | CIVIL ACTION NO. 2:16-cv-02364-KM-SCM |
| Plaintiff, | |
| v. | **CERTIFICATION OF JOHN ZERBINI** |
| CHRISTOPHER J. CHRISTIE, ESQ, et al., | |
| Defendants | |

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299

John Zerbini hereby certifies to the Court as follows:

1. I am forty-three (43) years old, a United States citizen and was a patient of Dr. Kaul from November 24, 2010 to July 21, 2011.

2. I make this statement in support of the claims that Dr. Richard Arjun Kaul has filed against the Defendants in the above matter.

3. In late July 2017 I spoke with Dr. Richard Kaul several times regarding various issues that pertain to the above matter. The following represents the essence of what was discussed. The information contained in this statement is a representation of the conversations that took place between March 2012 to late 2013, between myself, Dr. Kaufman and Deputy Attorney General, Doreen Hafner. Where the conversation is quoted verbatim it is marked in "". I have examined this record and signed it as

1

representative of what was said in the conversations. I have organized the conversations into 5 sections for ease of interpretation:

(a) **Report of conversations between Dr. Kaufman and myself**

I had several conversations with Dr. Kaufman in which he expressed his opinion of Dr. Kaul and also his intention to destroy Dr. Kaul's medical career. Dr. Kaufman frequently directed these opinions to me, in front of the nurses who assisted him and usually after he had performed procedures on my spine.

Dr. Kaufman was not interested in the care I had received from Dr. Kaul, but was more preoccupied with how he was planning to have Dr. Kaul's license revoked. It was obvious to me that he had no concern for my welfare, as all of the time we spent together from March 2012 to November 2012, he devoted to telling me and others how he was going to destroy Dr. Kaul. It was, to say the least, extremely unprofessional and rather disturbing.

These conversations occurred mainly in a curtained consulting room in the pain management lab, at Overlook Hospital New Jersey. The curtains of my cubicle were not always drawn, and the area was an open space, in which at any one time, there were a least fourteen other people, comprised of patients and staff. I would always sit in a cardiac chair, and Dr. Kaufman's comments were loud enough for all patients and nurses to have clearly heard what was being said.

Dr. Kaufman 'ranted' about Dr. Kaul, on numerous occasions. I felt that Dr. Kaufman was bragging about his actions towards Dr. Kaul. He made it clear that he had instigated proceedings against Dr. Kaul and said that he and "a few other doctors" were going after Dr. Kaul. I was not aware of the names of the other doctors.

The first time that Dr. Kaufman discussed these things with me was in April 2012.

Dr. Kaufman seemed to have some kind of vendetta against Dr. Kaul, and made comments to the effect that he was going to destroy Dr. Kaul's medical career, his reputation, and make sure he never worked again as a doctor. He stated that he was going to make sure Dr. Kaul was ostracized, and that he and a group of five other doctors had been working together since at least 2011, to make sure Dr. Kaul's medical license was revoked. He mentioned that they were

2

going to have articles and stories published, that caused permanent damage to Dr. Kaul's reputation, so that he would never be able to find work. Dr. Kaufman told me, "Dr. Kaul is a criminal", and that he [Kaufman] had instigated the plan to have Dr. Kaul's license revoked. His venomous conduct led me to believe that that he would not stop until he had achieved those ends.

I recall that Kaufman said that he had found something about Dr. Kaul that really pissed him off which is why he acted in this way. Kaufman said, "Dr. Kaul has no business being a doctor" and "he has no business practicing medicine". He told me that he would make sure Dr. Kaul never practiced medicine again.

During my conversations with Dr. Kaul I told him that I could not understand why Dr. Kaufman had such hatred towards him. I had never witnessed such venom, and he [Kaufman] seemed to have the small man angry syndrome. Kaufman is about five foot six inches, and one hundred and forty pounds.

Dr. Kaufman ranted about Dr. Kaul, in this way, at about two thirds of our consultations. I consulted with Dr. Kaufman every six weeks over period of one year, from March 2012 to late 2012.

The comments that Kaufman made about Dr. Kaul were made directly to me, and frequently in the presence of other staff and patients. My recollection of these comments was so vivid that I even remember the clothes I was wearing at each consultation, and on one occasion it involved a particularly bright stripped collared shirt.

In my opinion there was clear evidence for defamation of character, as when Dr. Kaufman was ranting, there were approximately 14 other people within earshot.

I told Dr. Kaul, during our conversations, that Dr. Kaufman "went after you (Dr. Kaul) like fury". "he was on fire."

I recounted how, in my earlier conversations with Dr. Kaufman, he said, "Check up on this guy (Dr. Kaul) on the internet and you will see that I and five other doctors have already taken action against him". When I went home I checked the internet and found what Dr. Kaufman had said, as well as the name of several other doctors who were involved.

3

During one of my conversations with Dr. Kaul, I told him, "I left Kaufman but I think he would tell you that he left me". I described to Dr. Kaul how Dr. Kaufman would not return my calls, when I telephoned his office, because my pain pump was not working, and I was in severe pain. This happened on multiple occasions. On one occasion, as a result of not having received a response from Dr. Kaufman after one week, and being in severe pain, I went to see my family physician. I subsequently told Dr. Kaufman that I had consulted with another doctor, and initially he said "no problem". However, 3 months later he became angry and told me that I had "violated his trust" and that he would no longer treat me. He started screaming at me, and I felt humiliated and began to cry. I pleaded with him not to suddenly stop prescribing my medications, but he didn't seem to care, and became very cold and callous. This was in November 2012. In fact, his uncaring attitude had caused me on several prior occasions to ask him, with tears in my eyes, "Why do you hate me?". It seemed to me, that his hostility, was a consequence of the fact that I had been under the care of Dr. Kaul, as I noticed he had a different attitude with other patients. I told Dr. Kaufman that I had never been spoken to by any of my treating physicians, in the derogatory manner in which he publicly berated me. After having been abandoned by Dr. Kaufman, I attempted to find another physician to manage my pain. However, it proved very difficult, because of the complicated nature of my medical conditions. However, Kaufman threatened to contact my internal medicine doctor, and any future pain management doctor, and tell them I had violated an agreement with him. Dr. Kaufman would then call me and berate me on the phone for "violating his trust". I eventually went to see Dr. Sukdeb Datta.

**(b) My comments regarding my perception of the relationship between Dr. Kaufman and Deputy Attorney General, Doreen Hafner**

During my conversation with Dr. Kaul I commented that "he [Kaufman] was "very chummy with that prosecutor". I observed that Dr. Kaufman's relationship with Doreen Hafner was "weirdly close" and that "it was really weird, moochy coochy, strange." I noted that Dr. Kaufman called the Deputy Attorney General by her first name, and on one occasion he told me that was meeting her for lunch. I observed that Dr. Kaufman was oddly "chummy" with Hafner, in a manner that seemed strange for a physician and deputy attorney general.

4

### (c) My recollections of my meetings with Doreen Hafner

I recollect Dr. Kaufman saying on several occasions, "I'm going to see her [Hafner] later today or to have lunch with her".

I recollect at my first meeting with Hafner, she had two female investigators with her. The meeting occurred at my attorney's office. They inspected my back and how well I was able to walk. After this first meeting, Hafner contacted me directly, and our communications from that point did not involve my attorney. She told me in the first interview that "they were going to take make sure that we who were hurt will be taken care of". However, Hafner honored none of the promises she made, and after I testified took no further interest in my welfare. Both my wife and I felt that she exploited me, and lied to me to get me to testify against Dr. Kaul.

I believe that Hafner told me that Dr. Kaul had a "$14 million condo in New York", and that she said she was going to take it. She told me Dr. Kaul had two Aston Martins, and that she was going to take them as well.

Hafner stated that Dr. Kaul had committed Medicaid and Medicare fraud, and asked me what insurance company had paid him for the procedure he performed on me. I told her that I had no insurance, and that Dr. Kaul had provided his services and that of his facility for free. I told her that he never asked me for a dime. I also told her that he had been able to get the device company, Medtronic, to provide the spinal cord stimulator free of charge. I asked Hafner that if Dr. Kaul had committed the crime she described, whether his passport had been confiscated. She responded, "I can't comment on that". I thought it was bizarre that Hafner was readily telling me about crimes Dr. Kaul was supposed to have committed, but then refused to answer a simple question about the information she so willingly divulged. I believe she was trying to manipulate and exploit me, in order to have me testify against Dr. Kaul.

I believe that Hafner went into great detail about a case in London that occurred in 1999, in which a patient suffered a cardiac arrest at the end of a dental procedure. She told me that Dr. Kaul fled the country before the authorities had completed their investigation, and had been a fugitive. I asked her that if this was the case, then why had he not been extradited back to

5

England. Again, her response was, "I can't comment on that", which I found to be as equally bizarre as her previous response. I asked her again why they had not confiscated his passport, and she once again responded with, "I can't comment on that". At this point in the proceedings, we communicated directly, without any involvement from my attorney, and Hafner would contact me directly. The things that Hafner was telling me about Dr. Kaul did not make any sense. I said to her, "If he is a criminal here from England and still on the streets, why wouldn't you arrest him?". Again her response was, "I can't comment on that".

I believe it was Hafner who told me that Dr. Kaul had been paid $300,000 by Medtronic to find volunteers, for the use of spinal cord stimulators in the treatment of angina. This, as I found out from Dr. Kaul during one of our conversations, was a lie. I explained to Hafner that I could not believe Dr. Kaul had committed Medicare fraud. I told her that he used his own money to establish a charity that helped people in Africa, and she told me that the charity was just a front, and that Dr. Kaul was "trying to line his pockets".

I believe that Hafner lied to me about Dr. Kaul, and about wanting to help me with my lawsuit, to make sure that I testified against Dr. Kaul. She told me that if I testified against Dr. Kaul, it would help me with my lawsuit, "especially if Dr. Kaul had been stripped of his license to practice medicine". Hafner also told me that because Dr. Kaufman was a pain management expert for the state, it would help my case. I feel that Hafner exploited my situation to serve her own purpose, which was to take away Dr. Kaul's livelihood, and destroy his reputation.

### (d) My opinion regarding the professional competence of Dr. Kaufman

My opinion of Dr. Kaufman is that he is an extremely unprofessional individual, a terrible doctor, and a man that seems to have nothing but hatred in his heart. He could not contain his anger towards Dr. Kaul, and I have never witnessed the outrageous public displays of unprofessionalism, that I had the misfortune to do so, with him. On one occasion he became so angry, his face turned red. I told Dr. Kaul, "He [Dr. Kaufman] screwed me up so badly that I wanted to sue him". Dr. Kaufman had installed a pain pump which did not work, and despite me repeatedly telling him that I was not getting any pain relief, he kept telling me the pump was working. He did not know to program the pump, and always had a representative from

6

Medtronic to do it for him. On a number of occasions, he had to stab me thirteen times in the stomach to find the entry point in the pump. He did this to me without any local anesthesia, which was extremely painful. He never checked to see if there were any blockages in the catheter in my spine. The pain kept on increasing, and Dr. Kaufman did nothing, and never returned my calls. When I did see him the only thing he did was to increase the infusion rate of the medication, which did not reduce the pain. Eventually I went to another doctor, who used fluoroscopy and intravenous hydration, and was able to diagnose that the catheter tip was crushed. This was the reason that the medication was not getting into my spine. Dr. Kaufman failed to perform this simple test, which caused me to remain in agony from May 2012 to August 2013, at which point the intrathecal pump was re-inserted by another physician. I told Dr. Kaul that Dr. Kaufman, "thinks he is hot shit but he didn't ever check what was wrong". Throughout the months of excruciating pain, Dr. Kaufman was very bad at responding to my calls, and on multiple occasions, because the pain was so severe, I was rushed to Overlook Hospital. I was experiencing such extreme pain and was shaking uncontrollably, with profuse sweating, all of which exacerbated my angina. I thought I was going to have a stroke or massive heart attack, as I was already in heart failure. When I was admitted to the hospital on each occasion, the staff were unable to contact Dr. Kaufman for several days. These was the episodes that caused me to find another doctor.

(e) **Comments made by Dr. Kaufman regarding Dr. Kaul, during the hearing in the office of administrative law, in April 2013.**

On or about April 17, 2013 I testified against Dr. Kaul in the proceedings in the office of administrative law. I was driven to the hearing by an armed female agent from the Attorney General's office, who made sure her badge was exposed. While I was sitting outside the hearing room, with the 'special' agent, who did not leave my side for one moment, Dr. Kaufman came out of the hearing room. He looked very agitated and made the following comments:

(1) "Kaul is sitting there, pretending he cannot afford to hire an attorney"

(2) "Kaul is wearing a suit that is worn out with trousers that are frayed at the bottom as if he is poor and no money to buy a decent suit".

(3) "Kaul is trying to pretend that he has no money"

The 'special' agent and the court security guard heard Kaufman's outburst.

I feel like I was exploited by Doreen Hafner and Dr. Kaufman, with lies that were intended to have me testify against Dr. Kaul. My clinical care with Dr. Kaufman was terrible, and he is a despicable human being.

I support Dr. Kaul in his quest for justice, and I hope, as do many of his patients, that he returns to the practice of medicine, and that those who caused him harm are severely punished.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Dated: August 6, 2017                    _____

                                         John Zerbini

8

I feel like I was exploited by Doreen Hafner and Dr. Kaufman, with lies that were intended to have me testify against Dr. Kaul. My clinical care with Dr. Kaufman was terrible, and he is a despicable human being.

I support Dr. Kaul in his quest for justice, and I hope, as do many of his patients, that he returns to the practice of medicine, and that those who caused him harm are severely punished.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Dated: August 6, 2017

John Zerbini

8

# Exhibit 3

**Richard Kaul**

| | |
|---|---|
| **From:** | Robert Conroy [RConroy@drlaw.com] |
| **Sent:** | Wednesday, May 09, 2012 5:42 PM |
| **To:** | 'Doreen Hafner' (Doreen.Hafner@dol.lps.state.nj.us) |
| **Subject:** | I/M/O Kaul |

Doreen,

It sounds to me like the AG has prejudged this matter or he may be trying to exercise undue "influence" over the Board.  His quote on CBS Radio could prove very problematic for the State's case. I want to put you on notice that we may make it an issue. In case you didn't catch it, here it is:

"Whatever training he has is not sufficient for the kinds of surgery including, including discectomies and spinal fusions, which, as people can appreciate, is a highly technical, highly complex surgery that's gotta be performed by people who have been trained for years in that kind of specialty," Attorney General Jeffrey Chiesa told WCBS 880 reporter Marla Diamond.

When it comes to matters best left to the Board, he might be best advised to keep his opinions to himself.  Pre-hearing publicity of this sort can be prejudicial.
In the meantime, please forward the signed consent order when you have  chance.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ  08807
tel:  908-704-8585
fax:  908-704-8899
email:  conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in:  New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

----------------------------------------------------------

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4).  Thank you for your cooperation.

# KERN AUGUSTINE CONROY
## & SCHOPPMANN, P.C.

*Attorneys to Health Professionals*

New Jersey:
1120 Route 22 East, Bridgewater, NJ 08807
Tel: (908) 704-8585, Fax: (908) 704-8899

New York:
1325 Franklin Avenue, Suite 255, Garden City, NY 11530
Tel: (516) 294-5432, Fax: (516) 294-5414

590 Madison Avenue, 21st Floor, New York, NY 10022
Tel: (212) 521-4221, Fax: (800) 941-8287

Pennsylvania:
1500 Market Street, 12th Fl, Philadelphia, PA 19102
Tel: (215) 665-5790, Fax: (800) 941-8287

Illinois Affiliate:
Augustine, Kern and Levens, Ltd.
218 N. Jefferson Street, Chicago, IL 60661
Tel: (312) 648-1111, Fax: (312) 648-1057

Steven I. Kern (1988 – 2011)
Algis K. Augustine (IL, CO & NY Bars)
Robert J. Conroy (NJ, NY, PA, CA, FL & DC Bars)
Michael J. Schoppmann (NJ, NY, PA & DC Bars)
Mathew J. Levy (NY, PA & DC Bars)
David L. Adelson (NY & NJ Bars)
Sheila M. Minto (NJ & NY Bars)
Edward R. Hopkins (NY Bar)
Charles H. Newman (NJ, NY & PA Bars)
Denise Sanders (NJ & PA Bars)
R. Bruce Crelin (NJ Bar)

Donald R. Moy (NY Bar)
Daniel O. Giaquinto (NJ, NY & PA Bars)
Thomas M. Gallo, RPA (NY Bar)
Matthew T. Talty (NY Bar)
Lawrence F. Kobak, DPM (NY Bar)
David N. Vozza (NY Bar)
Sharmila D. Jaiperesaud (NJ & NY Bars)
Svetlana Ros (NJ & NY Bars)
Stacey Lipitz Marder (NJ & NY Bars)
Of Counsel: James S. Wulach, Ph.D. (NJ Bar)
James E. Szalados, M.D (NY Bar)

Website: DrLaw.com           Please Reply to: New Jersey Office           Email: info@drlaw.com

June 11, 2012

<u>Via Email</u>

Mr. William V. Roeder
Executive Director
State Board of Medical Examiners
P.O. Box 183
Trenton, NJ 08625

Re: I/M/O Richard A. Kaul, M.D.
    License No. 25 MA 063281

Dear Mr. Roeder:

As you are aware we represent Dr. Kaul in the above-referenced matter.

We are writing in opposition to the pending application of the Attorney General for a "second bite at the apple" or as his Deputy has styled it, an application in aid to litigant's rights. I say a "second bite of the apple" because that is exactly what it is. (The submission of this letter should not be misconstrued as our acknowledging that the Board has jurisdiction over this matter or these issues at this time. This matter was previously transmitted to the Office of Administrative Law and jurisdiction rests there or in the courts.)

The Attorney General personally went on air (WCBS Radio, see our attached court papers for more specifics) and proclaimed that our client wrongly performed surgeries and the like. He did not bother with the usual qualifying statement that his office was alleging such and that it would be up to you, the Board, to judge the case ultimately. No, he stated the doctor's guilt as a matter of fact. We dare say, as an experienced prosecutor, he would not have made such a public comment about an accused mass murderer or an accused rapist;[1] yet he seems to believe that doctors who stand accused before the Board have fewer rights than those accused of the most heinous crimes. Odd, is it not. Surely, he had to know that his words were likely to materially prejudice these proceedings. Are we not here solely because he and his subordinate, the Acting Director of Consumer Affairs ("ADCA"), are second guessing you, the Board? You and I can ask him, under oath, about all of this when he and the ADCA appear on

---

[1] Indeed, the courts have viewed such comments to have violated the predecessors to RPC 3.6, and to constitute unprofessional conduct. *State v. Blegenwald*, 106 N.J. 13, 39-40 (1987).

KERN AUGUSTINE CONROY
/ ~CHOPPMANN, P.C.
*Attorneys to Health Professionals*

Page 2

Wednesday pursuant to my notice in lieu of a subpoena which was served on the Deputy last week.   (Another of his deputies has represented, in effect, to the Court that we shall have a full opportunity to vindicate the doctor's rights in the proceedings on Wednesday; so we are sure that the AG and the ADCA will appear.)  Accordingly, we will not belabor this point at this time in these papers.  We do, though, commend our papers filed in court last week to your attention, and we incorporate all of the arguments and factual statements made therein as if they were more fully set forth herein.  Of course, should either the AG or the ADCA fail to apper and be sworn, we will ask that an adverse inference be drawn, and that the Board rule that the facts as set forth in our court papers as being uncontroverted.

**Dr. Kaul is Not a Risk to the Public's Health, Safety and Welfare**

You have with the extant interim consent order—despite the AG's and the ADCA's misgivings—already taken care of any concerns, legitimate or otherwise, with the safety of Dr. Kaul's continued limited practice.  He is not, and the Deputy has not alleged, that he is performing any procedure that he is not permitted to perform.  Moreover, since the ADCA has unilaterally and summarily suspended his CDS prescribing privileges, Dr. Kaul cannot even perform anesthesia-related services.  So, what is it that renders Dr. Kaul now MORE of a danger to the public than he was alleged to have been months ago?  Nothing.  The Deputy seeks to hide behind more pretext as she does her superiors bidding.  And, what does she allege by way of pretext?

1. By failing to remove all remnants and fragments from his website that make mention of his having performed certain procedures the doctor is being untruthful and presents a hazard to the public.

   That is just plain silly.  Not even the Board can live up to that standard.  How many months have transpired between a new appointment being made to the Board and a former member's name being removed from the Board's website?   I am also sure that on the Division's and the Department's websites we could find a number of inaccuracies, etc.  Does that mean that the AG or the ADCA should be disciplined?  No.  Here, it is not clear what it is that the Deputy finds so objectionable that she believed that her application and the Board's precious time were required--that is, apart from the orders, we suspect, she received from her superiors.  Accordingly, we called upon the State to produce Investigator Susan Sugalski to appear before the Board and give testimony.  This call should be considered a notice in lieu of subpoena, and we may seek judicial intervention should Ms. Sugalski not appear.

2. By demanding that the Deputy follow the discovery procedures and protocol of the Office of Administrative Law, the doctor presents a hazard to the public.

   As we have pointed out above, this matter was transmitted to the Office of Administrative Law (OAL) some time ago.  As the Deputy knows there is a procedure to be followed there in terms of discovery and she has not done so.  She also has not complied the rules of the OAL calling for the exchange of discovery.  Despite going through the charade of trying to come into compliance, while at the same time she was looking to call Dr. Kaul out for not complying with an unlawful subpoena, the Deputy neglected to provide us with the investigative report that Ms. Sugalski and others have undoubtedly prepared.  I say "neglected" but it may have been more sinister than that.  Her office may have very well not wanted to expose Ms. Sugalski or others to cross examination on the return date on matters which may be found in the report.  There can be no denying though that the AG has not complied with the OAL discovery rules.  Does that mean the Deputy's application should be denied for prosecutorial misconduct?  We will leave that to you and the Courts.  One is reminded of

KERN AUGUSTINE CONROY
CHOPPMANN, P.C.
*Attorneys to Health Professionals*

Page 3

what we were all told about people who live in glass houses.... Just as a matter of logic the state's argument makes no sense. But, then again, their dredging up the prior Board case makes little sense either—unless, again, it was, and is, calculated to prejudice this Board. In a court of law such conduct by a prosecutor would lead to a mistrial and possibly an ethics investigation. Dr. Kaul paid his debt and held a license; that is it. What he is alleged to have done since having his license restored is at issue, not his past.

3.  Allegedly having failed to have medical malpractice insurance in the past now renders him a risk to the public although he cannot perform, and does not perform, the sorts of surgery in issue.

In reading this allegation, I had to pause...pause for fear that I might fall down the "rabbit hole" with the Deputy. When you logically, and un-biasedly, look at her allegations, they are as follows: Dr. Kaul is today a risk to the public NOT because he is presently un- or under-insured but because at a time now well BEYOND THE STATUTE OF LIMITATIONS he might have been under-insured. Obviously, this allegation is a pretext. A pretext intended to allow the Deputy to get you, the Board, to reconsider the interim consent order that she, herself, urged on you a few short weeks ago. That is bad enough, but asking you to rule on this point may have some very troubling (albeit perhaps, unintended) consequences for those patients looking to sue the Doctor. It is easy to imagine an insurance carrier looking to deny coverage retrospectively or worse. Indeed, at least, one, highly respected malpractice lawyer who is representing a former patient of Dr. Kaul's has shared with me his belief that a carrier cannot lawfully so restrict its coverage to exclude spinal surgery. Now, if this Board were to act as the Deputy seeks that former patient may find herself without an argument and without coverage. What will the AG or the ADCA do then? The admonishment of the Hippocratic Oath to first do no harm comes to mind.

As for the amendment of the complaint previously filed and now before the OAL, we would have had no objection if the Deputy had sought such relief in the appropriate forum, the OAL.

On Wednesday, although Dr. Kaul's name may appear on the Board's docket, it is you, THE BOARD, who are on trial. Will you allow the AG and his ADCA, to second guess you? Whether it is because the AG and the ADCA have some personal animus against Dr. Kaul, or they are simply grand-standing in the aftermath of Sidney Wolfe's public criticisms of the Board, it does not matter. [Dr. Wolfe's widely published critique of the Board appeared on May 18, 2012 in the Star Ledger, a copy of which accompanies this letter. That date is telling in that it comes nine (9) days after the entry of the Interim Consent Order and five (5) days before the Board office transmitted this matter to the OAL. (See accompanying May 23, 2012, letter of Ms. Colleen Feldman and enclosures.) Indeed, this application and the groundwork that the AG set to "support" it also came five (5) days after the Wolfe comments.] Coincidence or motive? That is the question.

Are New Jersey physicians to be regulated and overseen by other physicians or are they to be regulated by bureaucrats and prosecutors? Government by prosecution, or persecution, is not good government: it is tyranny. The answer to Sidney Wolfe's criticisms lies not in doing more of the same and expecting a different result. That would be insane. Now is the time for this Board to throw off the shackles of their structure and seize back control of medicine; and, in doing so, to help the public and the medical community to see that their safety and the very integrity of the system cannot be assured by selective and sometimes capricious prosecutions—prosecutions designed, many times, to make some itinerant office-holder look good in the media.

KERN AUGUSTINE CONROY
(  CHOPPMANN, P.C.
            *Attorneys to Health Professionals*

Page 4

There are fundamental changes that need to be made. For one, the Board needs to be moved to the Department of Health and Senior Services where the Commissioner can direct its activities in furtherance of the quality of care of all involved in our health care system. This case speaks volumes as to the waste and wrong-headedness of the present structure, a structure that encourages bureaucrats without any medical knowledge to play "cops and robbers" with our health care system and patient safety. States in the Northwest learned this lesson years ago and it is the reason that in many large urban states, like New York, the Commissioner (or Secretary) of Health oversees the medical licensing authorities. Patient safety should not be left to those who dabble or are looking to advance themselves through press releases. The regulation of medicine needs a knowledgeable and capable hand.

We, of course, reserve the doctor's rights to further supplement our submissions as we move closer to the hearing. Indeed, given the abrupt manner in which this matter has come about, we may even need to introduce documents, papers, etc., at the hearing.

Thank you

Very truly yours,

KERN AUGUSTINE
CONROY & SCHOPPMANN, P.C.

By: _____
        Robert J. Conroy

Enclosures

cc: Doreen A. Hafner, DAG – via email
     Richard A. Kaul, M.D.

# Richard Kaul

**From:**       Bruce Crelin [BCrelin@drlaw.com]
**Sent:**       Friday, June 01, 2012 3:43 PM
**To:**         Kelly Gay
**Cc:**         Richard Kaul; Robert Conroy
**Subject:**    RE: CDS statement for malpractice insurance application
**Attachments:** doc-explanation-for-insurance.docx

Kelly:

Here is some language you can use.

R. Bruce Crelin
Kern Augustine Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
Tel. - (908) 704-8585
Fax - (908) 704-8899
bcrelin@drlaw.com

Admitted to practice law in New Jersey

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed and its contents may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone at the number noted above or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (i) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (ii) any such advice is written in connection with the matters addressed; and (iii) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor.

**From:** Kelly Gay [mailto:kgay@njsrlaserspine.com]
**Sent:** Friday, June 01, 2012 3:16 PM
**To:** Bruce Crelin
**Cc:** Richard Kaul
**Subject:** CDS statement for malpractice insurance application

Dear Mr. Crelin,

As Dr. Kaul told you, his malpractice insurance is up for renewal and there is a question on the application:  Have you ever voluntarily surrendered or had a narcotics license refused, suspended or revoked?

I have the Administrative Action document but would you please be able to supply me with a short paragraph in response to the action that I may attach to the application.

Thank you,
Kelly Gay

New Jersey Spine & Rehabilitation
125 Wanaque Avenue, 2nd Floor
Pompton Lakes, NJ  07442
Tel:  973-248-8818 x203
Fax:  973-800-1905
kgay@njsrlaserspine.com
www.njsrlaserspine.com

By means of a unilaterally issued order of immediate suspension, dated May 22, 2012, the Acting Director of the New Jersey Division of Consumer Affairs summarily suspended my New Jersey CDS registration.  My attorneys advise me that this action is unprecedented and illegal, and are in the process of preparing papers in order to file suit to vacate this order.  They expect to have the suit filed, and heard by a Judge, sometime during the week of June 4th.

**Richard Kaul**

**From:**  Robert Conroy [RConroy@drlaw.com]
**Sent:**  Tuesday, May 22, 2012 4:31 PM
**To:**  Richard Kaul
**Subject:**  FW: I/M/O Richard Kaul, M.D.

**From:** Robert Conroy
**Sent:** Tuesday, May 22, 2012 3:40 PM
**To:** 'Doreen Hafner' (Doreen.Hafner@dol.lps.state.nj.us)
**Subject:** I/M/O Richard Kaul, M.D.

Please share this email with the powers that be.

I am not accusing you of bad faith but I believe that the Attorney General and the Acting Director of the Division of Consumer Affairs have not only acted in extreme bad faith in seeking to summarily suspend my client's CDS privileges but that have done so as part of a cheap piece of political theater and have made a mockery of my client's Due Process Rights. We believe their actions to have so prejudiced the administrative process that Dr. Kaul is unable to obtain a fair hearing. I have raised the improper merger of the investigatory, prosecutorial and adjudicatory functions in the Office of Attorney General before as a clearly unconstitutional practice. Apparently, this will give us the factual basis to establish once and for all that the Office of Attorney General cannot be trusted to conduct itself fairly and within the confines of the Constitution. Insofar as the Attorney General and the Acting Director of the Division of Consumer Affairs have made statements to the media that clearly reveal their personal animus toward my client and their pre-judgment of this matter, we call upon them to immediately recuse themselves from any and all future deliberations, etc., involving Dr. Kaul, and make themselves available to testify as required by a subpoena I will be issuing to compel their attendance at the hearing on this latest summary suspension. I must also warn them about engaging in any efforts to obstruct our client's attempt to receive a fair hearing or cover up their previous involvement. Lastly, we are presently considering federal action. Might I remind the powers that be that we have been successful in the past in obtaining a sizeable attorneys' fee award against the state in a Board matter; indeed, we are the only party in the history of our Republic to ever have the US Marshall seize a state's general revenue fund. Apparently, they want to afford us another opportunity to do so.

If cooler heads prevail, please have them contact me. Otherwise, I can assure them that this will ultimately not be judged their finest hour.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

6/16/2012

...........................................................

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4). Thank you for your cooperation.

6/16/2012

**Richard Kaul**

| | |
|---|---|
| **From:** | Robert Conroy [RConroy@drlaw.com] |
| **Sent:** | Wednesday, May 09, 2012 5:42 PM |
| **To:** | 'Doreen Hafner' (Doreen.Hafner@dol.lps.state.nj.us) |
| **Subject:** | I/M/O Kaul |

Doreen,

It sounds to me like the AG has prejudged this matter or he may be trying to exercise undue "influence" over the Board. His quote on CBS Radio could prove very problematic for the State's case. I want to put you on notice that we may make it an issue. In case you didn't catch it, here it is:

"Whatever training he has is not sufficient for the kinds of surgery including, including discectomies and spinal fusions, which, as people can appreciate, is a highly technical, highly complex surgery that's gotta be performed by people who have been trained for years in that kind of specialty," Attorney General Jeffrey Chiesa told WCBS 880 reporter Marla Diamond.

When it comes to matters best left to the Board, he might be best advised to keep his opinions to himself. Pre-hearing publicity of this sort can be prejudicial.
In the meantime, please forward the signed consent order when you have chance.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

.............................................................

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4). Thank you for your cooperation.

6/16/2012

NYS0728

**Richard Kaul**

| | |
|---|---|
| **From:** | Robert Conroy [RConroy@drlaw.com] |
| **Sent:** | Tuesday, May 22, 2012 3:49 PM |
| **To:** | Richard Kaul |
| **Subject:** | [BULK] FW: Request for Removal of Content |
| **Importance:** | Low |

FYI

**From:** Monheit, Michael [mailto:mmonheit@anapolschwartz.com]
**Sent:** Tuesday, May 22, 2012 3:30 PM
**To:** Robert Conroy
**Subject:** FW: Request for Removal of Content



We are removing content. Do you know which site this was on? The only content we found was as follows, and it is being removed immediately. I am looking into how this content got onto our site and will also take steps to ensure that the researchers and writers take better steps.



**Anapol Schwartz**
ATTORNEYS AT LAW
**Michael H. Monheit, Esquire**
MMonheit@AnapolSchwartz.com

CELL:
1710 SPRUCE STREET    215.840.6573
PHILADELPHIA, PA 19103    Direct Fax: 215.893.4925

**Find us on Facebook**  twitter

=============================================================
CONFIDENTIALITY NOTICE: This e-mail contains information that is or may be privileged and
confidential. It is subject to legal restrictions and penalties regarding its unauthorized disclosure or other
use. You are prohibited from copying, distributing, disclosing or otherwise using this information, if you are
not the intended recipient (or authorized to receive this for the addressee). If you have received this e-
mail in error, please advise the sender immediately by return e-mail (to the address above) and delete
this e-mail and all attachments from your system. Thank you.

**From:** Fedeli, Jackie
**Sent:** Tuesday, May 22, 2012 1:10 PM
**To:** Monheit, Michael; 'Ryan Forrister'
**Subject:** Request for Removal of Content

Mike, Ryan,

6/16/2012

Please see below.  I believe this is in response to this page: http://www.lawyer-nj.com/personal-injury/

Should we have this content removed?

Jackie

**From:** conroy@drlaw.com [mailto:conroy@drlaw.com]
**Sent:** Saturday, May 19, 2012 10:59 PM
**To:** Fedeli, Jackie
**Subject:** Request for additional information

This inquiry is the result of a search of the Lawyer Locator on *martindale.com*.

*Sent By:*
Name: Robert J. Conroy
Company Name: Kern Augustine Conroy & Schoppmann, P.C.
City: Bridgewater
State/Country: United States of America
Email Address: conroy@drlaw.com
Phone: 908-7048585
Comments:
Your piece on my client, Dr. Kaul, has defamed him and we are prepared to begin suit against your firm, immediately. There are no prand jury proceedings pending that invovle him to the best of our knowledge. Moreover, given grand jury secrecy in NJ it would be impossible for you to know about such; if you did, publishing same would be illegal. Please email me immediately or we will file suit against your firm without further notice. We also demand that you withdraw your false and misleading advertisement IMMEDIATELY or face the full measure of the law. Thank you. Robert J. Conroy Kern Augustine Conroy & Schoppmann, P.C.

NOTE: *Due to the inherent anonymity of the Internet, the identity of all individuals should be confirmed prior to entering into any business arrangement.*

6/16/2012

NYS0822

## Richard Kaul

**From:**     Robert Conroy [RConroy@drlaw.com]
**Sent:**     Tuesday, May 22, 2012 5:01 PM
**To:**       'Doreen Hafner' (Doreen.Hafner@dol.lps.state.nj.us)
**Subject:**  I/M/O Richard Kaul, M.D.

Please advised immediately of who is authorized to accept service of process on behalf of the now acting Director?  If I do not have a response today, we will advised the Court that he has waived his right to notice.  Of course, the acting Director's media comments require him to recuse himself or face removal by the courts and possibly worse.  We believe that his conduct in this matter render him unfit to serve and so he continue on this path we will have no alternative but to bring his conduct to the attention of the Senate Judiciary Committee.  Foolishness in government is never a good thing but when a fool believes he is the government that is worse.  Might I strongly suggest that he review MSNJ v. Ombudsman for the institutional Elder as to the fate awaiting a bureaucrat who makes foolish unilateral edicts of this sort.

Since we suspect that the Attorney General may be called to account for the actions of the Acting Director, we must ask that you make the Attorney General personal aware of this foolishness.


**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ  08807
tel:  908-704-8585
fax:  908-704-8899
email:  conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in:  New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

-----------------------------------------------------

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4).  Thank you for your cooperation.

6/16/2012

NYS0824

**Doreen Hafner - RE: Richard Kaul, M.D.**

From:    Robert Conroy <RConroy@drlaw.com>
To:      '"Doreen Hafner"' <Doreen.Hafner@dol.lps.state.nj.us>
Date:    5/24/2012 9:57 AM
Subject: RE: Richard Kaul, M.D.

Doreen,

Based upon recent statements made by the Attorney General in the media, we believe that your office MUST withdraw from this matter and independent counsel be represented to prosecute this matter. We are also of the opinion that the Office of Attorney General may not ethically play any role in advising the Board in this matter. Furthermore we believe that the present merger of function is Constitutionally flawed and must not continue.

As to the subpoena itself, insofar as you are planning to amend your complaint using information gather in pursuant to the subpoena, we believe the subpoena to be improvident and outside the scope of your authority. I said this without prejudice to our objections as noted above to your office's involvement in this matter.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu

Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

----------------------------------------------------------------

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511 (4). Thank you for your cooperation.

file:///C:/Users/hafnedor/AppData/Local/Temp/XPgrpwise/4FBE0614lplgw5lplp531001637...  6/1/2012

NYS0832

**From:** Doreen Hafner [mailto:Doreen.Hafner@dol.lps.state.nj.us]
**Sent:** Wednesday, May 23, 2012 6:39 PM
**To:** Robert Conroy
**Subject:** RE: Richard Kaul, M.D.

Bob,

Attached please find the Attorney General's First Request for Production of Documents as well as Administrative Action Subpoenas to both New Jersey Spine and Rehabilitation Center and Richard A. Kaul, M.D.

These are provided to you in response to your objections to the OAL Subpoena as set forth in the below email. Please note that the due date for the Subpoenas is June 1, 2012. The due date for the First Request for the Production of Documents is June 7, 2012.

Thank you for your attention to this matter. Please feel free to call me with any questions.

Doreen

Doreen A. Hafner
Deputy Attorney General
State of New Jersey
Department of Law @ Public Safety
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark New Jersey 07101

Tel. (973) 648-7454
Fax (973) 648-7782
Doreen.Hafner@dol.lps.state.nj.us

>>> Robert Conroy <RConroy@drlaw.com> 5/21/2012 2:40 PM >>>

We believe the subpoena to be improper and defective on its face. This matter is not about to be litigated before the OAL. Using a subpoena in this manner to frame a complaint or circumvent the discovery process under the APA is wrong. Unless you can convince us to the contrary, we will treat the subpoena as a nullity. Of course, the Deputy is free to speak with me tomorrow regarding same. As for serving my client, that too would be improper. We would consider it a violation of the RPCs prohibition on contact with a represented party. Please be so advised.

file:///C:/Users/hafnedor/AppData/Local/Temp/XPgrpwise/4FBE0614lplgw5lplp531001637...  6/1/2012

NYS0833

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

-------------------------------------------------

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4). Thank you for your cooperation.

-------------------------------------------------

**From:** Nichole Hall [mailto:Nichole.Hall@dol.lps.state.nj.us]
**Sent:** Monday, May 21, 2012 2:17 PM
**To:** Robert Conroy
**Cc:** Doreen Hafner
**Subject:** Richard Kaul, M.D.

As per DAG Doreen Hafner she anticipates that these subpoenas will be served today on Dr. Kaul.
CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.
CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the

file:///C:/Users/hafnedor/AppData/Local/Temp/XPgrpwise/4FBE0614lplgw5lplp531001637...  6/1/2012

persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

NYS0835

**Richard Kaul**

| | |
|---|---|
| **From:** | Robert Conroy [RConroy@drlaw.com] |
| **Sent:** | Tuesday, May 22, 2012 6:40 PM |
| **To:** | Richard Kaul |
| **Cc:** | Bruce Crelin |
| **Subject:** | Fwd: I/M/O Richard Kaul, M.D. |

FYI

Robert (Bob) J. Conroy
Kern Augustine Conroy & Schoppmann, P.C.

Cell. 1-908-295-8702

Begin forwarded message:

> **From:** Robert Conroy <RConroy@drlaw.com>
> **Date:** May 22, 2012 6:38:54 PM EDT
> **To:** Doreen Hafner <Doreen.Hafner@dol.lps.state.nj.us>
> **Subject: Re: I/M/O Richard Kaul, M.D.**
>
> Who is counsel? I don't want to bother you since you are not involved. In the meantime, I commend the judgement in MSNJ v. Jacobs to the "powers that be" for their consideration. I want them to be fully aware of the State's potential liability.
>
> Robert (Bob) J. Conroy
> Kern Augustine Conroy & Schoppmann, P.C.
>
> Cell. 1-908-295-8702
>
> On May 22, 2012, at 6:03 PM, "Doreen Hafner" <Doreen.Hafner@dol.lps.state.nj.us> wrote:
>
>> Bob,
>>
>> I have been informed that the people who can accept service are:
>>
>> The Director
>> Ellen Seitz
>> Annette Smallcombe
>> Lisa Hawes
>> Leslie Gore
>> Kathy Cathel
>> Kevin Jespersen
>> Cynthia Cardi
>>
>> These people are in Trenton.
>>
>> Doreen

6/16/2012

NYS0826

>>> Robert Conroy <RConroy@drlaw.com> 5/22/2012 5:28 PM >>>
Doreen,

Please share the attached case with the Acting Director and the Attorney General. I do not want them to claim ignorance of this case. Further, I am of the opinion that the Governor, like the then Governor of Florida in the Schopler matter, must appoint a new ad hoc acting director to hear the CDS issue, and on , at least an ad hoc basis, the Board must be removed from the present acting director's oversight, independent counsel retained for the Board, and the Attorney General's office must withdraw from all involvement in this matter. As to damages and the like, as in the Schopler matter we will leave that for another day and perhaps another forum. I must insist on an answer to these demands before noon tomorrow.


**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel:  908-704-8585
fax:  908-704-8899
email:  conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in:  New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

*AG. No involvement with them.*

..................................................................

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4).  Thank you for your cooperation.


CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or

6/16/2012

entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

6/16/2012

## Richard Kaul

**From:** Robert Conroy [RConroy@drlaw.com]
**Sent:** Monday, May 21, 2012 2:41 PM
**To:** Richard Kaul
**Subject:** FW: Richard Kaul, M.D.

**From:** Robert Conroy
**Sent:** Monday, May 21, 2012 2:40 PM
**To:** 'Nichole Hall'
**Cc:** Doreen Hafner; Bruce Crelin
**Subject:** RE: Richard Kaul, M.D.

We believe the subpoena to be improper and defective on its face. This matter is not about to be litigated before the OAL. Using a subpoena in this manner to frame a complaint or circumvent the discovery process under the APA is wrong. Unless you can convince us to the contrary, we will treat the subpoena as a nullity. Of course, the Deputy is free to speak with me tomorrow regarding same. As for serving my client, that too would be improper. We would consider it a violation of the RPCs prohibition on contact with a represented party. Please be so advised.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

-----------------------------------------------------

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the

6/16/2012

original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4).  Thank you for your cooperation.

**From:** Nichole Hall [mailto:Nichole.Hall@dol.lps.state.nj.us]
**Sent:** Monday, May 21, 2012 2:17 PM
**To:** Robert Conroy
**Cc:** Doreen Hafner
**Subject:** Richard Kaul, M.D.

As per DAG Doreen Hafner she anticipates that these subpoenas will be served today on Dr. Kaul.
CONFIDENTIALITY NOTICE The information contained in this communication from the Office of the New Jersey Attorney General is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this e-mail, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the Office of the Attorney General at (609) 292-4925 to arrange for the return of this information.

6/16/2012

**Richard Kaul**

| | |
|---|---|
| **From:** | Robert Conroy [RConroy@drlaw.com] |
| **Sent:** | Saturday, May 19, 2012 11:01 PM |
| **To:** | Richard Kaul |
| **Subject:** | Email to Offending Law Firm |

**Importance: Low**

There emails are hidden on the web so I used one of the web referral services to send them the email below.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

............................................................

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4). Thank you for your cooperation.

**From:** conroy@drlaw.com [mailto:conroy@drlaw.com]
**Sent:** Saturday, May 19, 2012 10:59 PM
**To:** Robert Conroy
**Subject:** [Spam] Request for additional information
**Importance:** Low

This inquiry is the result of a search of the Lawyer Locator on *martindale.com*.

*Sent By:*

6/16/2012

Name: Robert J. Conroy
Company Name: Kern Augustine Conroy & Schoppmann, P.C.
City: Bridgewater
State/Country: United States of America
Email Address: conroy@drlaw.com
Phone: 908-7048585
Comments:
Your piece on my client, Dr. Kaul, has defamed him and we are prepared to begin suit against your firm immediately. There are no grand jury proceedings pending that invovle him to the best of our knowledge. Moreover, given grand jury secrecy in NJ it would be impossible for you to know about such; if you did, publishing same would be illegal. Please email me immediately or we will file suit against your firm without further notice. We also demand that you withdraw your false and misleading advertisement IMMEDIATELY or face the full measure of the law. Thank you. Robert J. Conroy Kern Augustine Conroy & Schoppmann, P.C.

NOTE: *Due to the inherent anonymity of the internet, the identity of all individuals should be confirmed prior to entering into any business arrangement.*

6/16/2012

Page 1 of 1

**Doreen Hafner - Re: 2 more Kaul Cases**

| | |
|---|---|
| **From:** | <gprzybyl@optonline.net> |
| **To:** | Doreen Hafner <Doreen.Hafner@dol.lps.state.nj.us> |
| **Date:** | 5/29/2012 8:34 PM |
| **Subject:** | Re: 2 more Kaul Cases |

Dear Ms Hafner
The deviation on the young woman was gross.  Decision making on the man was a minor deviation.  I can attend on Wed June 13
Greg

age -----
From: Doreen Hafner
Date: Tuesday, May 29, 2012 8:44 am
Subject: Re: 2 more Kaul Cases
To: gprzybyl@optonline.net

> Thanks...I will review the attachment once I get to the office.
> Would you classify the deviations that you found as gross,
> moderate or minor?
> Are you available to testify on the 13th of June in Trenton?
> Thanks for taking a look at these addt'l pt rcds.
> Doreen
> -----Original Message-----
> From:
> To: Doreen Hafner
>
> Sent: 5/29/2012 7:27:00 AM
> Subject: 2 more Kaul Cases
>
>
> CONFIDENTIALITY NOTICE
>
> The information contained in this communication from the
> Office of the New Jersey Attorney General is privileged
> and confidential and is intended for the sole use of the
> persons or entities who are the addressees. If you are not
> an intended recipient of this e-mail, the dissemination,
> distribution, copying or use of the information it contains
> is strictly prohibited. If you have received this communication
> in error, please immediately contact the Office of the Attorney
> General at (609) 292-4925 to arrange for the return of this
> information.

NYS0837

https://mail.google.com/mail/u/0/?ui=2&ik=4ff17f47e0&view...



Richard Kaul <drrichardkaul@gmail.com>

---

## FW: State Attorney General
1 message

**Richard Kaul** <rkaul@njsrlaserspine.com>                    Wed, May 9, 2012 at 6:42 PM
To: richard kaul <drrichardkaul@gmail.com>

---

**From:** Daniel Goldberg
**Sent:** Wednesday, May 09, 2012 4:33 PM
**To:** Richard Kaul; Kelly Gay
**Subject:** State Attorney General

Listen to the audio on this one.  The state attorney general seems to have it out for you.

http://newyork.cbslocal.com/2012/05/09/doctor-convicted-of-manslaughter-performs-back-surgery-in-north-jersey/?utm_source=dlvr.it&utm_medium=twitter

Daniel Goldberg

Director of Business Development

New Jersey Spine and Rehabilitation

Phone: 973.248.8818 ext 204

Cell: 201.873.0749

# Exhibit 4

**KERN AUGUSTINE**
**CONROY & SCHOPPMANN, P.C.**
1120 Route 22 East
Bridgewater, NJ 08807
(908) 704-8585
Attorneys for Plaintiff

| | |
|---|---|
| RICHARD A. KAUL, M.D., <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF NEW JERSEY; HON. JEFFREY S. CHIESA, THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY (in his official capacity only); THE NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY; THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS; HON. ERIC T. KANEFSKY, THE ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS (in both his official and individual capacities) and DOREEN A. HAFNER, D.A.G. (in her official capacity only), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, MERCER COUNTY DOCKET NO: <br><br> Civil Action <br><br> VERIFIED COMPLAINT IN LIEU OF PREROGATIVE WRITS, DESIGNATION OF TRIAL COUNSEL AND CERTIFICATION PURSUANT TO *R.* 4:5-1 |

     The plaintiff, Richard A. Kaul, M.D., having a medical practice located at 125 Wanaque Avenue in the Borough of Pompton Lakes, County of Passaic and State of New Jersey, by and through his attorneys, Kern Augustine Conroy & Schoppmann, P.C., by way of verified complaint in lieu of prerogative writs against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky,

the Acting Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., states as follows:

## THE PARTIES

1.      The plaintiff, Richard A. Kaul, M.D. ("Dr. Kaul"), is a physician duly licensed by the State of New Jersey to practice medicine and surgery, specializing and Board-certified in the practice of anesthesiology.  *See* accompanying Certification of Richard A. Kaul, M.D. ("Kaul Cert."), ¶1.

2.      The defendant, the State of New Jersey ("New Jersey"), is a constituent State of the United States of America.

3.      The defendant, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey (the "Attorney General"), is an appointed, Cabinet-level official of the government of New Jersey, and is the chief law enforcement official in the State.  The Attorney General is named as a defendant in this action in his official capacity only.

4.      The defendant, the New Jersey Department of Law and Public Safety (the "Department"), is a department and agency of the defendant, New Jersey, and is headed by the defendant, Attorney General.

5.      The defendant, the New Jersey Division of Consumer Affairs (the "DCA"), is a component Division of the defendant Department.

6.      The defendant, Hon. Eric T. Kanefsky, the Acting Director of the defendant, DCA (the "Acting Director"), is an appointed government official, having assumed this position on April 16, 2012 after being nominated by the Governor, but said nomination has not yet been approved by the Senate.  The Acting Director is named as a defendant in this action in both his official and individual capacities.

2

7.      The defendant, Doreen A. Hafner, D.A.G. ("Ms. Hafner"), is a Deputy Attorney General of the defendant, New Jersey, assigned to the defendants, Department and DCA.  She is engaged in the prosecution of administrative matters on behalf of the defendant, Attorney General, before the New Jersey State Board of Medical Examiners (the "Board"), which is a component board of the defendants, Department and DCA, charged with establishing the qualifications required for physicians to be licensed to practice in New Jersey and with the regulation of the practice of medicine within the State of New Jersey.  Ms. Hafner is named as a defendant in this action in her official capacity only.

## FACTUAL BACKGROUND

8.      On April 2, 2012, the defendant Attorney General, on behalf of the Board, filed a verified complaint, *see* Kaul Cert., ¶2, Exhibit "A," and order to show cause, *see* Kaul Cert., ¶3, Exhibit "B," thereby instituting an administrative proceeding against Dr. Kaul seeking the immediate, temporary suspension of his license to practice. This immediate, temporary suspension of Dr. Kaul's license was sought primarily on the basis of allegations the doctor lacked sufficient experience and training to perform spinal surgery procedures. The defendant, Ms. Hafner, signed the pleadings in this case.

9.      More than two years prior to the filing of the verified complaint in the administrative proceeding, Dr. Kaul appeared at a hearing by a Preliminary Evaluation Committee ("PEC") of the Board on February 3, 2010, with respect to an investigation of the doctors' qualifications to perform various types of surgery. Following Dr. Kaul's appearance at this PEC, no further information was sought from him with respect to any of the issues which had been reviewed.  *See* Kaul Cert., ¶2, Exhibit "A," p.2, ¶5.

3

10.    Subsequent to the service of the verified complaint and order to show cause, Dr. Kaul's counsel negotiated an interim consent order with the defendant, Ms. Hafner. This interim consent order was ultimately approved by the Board and filed on May 9, 2012. *See* Kaul Cert., ¶4; Exhibit "C."

11.    Under the terms of the interim consent order, Dr. Kaul agreed to not perform any surgery or special procedures, and to take other actions, pending further order of the Board. The interim consent order further states that it "does not constitute an admission or finding against Richard A. Kaul, M.D.," and the Board found the disposition entered under the interim consent order "to be adequately protective of the public health, safety and welfare." The interim consent order also permits Dr. Kaul to apply to a New Jersey hospital, or to the Board, for privileges to perform the procedures which the order restricts him from performing, and also to hire other Board-certified surgeons to perform the procedures which Dr. Kaul has agreed not to perform. *See* Kaul Cert., Exhibit "C."

12.    Despite the fact that the allegations contained in the verified complaint are simply unproven allegations, and the fact that the interim consent order does not constitute any admission or finding against Dr. Kaul, and the fact the interim consent order explicitly recites that its terms are sufficient "to be adequately protective of the public health, safety and welfare," the defendant Attorney General made the following statement to WCBS 880 radio news on or about May 9, 2012:

> Whatever training he [Dr. Kaul] has is not sufficient for the kinds of surgery including, including discectomies and spinal fusions, which, as people can appreciate, is a highly technical, highly complex surgery that's gotta [sic] be performed by people who have been trained for years in that kind of specialty.

4

Dr. Kaul's counsel has an audio file of the radio broadcast, as well.  *See* accompanying Certification of R. Bruce Crelin ("Crelin Cert."), ¶2; Exhibit "A."  The defendant Attorney General is not a physician, is not competent to opine on matters involving the appropriate level of training or scope of practice of a physician.  Furthermore, this statement indicates the defendant Attorney General, who heads the governmental agencies and institutions which are investigating, prosecuting and adjudicating the allegations against Dr. Kaul, has already made him his mind and pre-judged Dr. Kaul to be guilty of the charges leveled against him.

13.    Despite the filing of the verified complaint and order to show cause, and the entry of the interim consent order, as previously described, on May 22, 2012, the defendant Acting Director entered an "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued."  *See* Kaul Cert., ¶5; Exhibit "D."

14.    The practical effect of the suspension of Dr. Kaul's CDS registration is to prevent him from practicing medicine, at all.  Without a valid CDS registration, a physician cannot attain or maintain privileges at any hospital, which makes it impossible to practice.  The interim consent order specifically states Dr. Kaul is permitted to pursue applications for hospital privileges. *See* Kaul Cert., ¶6.

15.    In issuing the Order of Immediate Temporary Suspension, the defendant Acting Director relied upon the following statutory authority:

a. A registration pursuant to section 11 of P.L.1970, c. 226 (C.24:21-11) to manufacture, distribute, or dispense a controlled dangerous substance, may be suspended or revoked by the director upon a finding that the registrant:

(1) Has materially falsified any application filed pursuant to P.L.1970, c. 226 (C.24:21-1 et seq.), as amended and supplemented, or required by P.L.1970, c. 226, as amended and supplemented; or

(2) Has been convicted of an indictable offense under P.L.1970, c. 226, as

5

amended and supplemented, or any law of the United States, or of any State, relating to any substance defined herein as a controlled dangerous substance; or

(3) Has violated or failed to comply with any duly promulgated regulation of the director and such violation or failure to comply reflects adversely on the licensee's reliability and integrity with respect to controlled dangerous substances; or

(4) Has had his Federal registration suspended or revoked by competent Federal authority and is no longer authorized by Federal law to engage in the manufacturing, distribution, or dispensing of controlled dangerous substances; or

(5) Has had his registration suspended or revoked by competent authority of another state for violation of its laws or regulations comparable to those of this State relating to the manufacture, distribution or dispensing of controlled dangerous substances.

b. The director may limit revocation or suspension of a registration to the particular controlled dangerous substance with respect to which grounds for revocation or suspension exist.

c. Before taking action pursuant to this section or pursuant to a denial of registration under section 11 of P.L.1970, c. 226 (C.24:21-11), the director shall serve upon the applicant or registrant an order to show cause why registration should not be denied, revoked, or suspended. The order to show cause shall contain a statement of the basis thereof and shall call upon the applicant or registrant to appear before the director at a time and place stated in the order, but in no event less than 30 days after the date of receipt of the order unless an earlier date is requested by the applicant or registrant and agreed to by the director. Proceedings to deny, revoke, or suspend shall be conducted pursuant to this section in accordance with the provisions of the "Administrative Procedure Act," P.L.1968, c. 410 (C. 52:14B-1 et seq.). Such proceedings shall be independent of, and not in lieu of, criminal prosecutions or other proceedings under P.L. 1970, c. 226, as amended and supplemented, or any law of the State.

d. The director may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section in cases where he finds that there is an imminent danger to the public health or safety. Such suspensions shall continue in effect until the conclusion of such proceedings, including judicial review thereof, unless sooner withdrawn by the director or dissolved by a court of competent jurisdiction.

*N.J.S.A.* 24:21-12 (a) – (d).

16.     The defendant Acting Director is not a physician, is not competent to opine on

6

whether or not Dr. Kaul's continued prescription of CDS is contrary to the public interest, as the Board had already entered in interim consent order which it explicitly stated was "adequately protective of the public health, safety and welfare,"  Furthermore, this entry of this immediate suspension order indicates the defendant Acting Director, who heads the governmental division which is investigating, prosecuting and adjudicating the allegations against Dr. Kaul, has already made him his mind and pre-judged Dr. Kaul to be guilty of the charges leveled against him.

17.    The order to show cause, *see* Kaul Cert., ¶3, Exhibit "B," is returnable before the Acting Director who, by virtue of the facts recited, *supra*, is not a disinterested party who is capable of fully and fairly adjudicating the order to show cause, but is instead seeking to rule upon an illegal, invalid order which he, himself, has entered.

18.    Upon receipt of this Order immediately suspending Dr. Kaul's CDS registration, his counsel contacted the defendant, Ms. Hafner, and numerous other officials and employees of the defendant, New Jersey, to protest the extreme irregularity and unprecedented nature of this Order, and to inform the defendants that appropriate litigation would be filed on the event the Order was not revoke or rescinded.  The defendants took no action to rescind or revoke the Order, and indeed took no substantive action with respect to Dr. Kaul, until Tuesday, June 5, 2012. *See* Crelin Cert., ¶3.

19.    On June 5, 2012, Susan Sugalski ("Ms. Sugalski"), an investigator employed by the defendant DCA, Enforcement Bureau, delivered a box containing approximately two (2) reams of 8 ½ by 11 inch paper, consisting of the following documents:

    a)    Notice of motion in aid of litigant's rights seeking to renew the temporary suspension application and amend the verified complaint;

    b)    Letter brief in support thereof;

7

c)      Proposed amended verified complaint;

d)      Certification in support thereof; and

e)      Exhibits "A" through "U" to the certification.

Items "a," "b" and "d" are all signed by the defendant, Ms. Hafner, and item "c" contains a signature line for Ms. Hafner, who will presumably execute the original document if and when approval to file it is issued. Although item "c" is denominated as a "verified complaint," there is no verification for anyone with personal knowledge of the facts set forth in this document for execution, and the only signature line appearing on this document is one for Ms. Hafner, on the last page of the document. True copies of items "a" through "d" are appended to the Crelin Cert. as Exhibits "B" through "E." Item "e" is omitted due to the voluminous nature of the exhibits. *See* Crelin Cert., ¶¶4 – 8.

20.      The above motion is returnable before the Board on Wednesday, June 13, 2012. *See* Crelin Cert., ¶4, Exhibit "B."

21.      Upon information and belief, Ms. Sugalski works under and at the specific direction of the defendant, Acting Director. *See* Crelin Cert., ¶9.

### FIRST COUNT

22.      The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

23.      The actions of the Acting Director in issuing the immediate suspension order were *ultra vires*, in violation of the provisions of *N.J.S.A.* 24:21-12 (a) – (d) and contrary to the terms of the Board's interim consent order.

24.      The immediate suspension order is therefore null and void and of no legal effect.

8

**WHEREFORE**, the plaintiff, Richard S. Kaul, M.D., demands a declaratory judgment against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

A.   Declaring that the May 22, 2012 "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued" is null and void and of no effect ; and

B.   Declaring, *nunc pro tunc*, that Dr. Kaul's CDS registration was, is and remains, valid until such time as the New Jersey Board of Medical Examiners takes valid action with respect to same, on notice to Dr. Kaul with an opportunity for a hearing; and

C.   Granting such other relief as the Court deems equitable and just.

## SECOND COUNT

25.   The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

26.   To the extent the actions of the Acting Director in issuing the immediate suspension order were in compliance with the provisions of *N.J.S.A.* 24:21-12 (a) – (d), said actions were undertaken in violation of Dr. Kaul's due process rights under the New Jersey Constitution, and *N.J.S.A.* 24:21-12 (a) – (d) is unconstitutional as applied to Dr. Kaul in this matter.

27.   The immediate suspension order is therefore null and void and of no legal effect.

**WHEREFORE**, the plaintiff, Richard S. Kaul, M.D., demands a declaratory judgment against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey

9

Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey

Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

A.    Declaring that the May 22, 2012 "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued" is null and void and of no effect ; and

B.    Declaring, *nunc pro tunc*, that Dr. Kaul's CDS registration was, is and remains, valid until such time as the New Jersey Board of Medical Examiners takes valid action with respect to same, on notice to Dr. Kaul with an opportunity for a hearing,; and

C.    Granting such other relief as the Court deems equitable and just.

### THIRD COUNT

28.    The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

29.    To the extent the actions of the Acting Director in issuing the immediate suspension order were in compliance with the provisions of *N.J.S.A.* 24:21-12 (a) – (d), said actions were undertaken in violation of Dr. Kaul's due process rights under the United States Constitution.

30.    In issuing the immediate suspension order, the Acting Director was acting under color of state law, and his actions deprived Dr. Kaul of his rights under the United States Constitution and federal law, as aforesaid, for which deprivation Dr. Kaul has a remedy pursuant to 42 *U.S.C.* § 1983.

31.    The immediate suspension order is therefore null and void and of no legal effect.

**WHEREFORE**, the plaintiff, Richard S. Kaul, M.D., demands a declaratory judgment against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey

Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey

Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

A.    Declaring that the May 22, 2012 "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued" is null and void and of no effect ; and

B.    Declaring, *nunc pro tunc*, that Dr. Kaul's CDS registration was, is and remains, valid until such time as the New Jersey Board of Medical Examiners takes valid action with respect to same, on notice to Dr. Kaul with an opportunity for a hearing,; and

C.    Granting such other relief as the Court deems equitable and just.

### FOURTH COUNT

32.    The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

33.    In the event the immediate suspension order is not rendered null and void, and the Court determines it must be decided by means of an administrative order to show cause, as set forth therein, the actions of the Attorney General, the Acting Director and Ns, Hafner, as aforesaid, demonstrate an improper merger of the investigative, prosecutorial and adjudicative functions of the Department and the Division.

34.    As a result of the aforesaid improper merger of functions, neither the Attorney General, the Acting Director nor anyone acting under their direction or authority may prosecute or adjudicate the return of an order to show cause on the immediate suspension order.

**WHEREFORE,** the plaintiff, Richard S. Kaul, M.D., demands preliminary and permanent injunctive relief against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting

11

Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

    A.    Prohibiting the defendants from adjudicating the order to show cause with respect to the May 22, 2012 "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued;"

    B.    Ordering the appointment of a special prosecutor;

    C.    Ordering the appointment of an *ad hoc* adjudicatory officer to hear the matter; and

    D.    Granting such other relief as the Court deems equitable and just.

## FIFTH COUNT

35.    The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

36.    The actions of the Attorney General, the Acting Director and Ms. Hafner, as aforesaid, demonstrate an improper merger of the investigative, prosecutorial and adjudicative functions of the Department and the Division.

37.    As a result of the aforesaid improper merger of functions, neither the Attorney General, the Acting Director nor anyone acting under their direction or authority may prosecute or adjudicate the administrative action against Dr. Kaul.

**WHEREFORE**, the plaintiff, Richard S. Kaul, M.D., demands preliminary and permanent injunctive relief against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

    A.    Prohibiting the defendants or the New Jersey Board of Medical Examiners from

12

adjudicating the administrative action against Dr. Kaul;

B.     Ordering the appointment of a special prosecutor;

C.     Ordering the appointment of an *ad hoc* adjudicatory board to hear the matter;

D.     Enjoining the defendants from proceeding with their motion in aid of litigants' rights and to amend the complaint; and

e.     Granting such other relief as the Court deems equitable and just.

## SIXTH COUNT

38.     The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

39.     In filing the motion in aid of litigant's rights seeking to renew the temporary suspension application and amend the verified complaint, as aforesaid, the defendants acted improperly and in retaliation for Dr. Kaul's counsel's expression of the intent to seek redress in court for the improper issuance of the Order of immediate suspension of Dr. Kaul's CDS registration.

40.     The actions of the Attorney General, the Acting Director and Ms. Hafner, as aforesaid, demonstrate improper retaliation against Dr. Kaul for the exercise of his legal rights, as well as an improper merger of the investigative, prosecutorial and adjudicative functions of the Department and the Division.

41.     As a result of the aforesaid improper retaliation and merger of functions, neither the Attorney General, the Acting Director nor anyone acting under their direction or authority may prosecute or adjudicate the administrative action against Dr. Kaul.

**WHEREFORE**, the plaintiff, Richard S. Kaul, M.D., demands preliminary and permanent injunctive relief against the defendants, the State of New Jersey, Hon. Jeffrey S.

13

Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

A.    Prohibiting the defendants or the New Jersey Board of Medical Examiners from adjudicating the administrative action against Dr. Kaul;

B.    Ordering the appointment of a special prosecutor;

C.    Ordering the appointment of an *ad hoc* adjudicatory board to hear the matter

D.    Enjoining the defendants from proceeding with their motion in aid of litigants' rights and to amend the complaint;; and

E.    Granting such other relief as the Court deems equitable and just.

## SEVENTH COUNT

42.    The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

43.    The actions of the defendants in filing the motion in aid of litigant's rights seeking to renew the temporary suspension application and amend the verified complaint, as aforesaid, the defendants acted improperly and in retaliation for Dr. Kaul's counsel's expression of the intent to seek redress in court for the improper issuance of the Order of immediate suspension of Dr. Kaul's CDS registration, were undertaken in violation of law and of Dr. Kaul's rights under the United States Constitution.

44.    In filing the motion in aid of litigant's rights seeking to renew the temporary suspension application and amend the verified complaint, as aforesaid, the defendants acted improperly and in retaliation for Dr. Kaul's counsel's expression of the intent to seek redress in court for the improper issuance of the Order of immediate suspension of Dr. Kaul's CDS

14

registration, the defendants were acting under color of state law, and their actions deprived Dr. Kaul of his rights under the United States Constitution and federal law, as aforesaid, for which deprivation Dr. Kaul has a remedy pursuant to 42 *U.S.C.* § 1983.

**WHEREFORE,** the plaintiff, Richard S. Kaul, M.D., demands a declaratory judgment against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

A.   Declaring that the May 22, 2012 "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued" is null and void and of no effect ; and

B.   Declaring, *nunc pro tunc*, that Dr. Kaul's CDS registration was, is and remains, valid until such time as the New Jersey Board of Medical Examiners takes valid action with respect to same, on notice to Dr. Kaul with an opportunity for a hearing

C.   Enjoining the defendants from proceeding with their motion in aid of litigants' rights and to amend the complaint;; and

D.   Granting such other relief as the Court deems equitable and just.

## EIGHTH COUNT

45.   The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

46.   The actions of the defendants, as aforesaid, in entering into the interim consent order, in then issuing the order of immediate suspension of Dr. Kaul's CDS registration, and in filing the motion in aid of litigant's rights seeking to renew the temporary suspension application and amend the verified complaint, the defendants acted improperly and demonstrated that their actions in entering into the interim consent order were done fraudulently and with the intent to

15

abrogate the interim consent order and seek to impose further, immediate restrictions upon Dr. Kaul's ability to practice.

47.    The defendants waited more than two years, from Dr. Kaul's appearance at a hearing by a Preliminary Evaluation Committee ("PEC") of the Board on February 3, 2010, until filing the administrative complaint against Dr. Kaul on April 2, 2012. The administrative complaint is not based upon any significant facts not known to the defendants as of February of 2010 – if, as the defendants now contend, Dr. Kaul poses a danger to the public now, he then has posed such a danger for more than two years before the defendants took any action against him.

48.    This demonstrates that the defendants are not motivated by any real desire to protect the public, but are instead motivated by political or other improper means to make some sort of "example" of Dr. Kaul and the facts set forth herein, supra, establish that the defendants' have already pre-judged Dr. Kaul's case.

49.    Furthermore, by improperly seeking subpoenaed evidence in a parallel proceeding, with respect to Dr. Kaul's CDS registration, and then using Dr. Kaul's supposed non-compliance with said subpoenas as an excuse to attempt to vacate the interim consent order, the defendants have both bypassed proper discovery procedures in an administrative action and have acted illegally to the detriment of Dr. Kaul's rights under state law.

50.    In effect, the defendants committed a fraud upon Dr. Kaul, and upon the administrative tribunal hearing his case, by engineering a scheme to undermine the interim consent order, which the defendants entered into with no intention of ever complying with. filing the motion in aid of litigant's rights seeking to renew the temporary suspension application and amend the verified complaint, as aforesaid, the defendants acted improperly and in retaliation for Dr. Kaul's counsel's expression of the intent to seek redress in court for the improper issuance of

16

the Order of immediate suspension of Dr. Kaul's CDS registration, the defendants were acting under color of state law, and their actions deprived Dr. Kaul of his rights under the United States Constitution and federal law, as aforesaid, for which deprivation Dr. Kaul has a remedy pursuant to 42 *U.S.C.* § 1983.

**WHEREFORE**, the plaintiff, Richard S. Kaul, M.D., demands a declaratory judgment against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

A.   Declaring that the May 22, 2012 "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued" is null and void and of no effect ; and

B.   Declaring, *nunc pro tunc*, that Dr. Kaul's CDS registration was, is and remains, valid until such time as the New Jersey Board of Medical Examiners takes valid action with respect to same, on notice to Dr. Kaul with an opportunity for a hearing,;

C.   Ordering specific performance of the interim consent order;

D.   Enjoining the defendants from proceeding with their motion in aid of litigants' rights and to amend the complaint; and

E.   Granting such other relief as the Court deems equitable and just.

## NINTH COUNT

51.   The plaintiff repeats and realleges the allegations previously set forth in this verified complaint as though the same were set forth at length verbatim herein.

52.   The actions of the defendants, as aforesaid, in the eighth count of this verified complaint, *supra*, the defendants were acting under color of state law, and their actions deprived

17

Dr. Kaul of his rights under the United States Constitution and federal law, as aforesaid, for which deprivation Dr. Kaul has a remedy pursuant to 42 *U.S.C.* § 1983.

**WHEREFORE,** the plaintiff, Richard S. Kaul, M.D., demands a declaratory judgment against the defendants, the State of New Jersey, Hon. Jeffrey S. Chiesa, the Attorney General of the State of New Jersey, the New Jersey Department of Law and Public Safety, the New Jersey Division of Consumer Affairs, Hon. Eric T. Kanefsky, the Acting Director of the New Jersey Division of Consumer Affairs and Doreen A. Hafner, D.A.G., as follows:

A.    Declaring that the May 22, 2012 "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued" is null and void and of no effect ; and

B.    Declaring, *nunc pro tunc*, that Dr. Kaul's CDS registration was, is and remains, valid until such time as the New Jersey Board of Medical Examiners takes valid action with respect to same, on notice to Dr. Kaul with an opportunity for a hearing;

C.    Ordering specific performance of the interim consent order;

D.    Enjoining the defendants from proceeding with their motion in aid of litigants' rights and to amend the complaint; and

E.    Granting such other relief as the Court deems equitable and just.

## DESIGNATION OF TRIAL COUNSEL

In accordance with *R.* 4:5-1(c), Robert J. Conroy is hereby designated as trial counsel for the plaintiff, Richard A. Kaul, M.D.

KERN AUGUSTINE
CONROY & SCHOPPMANN, P.C.
Attorneys for Plaintiff

By:_____
R. Bruce Crelin

Dated: Bridgewater, New Jersey
June 7, 2012

18

## CERTIFICATION PURSUANT TO *R.* 4:5-1

I hereby certify that the subject matter of the foregoing matter is not the subject matter of any pending or anticipated litigation or arbitration proceedings between these parties, other than the pending administrative action against Dr. Kaul mentioned in this verified complaint. To the best of my knowledge, no other party should be joined in this action.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

R. Bruce Crelin

Dated: Bridgewater, New Jersey
       June 7, 2012

19

## VERIFICATION OF COMPLAINT

I, Richard A. Kaul, M.D., of full age, do hereby certify that:

1.      I am the plaintiff named in the above verified complaint.

2.      I have read the above verified complaint, and certify that the facts stated within it are true, to the best of my personal knowledge and belief.  Facts which are not known to me personally are stated as being upon information and belief.

3.      I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Richard A. Kaul, M.D.

Dated: June 7, 2012

20

**KERN AUGUSTINE**
**CONROY & SCHOPPMANN, P.C.**
1120 Route 22 East
Bridgewater, NJ 08807
(908) 704-8585
Attorneys for Plaintiff

|  |  |
|---|---|
| RICHARD A. KAUL, M.D., <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF NEW JERSEY; HON. JEFFREY S. CHIESA, THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY (in his official capacity only); THE NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY; THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, HON. ERIC T. KANEFSKY, THE ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS (in both his official and individual capacities) and DOREEN A. HAFNER, D.A.G. (in her official capacity only), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, MERCER COUNTY DOCKET NO: <br><br> Civil Action <br><br><br> CERTIFICATION OF RICHARD A. KAUL, M.D., IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE |

**I, RICHARD A. KAUL, M.D.,** of full age, do hereby certify that:

1.    I am a physician duly licensed by the State of New Jersey to practice medicine and surgery, specializing and Board-certified in the practice of anesthesiology. I have a medical practice located at 125 Wanaque Avenue in the Borough of Pompton Lakes, County of Passaic and State of New Jersey. I make this certification in support of the plaintiff's application for an order to show cause. I am personally familiar with the facts set forth herein.

2.    On February 3, 2010, I appeared at a hearing by a Preliminary Evaluation Committee ("PEC") of the New Jersey State Board of Medical Examiners (the "Board"), which

1

was investigating issues of my qualifications to perform various types of surgery.  Following my appearance at this PEC, no further information was sought from me with respect to any of the issues which had been reviewed.  On April 2, 2012, the defendant Attorney General, on behalf of the Board, filed a verified complaint, a true copy of which is appended hereto as Exhibit "A."

3.    On April 2, 2012, the defendant Attorney General, on behalf of the Board, filed an order to show cause, a true copy of which is appended hereto as Exhibit "B."

4.    Subsequent to the service of the verified complaint and order to show cause, my counsel negotiated an interim consent order with the defendant, Ms. Hafner.  This interim consent order was ultimately approved by the Board and filed on May 9, 2012.  A true copy of the interim consent order   is appended hereto as Exhibit "C."

5.    Despite the filing of the verified complaint and order to show cause, and the entry of the interim consent order, as previously described, on May 22, 2012, the defendant Acting Director entered an "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued."  A true copy of the "Order of Immediate Suspension of a New Jersey CDS Registration and to Show Cause Why the Suspension Should not be Continued" is appended hereto as Exhibit "D."

6.    The practical effect of the suspension of my CDS registration is to prevent me from practicing medicine, at all.  Without a valid CDS registration, a physician cannot attain or maintain privileges at any hospital, which makes it impossible to practice.  The interim consent order specifically states I am permitted to pursue applications for hospital privileges.

7.    I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Richard A. Kaul. M.D.

Dated: Bridgewater, New Jersey
       June 7, 2012

3

# Exhibit 5

1

IN THE MATTER OF

- - -

RICHARD A. KAUL, M.D.                  :
                                       :
        Respondent                     :
                                       :

- - -

Trenton, New Jersey
Wednesday, June 13, 2012

- - -

HEARING in the matter of **RICHARD A. KAUL,**
**M.D.,** taken pursuant to notice, held in the Richard J.
Hughes Justice Complex, 25 Market Street, 4th Floor
Conference Center, on the above date, beginning at
approximately 10:30 a.m., before Robin A. Vance, a
Certified Court Reporter and Notary Public for the
State of New Jersey.

- - -

Robin A. Vance, CCR
144 Nathan Hale Drive
Deptford, New Jersey 08096
(609) 220-0665
Email: vanceccr@aim.com

2

```
 1    A P P E A R A N C E S:

 2

 3              KERN AUGUSTINE CONROY & SCHOPPMANN, PC
                BY:  ROBERT J. CONROY, ESQUIRE
 4                   And R. BRUCE CRELIN, ESQUIRE
                     1120 Route 22 East
 5                   Bridgewater, New Jersey 08807

 6
                     Attorneys for the Respondent(s)
 7

 8
      Also Present:
 9

10              Doreen Hafner, Esquire, DAG
                Kevin Jespersen, Esquire, AAG
11              Dr. Stanley
                Dr. Krauss
12              Dr. Rock
                Ms. Criss
13              Mr. Roeder
                DAG Dick
14              Dr. Scott
                Dr. Jordan
15              Dr. Berkowitz
                Kevin Walsh
16              Dr. Mendelowitz
                Dr. Maffei
17              Dr. Lomazow
                Dr. Ciechanowski
18              Dr. Cheema
                Ms. DeGregorio
19              Ms. Howard
                Dr. Baker
20              Dr. Rajput

21

22

23

24

25
```

3

IN THE MATTER OF RICHARD RICHARD A. KAUL, M.D.

I N D E X

MOTION TO QUASH THE NOTICE IN LIEU OF SUBPOENA..PAGE 4

MOTION TO ENFORCE LITIGANTS RIGHTS............PAGE 23

Opening Statement (Ms. Hafner)................PAGE 25

Presentation of the Gina Arnone Video.........PAGE 33

Questioning of Dr. Gregory Przybylski.........PAGE 74

    (VOIR DIRE)

    BY MS. HAFNER.........................PAGE 75

    BY MR. CONROY.........................PAGE 82

    (EXAMINATION)

    BY MS. HAFNER.....................PAGE 88, 129

    BY MR. CONROY....................PAGE 117, 130

Questioning of Dr. Andrew Kaufman...........PAGE   139

    (EXAMINATION)

    BY MS. HAFNER........................PAGE 139

    BY MR. CONROY........................PAGE 146

OPEN STATEMENT (Mr. Conroy)................PAGE 159

CLOSING STATEMENT (Ms. Hafner)............PAGE 170

REBUTTAL STATEMENT (Mr. Conroy)...........PAGE 177

DECISION FROM RESULT OF HEARING BY DAG DICK..PAGE 182

HEARING OF 6/13/12 - RICHARD A. KAUL, M.D.                    10

1    this proceeding, and to the extent that the

2    respondent in this case wishes to examine these

3    patients, who wants to probe the thought processes

4    of an administrative active, and that is entirely

5    inappropriate under the laws in this jurisdiction,

6    and I've cited those decisions.  So we urge this

7    board to quash this notice.

8          DR. SCOTT:  You have five minutes

9    remaining, sir.

10          MR. CONROY:  It's very interesting.  I

11    guess if you live long enough, you get to see just

12    about anything and everything.  And I've been

13    appearing before this board for more than 20 years

14    and I have never imagined that I would see a senior

15    official of the attorney general's office admit

16    that his boss had engaged in unprofessional

17    conduct.  That's exactly what he's done.  Because

18    not since the do-nothing party, and believe me they

19    have nefarious history, you can Google that later

20    on, as one government official that's so miss

21    guided in saying he knew nothing about anything.

22    Because the rules of professional conduct in this

23    state prohibit a prosecutor from making a statement

24    in the press that is designed to prejudice a

25    litigant, materially prejudice.  And I can't think

Case 2:18-cv-08086-JMV-JAD    Document 2    Filed 04/09/18    Page 204 of 232 PageID: 208

Case 16-1397, Document 41, 07/14/2016, 1818753, Page67 of 170

1  of a more devious way of influencing people than to

2  lie to the media.

3         Later on you're going to have the deputy

4  come up here, a different deputy, and argue that

5  Dr. Kaul's website is somewhat vague and ambiguous

6  and therefore, he should called to account for it.

7  Yet, in this case, we have the attorney general,

8  the highest law enforcement official, saying he

9  knows nothing personally about this case.

10        Now, let me suggest to you that what you

11  heard was argument, because you heard a lot of

12  argument about what my intentions were and it's

13  interesting to see -- although, the attorney

14  general doesn't know fact from fiction, he knows

15  what's in my head.  That's amazing when you think

16  about it.  Our intent was very simple, to

17  demonstrate that the attorney general made

18  statements to the press about which he knew

19  nothing.  I couldn't have done a better job than

20  the attorney general has done himself.  Sort of

21  reminds you of Barney Fife getting out of a patrol

22  car and shooting himself in the foot.  That's what

23  we just had, sad, terribly sad, that somebody gets

24  so tied up in pursuing the end, that they lose

25  sight of the means.

HEARING OF 6/13/12 - RICHARD A. KAUL, M.D.                    12

1          When those charged to uphold the laws

2    act in a lawless way, they were faced with tyranny,

3    and as I said in my papers, Dr. Kaul may be in the

4    caption, but it's this board that's being judged

5    today, and the fundamental fairness. I also wonder

6    about -- before we get too far into my argument,

7    that this tribunal really, I don't believe, has

8    jurisdiction on this issue.

9          Now, here's an interesting little aside

10   that the deputy didn't share with you. We tried to

11   go into court last week to get a judge to rule on

12   various aspects and procedural regularities in this

13   case. And yesterday we got handed down finally the

14   written opinion saying that that should go to the

15   appellate division. And you know what the attorney

16   general's office argued before the court? That we

17   didn't have a legal remedy in court, that

18   everything should come here. And then we come here

19   and we're told on, oh, no, they should go to court

20   for that subpoena. This is gamesmanship. It's

21   sad, but it's gamesmanship.

22         Now, we're going to go to the appellate

23   division and we're going to make a record. And we

24   have our own court reporter here because I wanted

25   to make sure we had that very statement by the

HEARING OF 6/13/12 - RICHARD A. KAUL, M.D.          13

1   representative of the attorney general recorded for

2   all posterity, that he knew nothing factually about

3   this case and yet, CBS News, with his own words and

4   his own invoice, he can't contradict what is

5   written down in their paper coverage because we've

6   got the audio, but he knows we have the audio and

7   he made statements to this effect.  He said, quote,

8   Dr. Kaul's putting the public in imminent danger --

9   this is after the board had already reached a

10  conclusion in this case -- imminent danger while

11  working out of a one-room surgical center, et

12  cetera, et cetera, et cetera.  Whoa.  Whatever

13  training he has, is not sufficient for the kinds of

14  surgery, including discectomies and spinal fusions.

15  He didn't say I didn't know anything about it, he

16  didn't say I'm ignorant.  He made that factual

17  statement.

18          Now, in another state, that wouldn't

19  present a problem, because the attorney general

20  does not have oversight of the board of medical

21  examiners, and what makes it particularly troubling

22  in this state is not only does he have oversight,

23  but all of you serve at the pleasure of the

24  governor and are not approved by the senate.  You

25  don't have a steady senate confirmation.  You don't

1  have, although your term is specified, you do serve

2  at the will.  So that makes you susceptible in

3  particular, to influence.  Now, in most large

4  states today, that's just not the way the board is

5  organized.  Because in those states, they see

6  inherent abuses of the merger of function.  And,

7  so, therefore, they're -- usually the board is

8  under the Department of Health.  The attorney

9  general's office or the governor's office may be

10  involved in prosecuting cases, but they certainly

11  don't have oversight over the board.  And that's

12  what makes the attorney general's statements so

13  harmful and so prejudicial.

14       Now, we weren't seeking to bring in here

15  of agency head.  I don't care if he was the number

16  10 in the office.  He made a factual statement and

17  I want to know where he got that information from.

18  Did he get it from sources inside the board?  Did

19  somebody -- the board prejudging.  We called -- we

20  called for Dr. Jordan to be a witness not because

21  we want to impute his integrity.  I think the man

22  is a man of honor.  Dr. Jordan, I've known him from

23  the times when he was back as Mayor of Jersey City.

24  And I was the chief shop stewart for the Asby local

25  over at the medical center.  I've always found him

HEARING OF 6/13/12 - RICHARD A. KAUL, M.D.          15

1   to be a man of integrity.  He signed the order

2   that we're all here about.  So we have -- we're

3   being told that the order that was negotiated by

4   the attorney general's office, he knows nothing

5   about, and now the board president, who signed the

6   order, he knows nothing about it.  Now that's

7   ridiculous.  That doesn't even bear scrutiny of a

8   third grader.  Come on.  That's silly.  What we

9   wanted to do is satisfy ourselves that Dr. Jordan

10  actually signed the document, because in this

11  document you made a finding, that the public's

12  health, safety and welfare was adequately protected

13  from him.  That's all in this matter.

14          And lastly, Mr. Kanefsky, he decided

15  after ten years of practicing law and chasing

16  securities fraud people, he knows more about

17  medicine than all of you.  And so he tried to

18  second guess all of you in an effort to back stop

19  his boss.  That's all.

20          But as Jimmy Carter, Richard Nixon and

21  any number of other people found out, it's always

22  the cover up that gets you.  And so he came and

23  stripped the doctor of his CDS privileges summarily

24  without hearing, after you, in good faith, ruled on

25  the settlement.

Robin A. Vance, CCR
609-220-0665

HEARING OF 6/13/12 - RICHARD A. KAUL, M.D.                    16

1          Now, who's going to enter into a

2    settlement in the future with you unless he signs

3    off, and the attorney general signs off personally,

4    they'd have to be insane.

5          But think about it, this person with no

6    medical background has second guessed you, and he

7    made a determination, because in his order he finds

8    that the doctor -- although, he's not practicing in

9    any of the areas in which he's accused of being

10   negligent -- he's a risk to the public's health,

11   safety and welfare.  In other words, you got it

12   wrong.  And it's the state's position he knows

13   nothing.  Well, if he knows nothing, then I want to

14   know on what basis he entered that order.  It's

15   going to be interesting because we're going to use

16   this admission by the attorney general.  I put him

17   on notice already in the appellate division.

18   You're not a man who takes away somebody's

19   livelihood, and he does so, but he doesn't know any

20   better.

21          Sort of reminds me of what we used to

22   call the Jersey City fifth Amendment.  When

23   somebody was stopped, they were accused of doing

24   something wrong, they'd say, what, what are you

25   talking about?  I know nothing.  And apparently

HEARING OF 6/13/12 - RICHARD A. KAUL, M.D.                    17

1    that seems to be the rule of the attorney general's
2    office, too.  I know nothing.  It would be humorous
3    if we weren't talking about a man's livelihood,
4    that's what we're doing here.
5              We tried to go into court, but they said
6    court wasn't the right place.  They said, oh, he
7    knows nothing, but yet we wants you to follow
8    through on what they've ordered, and then to top it
9    off, to insult your intelligence, and believe me, I
10   hope, at no time do you ever feel that I insult
11   your intelligence, but apparently the attorney
12   general's office doesn't have as much esteem for
13   your abilities as I do, because they put this
14   motion out of time, because a motion to quash isn't
15   right for consideration until I call a witness who
16   is subpoenaed.  That's a fundamental rule of
17   practice.
18             DR. SCOTT:  You're out of time, but
19   we'll give you one more minute.
20             MR. CONROY:  Thank you.
21             It's a fundamental rule of practice, so
22   they want to preemptively, before I even get a
23   chance to even call, I might not call them, that's
24   my prerogative, they've taken this effort.  And
25   why?  Because they have predisposed -- excuse me,

# Exhibit 6

www.drrichardkaul.com

September 26th 2013

Reply To:
Dr. Richard Arjun Kaul, MD
973 338 0980 EXT 214
drrichardkaul@gmail.com

Mr.Chris Christie
Office of the Governor of New Jersey
P.O. Box 001
Trenton, New Jersey 08625

Dear Mr. Christie

In response to a letter I sent to your office dated September 13th 2013 (please see attached) in which I brought to your attention the illegal alteration of legal transcripts in the matter of The State of New Jersey v Dr.Richard A Kaul requesting an investigation of the matter, did receive a phone call to the office of New Jersey Spine and Rehabilitation- tel 973 338 0980- at approximately 11am from a woman who identified herself in the following manner:

'this is Jaime from Governor Christie's office'

She then proceeded to tell me that unfortunately your could not get involved as this is a legal proceeding in the office of administrative law.

I responded by informing her that the committing of 'EVIDENCE TAMPERING' is an entirely separate issue and one that raises suspicions and questions on all other matters that have been handled in the Office of Administrative Law during your tenure as governor. She responded by telling me she would have to talk with her supervisor and then proceeded to give me her phone number- 609 777 2500.

**LEGAL CHRONOLOGY**

I will detail the legal events surrounding my case and the active participation of your Attorney General, Jeffrey Chiesa in manipulating both the media and interfering with the legal procedures of the New Jersey Medical Board in April 2012 under your explicit direction causing the suspension of my medical license. It is therefore evident you have already involved yourself and your administration in the legal process despite the words of protestation spoken by 'Jaime'from your office.

Jeffrey Chiesa, who is temporarily occupying the seat of the late Senator Lautenberg in Washington DC was your attorney general in April 2012 and prejudiced the entire legal process by making false statements to the press. This was again a clear instruction from you. This action amongst many others prompted an application to Superior Court by my attorney Robert Conroy asking the court to appoint:

1. A Special Prosecutor
2. An ad hoc board

Due to the grave concerns about the lack of due process that would be afforded to my case. Not since Watergate has a special prosecutor been appointed to oversee a state sponsored action and Mr. Conroy also communicated in an email to Doreen Hafner that he is the only attorney to ever have the

US Marshalls seize bank assets belonging to the state of New Jersey consequent to a Federal judgement and order.

The problem that now faces you goes to the heart of your integrity, credibility and administration of New Jersey and how you respond will determine the way history remembers you

The consequences of the illegal suspension of my medical license and my ability to make a living have been far reaching and I assure you that I intend on prosecuting this matter to its fullest extent. I filed a widely publicized lawsuit in Bergen County Superior Court, New Jersey on March 22nd 2013 and the 1st hearing on this matter is

September 27th 2013.

The action as I am sure you are aware makes allegations of defamation and anti-trust conduct against a group of 5 politically connected neurosurgeons who donated significantly to your campaign funds in return for you and Mr. Chiesa to suspend my medical license. The financial damages that I am seeking are in excess of $30 million and I will not rest till I secure justice and compensation in these proceedings. The monies from this settlement will be mostly donated to the Spine Africa Project, www.spineafricaproject.org, a 501 c 3 US Registed Charity that has since 2008 provided free healthcare and education to the disadvantaged people of the Democratic Republic of Congo and a charity that you and your administration tried to destroy with countless legal subpoenas and investigations that proved the charity was legally organized. This part of your conduct has sickened me as it hurt the most vulnerable citizens of both New Jersey and Africa and due to the resources and time I have had to devote to fighting the almost criminal acts committed against me and my family I have been unable to continue to provide support for the Spine Africa Project.

Mr.Christie you have destroyed the lives of many innocent people for nothing more than greed and your quest for power without a care for the devastated lives left in your trail.

The 'EVIDENCE TAMPERING' and the alteration of the transcripts must be addressed and parties must be held accountable for these crimes and you as the elected governor of the state of New Jersey have a responsibility to its citizens to at the very least have it properly investigated. If however, after reading this letter, you still choose to ignore this issue, I will have no option but to bring it to the attention of the US Federal Government and the government of India of which, as you are aware, I am a citizen.

I would also request that all communications from your office be made in writing.

Yours sincerely

Richard Arjun Kaul, MD

RONALD PAULINE
Notary Public
State of New Jersey
My Commission Expires Feb 3, 2017

Notary

www.drrichardkaul.com

September 12 2013

Reply To:
Dr. Richard Arjun Kaul, MD
973 338 0980 EXT 214
drrichardkaul@gmail.com

The Honorable Judge, Howard Solomon
The New Jersey Office of Administrative Law
7th floor
33 Washington Street
Newark, New Jersey 07102

Re: In the Matter of the Suspension or the Revocation of the License of Richard A.Kaul, M.D.
License No : 25 MA 063281
Docket No : BDS 08959- 2012 N

Dear Judge Solomon

I am writing this letter as a matter of last resort to bring your immediate attention to an issue that I
believe has significant relevance for the above matter and which deeply troubles me as I am sure,
having witnessed your impartial jurisprudence, it would you.

There are two issues of concern:

1.  The inconsistency of a critical part of the May 6th transcript provided by J.H. Buhren
    compared to the transcript from Veritext, the service that I retained for certain days and I
    understand the comments you made in court regarding your insistence that you would only
    be referring to the court scheduled transcripts. However in court on that same say was a
    senior journalist from the largest orthopedic trade publication, Walter Eisner, and in the
    widely read article 'Spine On Trial' he specifically described the admission of Dr.Gregory
    Przybylski that  NO STANDARDS exist for education and training in Minimally Invasive Spine
    Surgery. This very important detail has been omitted from the court scheduled transcript
    and as I am sure you will agree presents a very difficult situation.
2.  The were 23 days of testimony and there are 23 transcripts with a deadline for submission
    of September 22 2013. I and my attorney, Charles Shaw, Esq , are in possession of only 16
    with only 10 days left. I have placed multiple calls to J.H.Buhren requesting the provision of
    these outstanding documents and have received no response. Charles Shaw to his great
    credit has asked the New Jersey deputy attorney general, Doreen Hafner, to provide the
    transcripts of which she is in complete possession and has been consistently denied despite
    the fact that it would actually help mitigate the over $1,000,000 of taxpayers money already
    spent by the state of New Jersey in bringing this case. The quality of the brief submitted on
    September 23rd will be dependent on the accuracy and possession in a timely manner of ALL
    23 of the transcripts. Of great significance is the fact the transcript of Professor Solomon
    Kamson who was my main expert is one of the seven missing transcripts.

The outcome of this case has enormous consequences for many parties and the immediate concern is
ensuring that there is a fair and legal approach to the provision of ALL of the transcripts in an
accurate manner.

I would therefore respectfully request that the court order J.H.Buhren to provide the missing 7 transcripts by September 16th 2013 which would still only provide 3 days for analysis with the balance for brief drafting.

I have grave concerns that there will not be enough time to properly prepare the submissions unless the court intervenes immediately.

I look forward to your response

Yours sincerely

Richard Arjun Kaul, MD

Cc; Charles Shaw, Esq
    Doreen Hafner, Esq
    Daniel T. McMurray- Managing Director, FOCUS
    Ilissa Hook, Esq

9/12/2013

JACKELINE J TORALES
Commission # 2405621
Notary Public, State of New Jersey
My Commission Expires
March 14, 2016

<u>www.drrichardkaul.com</u>

September 13 2013

Reply To:
Dr. Richard Arjun Kaul, MD
973 338 0980 EXT 214
drrichardkaul@gmail.com

Mr. Chris Christie
Office of the Governor of New Jersey
P.O. Box 001
Trenton, New Jersey 08625

Dear Mr.Christie

I am writing this letter to bring your immediate attention to a problem that if not addressed now in a fair and legal manner will escalate rapidly and which specifically involves the following two issues:

1. The inconsistency between a critical part of the states transcript of Gregory Przybylski, MD, their main expert witness, and the transcript of the independent court reporter that I retained due to my concerns about the accuracy of the reporting process in the New Jersey Office of Administrative Law. In addition Walter Eisner, a senior reporter with Orthopedics This Week, flew in from Minneapolis for the May 6th cross examination of GP and wrote an article entitled 'Spine on Trial" which is consistent with the independent transcription but inconsistent with the states transcript at the critical point where GP under cross examination admits there are NO STANDARDS for education and training in minimally invasive spine surgery. This admission was a significant blow for their case and is missing from their transcription.

2. There were 23 days of testimony and there were 23 transcripts generated. The final date for the post trial submission briefs is September 22nd 2013 and so far only 16 have been provided by the court contracted transcription service, J, H. Buehrer to my attorney which as you can imagine is a significant hurdle and one which if not immediately addressed will in my opinion have a negative impact on the licensing matter. I have left multiple voice messages with J. H Bhuren and received no response. Charles Shaw has on multiple occasions asked Doreen Hafner, Esq, the deputy attorney general acting for the medical board and who is in possession of all of the transcripts to provide copies but she consistently denied all of the requests.

As I am sure you are aware the suspension of my medical license by the New Jersey Medical Board in June 2012 in a highly publicized and some would say politicized manner prompted the following responses from patient groups:

1. A petition with a 1000 patient signatures and 100 letters was delivered to you personally and in you capacity as the elected official currently occupying the office of New Jersey Governor to which there was absolutely no response and I

understand that in your official capacity you cannot be ostensibly involved but the communication was also hand delivered to you personally and I cannot currently ascertain any explanation for the lack of response.

2. Key Darrow, who was a patient of mine who testified on my behalf at the hearing in the matter above in June 2013 contacted the office of the Pompton Lakes Republican Assemblyman, Scott Rumana and subsequently hamded him a file containing a petition and letters of patient support. Mr. Rumana did nothing to help despite the fact that New Jersey Spine and Rehabilitation Surgical Center had brought significant business wit job creation to his struggling town.

3. Frank Cecala and his family had been patients of mine since 2003. Frank is the head groundsman for Delbarton School in Morristown, which is the school that you children attend and it was this capacity, and through this connection that he attempted to bring my case to your attention in 2012 but was as with all of these communications ignored.

4. Michael Tfank and his family have been patients of mine since 2003. Michael has been a friend of the father of Scott Rumana for many years and spoke to both of them about my case with an appeal to help. Again, as with every other patient, he was ignored.

5. Kathleen Calabrese and her now deceased husband, 'Jimmy"had been patients of mine since 2003. Kathy is very familiar with the New Jersey Republican Party and specifically the sector of the party that operates out of Morristown, your home base. Kathy talked with a senior member of your party in Morristown and expressed her profound respect for my professionalism. In this instance however the individual communicated that the suspension of my medical license was 'unfair' and should never have occurred'.

The suspension of the medical license was the cause of the filing in Federal Court for Chapter 11 Protection and this would NOT have happened had the license not been suspended which occurred in my opinion as a consequence of a professional turf war that became political.

The transcription irregularities and deficiencies combined with the deadline for post-trial submission briefs, which is September 23rd 2013, cause me great consternation. The quality of the brief will determine the outcome of the licensing matter, which will determine the outcome of the Chapter 11. The fact that only 16 of the 23 briefs have been provided, despite multiple efforts made by multiple parties, and with only 10 days remaining form the basis for this letter and specifically for a request directly to you, Mr.Christie, to engage and ensure that due process is afforded to the above matter in a fair, legal and transparent manner. This is very different request to the types described above as this talks to the issue of fundamental fairness of a system whose decisions and consequences are far reaching and for which you as the elected official are responsible.

I would therefore respectfully request that you contact the transcription service, J.H.Buehrer, and advise them of their obligation and duty to the legal system and more importantly Justice.

I look forward to your prompt response.

Yours sincerely

Richard Arjun Kaul, MD

Cc: Jeffrey Chiesa, Esq
    Doreen Hafner, Esq
    Judge Howard Solomon, Esq
    Charles Shaw, Esq
    Daniel T. McMurray
    Ilissa Hook, Esq
    Milica Fatovich, Esq
    J.H. Buehrer And Associates- Certified Court Transcribers

9/13/20X3

JACKELINE J TORALES
Commission # 2405621
Notary Public, State of New Jersey
My Commission Expires
March 14, 2016

# Exhibit 7

www.drrichardkaul.com

January 9, 2014

Please reply to:
Dr. Richard A. Kaul
200 Broadacres Dr., Suite 130
Bloomfield, NJ 07003
drrichardkaul@gmail.com

North Jersey Media Group
1 Garret Mountain Plaza
Woodland Park, NJ 07424
**Attn: Lindy Washburn**

Dear Ms. Washburn:

I hope you are well.

Since November 2013 you have written several stories about my current legal dispute with the New Jersey Medical Board and had the opportunity to interview me in the first week of August 2013, which you recorded without my prior permission. Kelley Blevins, Director of Communications for www.drrichardkaul.com, requested via e mail (please see attached) a copy of the unauthorized recording which you refused to provide. The story published in The Bergen Record on November 17th 2013 contained numerous factual inaccuracies and the glaring omission of many highly relevant details I had verbally communicated during the improperly recorded August interview and will, unless you have deleted them, be contained in the digital audio file. Your story was defamatory, grossly misleading and did not truthfully reflect the interview:

I would therefore repeat the request that you provide the unauthorized digital audio recording to either the address above or
drrichardkaul@gmail.com which would provide the public an opportunity to hear the actual interview.

During the interview the issue of transcript fraud was discussed and you specifically acknowledged the fact that the court transcripts had been altered in an attempt to delete parts of the legal record damaging to the case put forward by the state of New Jersey. This part of our conversation was not reported in any of your stories and I would like to know why considering the fact that your newspaper is now reporting widely about legal transcription fraud in a case in Hunterdon county involving an ex county prosecutor, Bennet Barlyn, and the administration of Chris Christie.

On December 13th 2013 at approximately 2pm EST you sent a text to Kelley Blevins asking if I-Dr.Kaul- had any comment about the legal opinion issued by Judge Solomon. I immediately contacted my attorney, Charles Shaw, to enquire whether he had received any decision from the court and was informed that he had not. I then received an e mail from you directed to drrichardkaul@gmail.com at approximately 3pm EST asking if I had any comment about the ruling at which time Charles Shaw had still not received any notification from the Judge Solomon. The fact that you became aware of the opinion at least 4 hours before my attorney strongly suggests the commitment of improper communications between you and the office of Judge Howard Solomon. My question is therefore:

How did you come to be in possession of the ruling four hours before my attorney, Charles Shaw?

I look forward to your prompt response.

Yours sincerely,

Dr. Richard Arjun Kaul, M.D.

RONALD PAULINE
Notary Public
State of New Jersey
My Commission Expires Feb 3, 2017

1-9-2014

1/9/2014 ·                              Fwd: Interview Recording - vrodriguez0330@gmail.com - Gmail

From: "Washburn, Lindy" <Washburn@northjersey.com>
Subject: RE: Interview Recording
Date: August 14, 2013 1:49:21 PM EDT
To: "kelley blevins" <kelley@kelleyblevins.com>


Kelley,

I'm sorry, journalists don't share their reporting materials.


Lindy Washburn


The Record

Phone: 973.569.7795

Fax: 201.457.2520

Email: washburn@northjersey.com

Website: www.northjersey.com

1 Garret Mountain Plaza

Woodland Park, NJ 07424

Twitter  @LindyWa




-----Original Message-----
From: kelley blevins [mailto:kelley@kelleyblevins.com]
Sent: Tuesday, August 13, 2013 5:38 PM
To: Washburn, Lindy
Subject: Interview Recording


Hello Lindy,


How are you?


I was wondering if you could send me a copy of the recorded interview from
last week?  Do you have it as a digital copy?


Thanks,

23

**www.drrichardkaul.com**

September 16th 2013

Reply To:
Dr. Richard Arjun Kaul, MD
973 338 0980 EXT 214
drrichardkaul@gmail.com

District XIV
Office of Attorney Ethics
Mountain View Office Parks
840 Bear Tavern Road
PO Box 963
Trenton, New Jersey 08625
609 530 4008

http://www.judiciary.state.nj.us/oae/atty_disc/atty_disc.htm#filing

Re: Doreen Hafner Ethical Violation
     Date of Ethical Violation- May 16th 2012

Matter: Kaul v The State of New Jersey et al

Dear Ethics Committee

I am writing to file a formal ethics complaint against Doreen Hafner for grossly unethical conduct in the above matter with a specific violation of the ethics code that was rooted in political pressure from the Christie Administration.

## CHRONOLOGY

I am a physician and graduated in 1988 from the Royal Free Hospital School of Medicine, London University. I undertook 8 years of post-graduate training in the United Kingdom and the United States in the fields of:

1.   General Surgery
2.   Anesthesiology
3.   Interventional Pain

I entered private practice in 1996 and up until June 2012 have provided care to the the following number of patients:

1.   8000- Anesthesiology
2.   10,000- Interventional Pain
3.   800- Minimally Invasive Spine Surgery

I performed the:

1st outpatient minimally invasive lumbar fusion in 2005
1st outpatient multi-level lumbar fusion in 2011
1st outpatient adolescent spondylolisthesis corrective fusion in 2011

From 2002- 2012 I was both the educator and participant in over 80 hands on cadaver and live training courses administered internationally.

New Jersey Spine and Rehabilitation Surgical Center opened in March 2011 and was a Medicare Certified and AAAHC Accredited Ambulatory Surgical Center in Pompton Lakes that had a 0% infection rate in 2011 as reported in North Jersey. Com. The state of New Jersey was involved in the process for the credentialling of this facility and had complete knowledge of the cases that would be performed.

The New Jersey Medical Board filed a verified complaint on April 2 2012 making allegations about my perceived 'lack'of education and training in Minimally Invasive Spine Surgery based upon the opinions of:

1. Dr.Andrew Kaufman- Interventional Pain- UMDNJ
2. Dr.Gregory Przybylski- Neurosurgeon- JFK Medical Center

It should be noted neither of these individuals are board certified in the speciality of Minimally Invasive Spine Surgery but I am and have been since 2004.

Doreen Hafner, Esq was retained by the New Jersey Medical Board and is therefore responsible for her legal conduct in this matter.

Robert Conroy, Esq represented my interests in the above legal matter from April 16th 2012 to July 8th 2012.

I entered into an agreement with the NJBME on May 9th 2012 in which I consented to temporarily refrain from performing lumbar discectomies and fusions and would make an application for privileges at a New Jersey Hospital although it must be stated that hospitals have a much higher infection rate than ambulatory surgical centers and are 3.5 times as expensive. A 13: 1 majority voted the agreement with the only dissenter being Dr. Steven Lomazow who is a neurologist on staff at Overlook Hospital and specifically at the Atlantic Neuroscience Institute, which coincidentally happens to be the same facility to which Drs Andrew Kaufman and Robert Heary bring their business.

Eric Kanefsky, Esq, the acting Director of the Division of Consumer Affairs, filed a complaint on May 15th 2012 suspending my CDS prescribing privelages knowing that it would prevent me from obtaining hospital privelages, a process I had already commenced and what can only be described as a complete abuse of political office. I responded by filing a lawsuit against Mr. Eric Kanefsky, Ms. Doreen Hafner, Mr. Jeffrey Chiesa and the Sate of New Jersey in Mercer County Superior Court in which I asked the court significantly to:

1. Appoint a special prosecutor
2. Appoint an ad hoc medical board

As I had no hope of a fair trial in the New Jersey Court System due to the completely political nature of the case and the intimate involvement of the Christie Administration.

On May 16th 2012 at approximately 4.30pm EST I received a phone call on my cell phone from Robert Conroy during which he communicated a conversation he had just had with Doreen Hafner and in which she described the events surrounding and leading to the order given by the Christie Administration to void the agreement and suspend my medical license. It was during this conversation that Doreen Hafner stated 'Bob I just want to let you know the decision to suspend his license had nothing to do with me. I am just following orders'.

I remember exactly where I was sitting when I heard this specific part of their conversation and realized that the órder'was handed down by Christie via Chiesa with Kanefsky acting as the delivery boy.

Doreen Hafner graduated from law school and swore an oath to her profession. She subsequently applied for and was given a the right to practice law in the state of New Jersey and all of this occurred before Mr. Christie occupied the Office of Governor in Trenton. Her duty as a lawyer is therefore to her ethical obligations and NOT Mr. Christie who I am sure has no concern for the professional welfare or reputation of Ms.Hafner and it was incumbent on her to follow these obligations and not the political order of Mr. Christie. An ethical course of action would have at the least led her to a refusal to engage in the aforementioned action and should have prompted her legal conscience to report and expose the wrongdoing. The FACT that she did not is the basis for the ethical violation, which in my humble opinion necessitates further investigation, and although I understand the very politically charged nature of this complaint I hope experienced, fair and politically impartial jurisprudence prevails.

I look forward to your response.

Yours sincerely

Richard Arjun Kaul, MD

9/16/2013

JACKELINE J TORALES
Commission # 2405621
Notary Public, State of New Jersey
My Commission Expires
March 14, 2016

# Exhibit 8

www.drrichardkaul.com

December 26, 2013

Reply to:
Dr. Richard Arjun Kaul
973-338-0980 EXT 214
drrichardkaul@gmail.com

The Honorable Judge, Howard Solomon
The New Jersey Office of Administrative Law
33 Washington Street, 7th floor
Newark, NJ 07102

Dear Judge Solomon:

The opinion and conclusions you rendered on December 13th 2013 in the matter of New Jersey v. Dr.Richard Kaul were completely unrepresentative of the lengthy evidence actually presented during the trial, which commenced April 9th and concluded June 30th 2013 in the Office of Administrative Law, Newark, New Jersey, USA.

I have read your almost 100 page 'ruling' which seems simply to be a regurgitation of the case put forward by Doreen Hafner, the attorney representing New Jersey, and in which you have not given any credible consideration to the thoughtful testimony provided by the many witnesses who testified on my behalf. Your ruling is so extreme that it has raised many questions with many individuals who have profound concerns about your impartiality. I still have some faith in the New Jersey legal process and in your own personal sense of fairness and transparency. I and my many supporters would however like the following questions answered:

1. The Bergen Record published a very prejudicial and unfair story written by Lindy Washburn on November 17th 2013. I understand you live in Bergen County and so it would not be unexpected that the newspaper was delivered to your home on the morning of the 17th which was a Sunday. I am also aware of the fact you are bound by the legal Rules of Professional Conduct which would specifically prohibit you from reading any stories about my case. The question is therefore:

   **Did you read the November 17th 2013 story written by Lindy Washburn and published in the Bergen Record regarding my case?**

2. I did not receive any response from you or your office regarding a letter I sent on September 11th 2013-copy attached- in which I brought to your attention the very serious issue of transcript fraud and evidence tampering. Your lack of response was alarming considering the allegations made and in light of your recent ruling it now almost confirms that the transcripts were altered and you most likely had knowledge that it occurred. The question is therefore:

**Do you have knowledge that the transcripts had been altered?**

3. Dr. Robert Heary, a key witness in the case, received a subpoena to attend the hearing which he ignored and you did not enforce. It was and is my position that Robert Heary encouraged Frances Kuren to file a complaint with the medical board which led to the suspension of my license. His pivotal involvement in the case ranged from political donations to Mr. Christie to his close relationship with a member of the medical board, Steven Lomazow, and your reluctance to enforce the subpoena and allow the trial to conclude prematurely has raised many suspicions.

   **The question is therefore: Did you have any communications at any time with any parties during which you were encouraged NOT to enforce the Robert Heary subpoena?**

I look forward to your responses.

Respectfully submitted,

Richard Arjun Kaul, M.D.

DANEA CARTER
Notary Public
State of New Jersey
My Commission Expires Jul 16, 2018

Cc: Charles Shaw, Esq.
    Laura Saunders-Acting Director & Chief Administrative Law Judge for the State of NJ
    Office of Administrative Law

# Exhibit 9

**JAMES AND SHEILA JARRELL v. RICHARD A. KAUL, et al. -- January 24, 2012**

SHEET 136

                    Argument - Stein                    270

1   a concept of having a minimum amount of --
2               THE COURT:  Let's not be repetitive.
3               MR. STEIN:  Pardon me?
4               THE COURT:  Let's not be repetitive.
5               MR. STEIN:  Okay.  I'm just --
6               THE COURT:  It's late in the day.
7               MR. STEIN:  I know.  So I do think that that
8   issue does go to the jury under that theory.
9               THE COURT:  Okay.  That may be a proposition
10  of law that may become the law someday, but it's not
11  the law today, and I'm a trial judge and it's not for
12  me to make up the law.  The standards of medicine the
13  hospitals say you need before they'll let you in their
14  program, they're not what boards, specialty boards,
15  say, if you're talking about whether somebody can do a
16  surgery.
17              The licenses in New Jersey, I think the law
18  is well-settled on this, are plenary, and the doctor
19  can perform anything that a doctor can do.  If while
20  he's performing it he deviates that's a separate issue.
21  But the idea that someone can walk in to court who
22  happens to be an orthopedic doctor and a neurological
23  doctor and say, well, he can't do this kind of
24  operation because he doesn't have the kind of training
25  that I had, or that the hospital insists on, I think is

                    Decision                    271

1   not a standard of medicine at all.  The standards of
2   medicine are how you practice the medicine, how you do
3   the various steps in whatever you're doing.  So I don't
4   think that's a -- a --  And it's not a question of
5   weighing testimony.  I'll accept that that's his
6   opinion.  I don't think he demonstrated that it was a
7   standard, by the way, of medical practice, but if he
8   did he didn't give a reason beyond that that's what
9   hospitals insist on before they let people operate in
10  hospitals, which we're not talking about here.
11              So I think that's not a -- not a medical
12  issue but a legal issue, and he was expressing an
13  opinion on something he had no right to express an
14  opinion on, so I reject that.
15              With respect to the motion relating to
16  whether this -- this procedure should have been done at
17  all, that his testimony was very strong and very, very
18  clear on, and there's a contradiction there.  The
19  defense, apparently these two doctors think nerves come
20  out of different spaces, controlling different things.
21  I gather that's the disagreement, although the defense
22  Dr. Basch wasn't very specific about that.
23              In any case, clearly the testimony by Dr.
24  Hodash is that this operation should not have been
25  committed -- should not have been done at all.  It

JAMES AND SHEILA JARRELL v. RICHARD A. KAUL, et al. -- January 25, 2012

SHEET 11

|  | Decision | 20 |
|---|---|---|

```
 1    throughout this case there's been a little contest
 2    between The two professionals.  Almost to a person,
 3    except maybe from Ms. Carrano -- no, even her -- all
 4    these doctors were so afraid of direct and cross-
 5    examination that they felt they had to take care of it
 6    with themselves, and I plan to comment on that to The
 7    jury.  And -- and I think in fairness to both sides, I
 8    mean, generally-speaking when I'm trying a case if
 9    somebody keeps on volunteering information between The
10    question that's usually an indication that we have a
11    salesman, or a liar.  And but with expert witnesses
12    it's a little bit different because they're so
13    suspicious that if they just answer yes and don't give
14    The reasons, even though The lawyer is not asking them
15    for The reasons yet, and has a right not to ask for The
16    reasons, they've got to go ahead and explain The
17    reasons, and they all did it.
18            I'm going to explain to The jury in The
19    charge that they have to be careful in dealing with
20    that kind of professional testimony and not to assume
21    immediately, just because The answers weren't --
22    weren't responsive, but it's a factor to consider, as
23    to whether The witness was there testifying to The
24    truth or making arguments like a lawyer.  On The
25    testimony with respect to qualifications, that was a
```

|  | Decision | 21 |
|---|---|---|

```
 1    clear example of a direct conflict between Dr. Hodash
 2    and The New Jersey Legislature.  The New Jersey
 3    Legislature has said that if you're a doctor you're a
 4    doctor.  Well, The hospitals take a somewhat different
 5    view of that.  They're concerns are legitimate with
 6    respect to patients and malpractice, and all The rest,
 7    they won't let just any old doctor operate in their
 8    facilities, and they have a right to do that, but that
 9    doesn't make it a deviation from -- that's not a
10    deviation from medical practices to do something that a
11    hospital doesn't want you to do, or doesn't think you
12    should do, or that Dr. Hodash thinks you shouldn't do
13    unless you're a neuro surgeon or an orthopedic surgeon.
14    Kind of similar to The battle that goes on between The
15    orthopedic surgeons and The neuro surgeons as to
16    whether The orthopedic surgeons ought to touch anything
17    close to The neck.  The neuro surgeons all say that's
18    brain surgery and they shouldn't, and The orthopedic
19    surgeons say we can do it, we're orthopedic surgeons,
20    and they can do it.
21            So anyway, that -- that -- that theory of
22    his, I think, is inconsistent with The law and is a
23    legal issue, not an issue of medical standards, and it
24    can't be turned into an issue of medical standards by a
25    hospital or by Dr. Hodash.
```

ELITE TRANSCRIPTS, INC.
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196 -- (FAX) 973-492-2927

# Exhibit 10

**www.drrichardkaul.com**

January 5th 2014

Dr.Richard Arjun Kaul,MD
200 Broadacres Drive, Suite 130
Bloomfield, New Jersey 07003
Office Tel:973 338 0980 ext 214
E mail: drrichardkaul@gmail.com

President Barack Obama
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Dear President Obama:

## COURT TRANSCRIPTION FRAUD

I am writing this letter to bring to your attention and request the assistance of the United States government in the investigation of the commitment of illegal acts of evidence tampering and court transcript alteration which have been brought on multiple occasions to the attention of the current governor of New Jersey Chris Christie. I have been forced to make this appeal to you and the Federal authorities due to the continued lack of response from the Christie administration and New Jersey administrative law judge, Howard Solomon, to multiple letters I have sent regarding the willful alteration and loss of court transcripts in the matter of New Jersey V Dr. Richard A. Kaul-Docket Number: BER-L-2256-13

## EDUCATIONAL BACKGROUND

I am a physician, citizen of India and graduated from medical school in London in 1988. I first came to the US in 1989 and underwent 6 years of post-graduate training in the fields of general surgery, anesthesiology and interventional pain returning to the UK in 1995 to undergo a further year of training in interventional pain. I relocated to the US in 2001 and entered private practice in the state of New Jersey and from 2002 to 2012 I underwent extensive international training in the emerging field of minimally invasive spine surgery and successfully carried out 5000 interventional spine procedures and 800 minimally invasive spine surgeries. In 2005 I was the 1st physician to perform an outpatient lumbar inter-body fusion, a procedure utilized to surgically address painful spinal conditions, and which up until that point had been only been available to patients in the more expensive hospital setting and as inpatients. The advances in spinal technology and surgical techniques have permitted physicians from interventional pain and radiology to safely and effectively provide spine care services to more patients using the more economic ambulatory surgical setting. Over the last decade a number of innovative New Jersey physicians have developed this previously neglected sector of healthcare and increased patient availability of minimally invasive spine surgery. However as with all innovations in medicine, particularly when they divert monies away from large business interests such as hospitals, they often lead to medical professional turf wars with the current disagreements referred in the media as The Spine Turf Wars. These also involve vigorously contested disputes between the neurosurgeons and interventional pain physicians as to who is properly qualified to perform spinal interventions.

## PROFESSIONAL HISTORY

While I admit my clinical professional record is not perfect I think it is important to state that I have paid dearly for any perceived transgressions. I am not perfect, medicine is not perfect and not every patient has a perfect outcome every time. The case that occurred in the UK in 1999 has been extensively litigated and I have been penalized excessively. The continued reference to and exploitation of this matter to attack my character and clinical competence is simply reflective of the political foundation that accounts for my current legal battle with the New